## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| QLESS, INC.,[1] | Case No.: 24-11395 (BLS) |
| Debtor. | **Objection Deadline: August 21, 2024  at 5:00 p.m. (ET)**<br>**Hearing Date: August 27, 2024 at 2:00 p.m. (ET)**<br>**Re: Docket Nos.  70** |

### OBJECTION OF ALEX BÄCKER AND CERTAIN PREFERRED SHAREHOLDERS TO DEBTOR'S SUBCHAPTER V ELIGIBILITY AND PLAN

Alex Bäcker ("Bäcker") and Cerocaru Investment Trust, Ricardo Bäcker, Tom Mitchell and Xianzhong Chen (together, the "Preferred Shareholders," and with Bäcker, the "Objectors"), by and through their undersigned counsel, hereby file this objection (the "Objection") to (1) QLess, Inc.'s election and representation that it is a small business debtor eligible for relief under subchapter V of chapter 11 of the Bankruptcy Code and (2) the *Plan* [D.I. 70] (the "Plan").[2]  In support of this Objection, the Objectors respectfully state as follows:

### PRELIMINARY STATEMENT

1.     The Debtor's eleventh-hour attempt[3] to manufacture eligibility as a subchapter V debtor on the eve of the sunset of the $7.5 million statutory cap, in an effort to shirk responsibility

---

[1] The Debtor's principal place of business and service address is 21 Miller Alley, Suite 210, Pasadena CA 91105.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Plan.

[3] The Small Business Reorganization Act of 2019 (SBRA) was enacted on August 23, 2019, with an effective date of February 19, 2020.  Pub. L. No. 116-54 (2019).  Upon enactment, small business debtors with less than about $2.75 million in debts, which amount would be adjusted at 3-year intervals per 11 U.S.C. § 104, could voluntarily elect to proceed under a new subchapter V of chapter 11 of the Bankruptcy Code if they met certain eligibility criteria.  Shortly thereafter, the CARES Act increased this debt limit to $7.5 million, for cases pending, commenced on, or commenced after March 27, 2020, which increase was

to its founder, shareholders, and litigants for a merger transaction that directly benefitted the debtor's private equity controlling shareholder who has necessitated, financed, and is the sole beneficiary of this bankruptcy, does not pass muster.

2.      The glaring blanks and undetermined amounts for readily-known claims in Debtor's schedules and the evasive responses at the 341 Meeting (defined herein) evidence efforts to shoehorn this Debtor into subchapter V and improperly invoke the expedited process, more limited oversight, and lesser requirements for confirmation that are afforded to small business debtors who appropriately qualify to be a debtor under section 1182 of the Bankruptcy Code.  But the shoe does not fit this Debtor.

3.      On this flawed footing, the Debtor and its controlling shareholder turned DIP lender, further seek improperly overbroad injunction, exculpation, and gatekeeping provisions in the Plan to cobble together an impermissible non-consensual third-party release in the wake of *Purdue Pharma* and immunize themselves from any liability for the Objecting Creditor's claims relating to the Merger Transaction (defined herein) or Bäcker's wrongful termination.  The Plan itself fails to satisfy the most fundamental requirement—that it be in the best interest of the Debtor's creditors—relying upon a liquidation value that is inexplicably 97% below a valuation conducted in 2023 to assert that creditors receive more under the Plan than in a hypothetical liquidation.

---

then further extended by two additional acts until June 21, 2024.  *See* Pub. L. No. 116-136 (2020), as amended by Pub. L. No. 117-5 (2021), as further amended by Pub. L. No. 115-151 (2002).  The extension that increased the debt limit applicable to subchapter V cases to $7.5 million expired on June 21, 2024. Therefore, had the Debtor filed this case only two days later, its debtors would have exceeded the applicable $3,024,725 debt limit.  Nonetheless, its debts exceed the $7.5 million limit as well.

4.      Accordingly, the Objecting Creditors respectfully request that the Court strike the Debtor's designation as a subchapter V debtor, terminate the appointment of the subchapter V trustee in this case, and deny confirmation of the Plan.

## BACKGROUND

### A.    The Bankruptcy Filing

5.      On June 19, 2024, (the "Petition Date"), QLess, Inc. ("QLess" or the "Debtor") commenced this case by filing a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code (the "Petition") [D.I. 1].  On the Balance Sheet that was included with the Petition, the Debtor listed its "Total Current Liabilities" as $6,934,907.79 and its "Total Liabilities" as $13,504,290.20.  *See* Petition, p. 14.

6.      Debtor is authorized to continue to operate its businesses and manage its properties as debtor and debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.[4]  On June 2, 2024, David M. Klauder was appointed as the subchapter V trustee [D.I. 12].  No committee of unsecured creditors was appointed in these cases.

### B.    Objecting Creditors' History with QLess and The Shareholder Litigation

7.      In 2007, Bäcker founded QLess, Inc., an innovative and award-winning software-as-a-service company that produced and licensed a virtual queue management system to reduce the time that customers wait in line for services.  Bäcker's mission for QLess was to eliminate waiting in line from the face of the Earth.

8.      As of 2020, QLess was generating millions of dollars of annual revenue with near-term revenue projections approaching $100 million of annual revenue.

---

[4] Unless otherwise specified, all statutory references to "Section" are to 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

9.     At the beginning of 2021, QLess had two groups of shareholders: (i) the common shareholders, and (ii) the Series A and A-1 preferred shareholders, of which Palisades Growth Capital II, L.P. ("Palisades")—a private equity firm—owned over 80% of QLess's preferred stock. As QLess's controlling and majority preferred shareholder, Palisades controlled QLess through its voting power and veto rights for a range of QLess's decisions, including, any merger, asset sale, or other corporate reorganization and the incurrence of any debt through borrowed funds.

10.     Palisades appointed three members (the "Palisades Directors") of QLess's five-seat Board of Directors (the "Board") and officers and therefore controlled the Board.

11.     In 2021, the Board, at the direction of Palisades, guided QLess into a freeze-out merger transaction at less than fair market value and for the purpose of removing QLess's shareholders from the rapidly growing company for Palisades' benefit.

12.     In January 2021, Palisades expressed its intention to acquire QLess and proposed a two-step merger transaction.  First, Palisades would secure additional voting power and leverage over QLess through a $1 million financing.  Second, QLess would be sold to Palisades at an undervalued price.  Palisades justified this proposal based on purported liquidity needs of QLess, which were overstated and of Palisades' own making.

13.     In March 2021, QLess entered a convertible note transaction with Palisades, over Bäcker's objections, that was conditioned on QLess initiating a process to sell the company.  This transaction was approved by the Board without consideration of whether a financing transaction with QLess's controlling shareholder that was conditioned on initiating a merger process that Palisades would control through its veto power, was in the best interest of QLess's shareholders, despite the availability of two markedly better financing offers which the Board failed to pursue at the direction of Palisades.

14.     Palisades, through the Palisades Directors, controlled the sale process.  Although three bids from bidders outside of Palisades were generated that were favorable to QLess's shareholders, Palisades utilized its veto power over these merger transactions and coerced QLess into an acquisition transaction with itself.

15.     Furthermore, as a result of Palisades' control over the Board, the Board ignored an offer to replace QLess's senior lender at the time (whose technical default was manufactured at Palisades' request and was explicitly called a "red herring" by Palisades' Managing Director at a QLess board meeting) and to inject millions of additional dollars into QLess.  The availability of this alternative financing demonstrates that a sale of QLess was not necessary.

16.     As a result of Palisades' control over the Board, the Board accepted Palisades' offer reflecting an enterprise value of $24.7 million, which was significantly less than the prior valuations and the alternate bids that projected QLess to be worth in excess of $100 million (the "Merger Transaction").

17.     Furthermore, Palisades dictated that the Merger Transaction be structured as a "Deemed Liquidation Event," as defined by the Debtor's Amended and Restated Articles of Incorporation, dated November 19, 2012 (the "Articles of Incorporation"), which caused nearly the entirety of the merger consideration that it paid for QLess to be paid to itself, with no merger consideration to common shareholders.

18.     In 2021, following the Merger Transaction, Bäcker, who had served as the President of QLess and a member of the Board since 2007, was improperly terminated from QLess and removed from the Board.

19.     As a result of this termination, in June 2022, Bäcker submitted claims to arbitration in accordance with his employment agreement for unpaid compensation under his employment

agreement and for consulting services, severance, and certain bonuses, which total approximately $2.4 million (collectively, the "Arbitration Claims").

20.     On December 27, 2023, Bäcker and the Preferred Shareholders filed a verified complaint in the Court of Chancery of the State of Delaware ("Chancery Court") bringing various claims for breach of fiduciary duty relating to the Merger Transaction against QLess, Palisades, and the Palisades Directors (the "Shareholder Litigation").[5]   The Shareholder Litigation is now stayed as to the Debtor by operation of the automatic stay, and is temporarily stayed as to the other defendants by consent of the parties, through August 30, 2024.

**C.      The Schedules and the 341 Meeting**

21.     On July 17, 2024, the Debtor filed the *Schedules of Assets and Liabilities for QLess, Inc. (Case No. 24-11395)* [D.I. 66] (the "Schedules"), as subsequently amended on August 2, 2024 [D.I. 91] (the "Amended Schedules"), listing the Debtor's total liabilities as $8,111,375.37.  *See* Schedules, p. 3; Amended Schedules, p. 3.

22.     On July 17, 2024, the Debtor also filed the *Statement of Financial Affairs for QLess, Inc. (Case No. 24-11395)* [D.I. 67] (the "SOFA"), as subsequently amended on August 2, 2024 [D.I. 92] (the "Amended SOFA"), which listed $2,469,749.33 as being paid within the 90 days before the Petition Date.  *See* SOFA, pp. 26-28; Amended SOFA, pp. 26-28.  Additionally, the Amended SOFA reflects that the day before the Petition Date, the Debtor made several large

---

[5] The Objectors timely filed proofs of claim asserting and preserving claims against the Debtor by the General Bar Date of August 19, 2024, relating to the Shareholder Litigation and the Arbitration Claims.  However, upon information and belief the Debtor did not provide Objectors with ballots to enable them to vote on the proposed Plan by the voting deadline of August 21, 2024 at 5:00 p.m. (ET) (the "Voting Deadline") by returning physical ballots received by the Voting Deadline with no option for electronic submission of ballots.  Objectors nevertheless sought ballots from the Debtor's claims and noticing agent and are using best efforts to hand deliver ballots to the claims and noticing agent by the Voting Deadline, but for the avoidance of doubt, Objectors each vote to reject the Plan.

payments totaling $350,230.34, and on the Petition Date, the Debtor made a payment of $18,904.11. *Id.*

23.     On June 28, 2024, the United States Trustee scheduled a meeting of creditors pursuant to Section 341 (the "341 Meeting") for July 19, 2024 at 2:00 p.m. [D.I. 38, 39].

24.     On July 19, 2024, the initial 341 Meeting was held by the United States Trustee, at which the Debtor's Chief Executive Officer, James Harvey (the "Debtor Representative") appeared and testified on behalf of the Debtor regarding the Petition, Schedules, and SOFA.  A true and correct copy of a transcript of the United States Trustee's official recording of the 341 Meeting is attached hereto as **Exhibit A** ("341 Tr.").  The United States Trustee continued the 341 Meeting and the 341 Meeting was concluded on August 12, 2024 [D.I. 98].

25.     On its Schedules, the Debtor listed the following debts totaling at least $1,078,729.96 as contingent and/or unliquidated and provided the following rationales at the 341 Meeting:

- **Brex, Inc.** – Schedule D, § 2.1
  **Claim Amount:** Undetermined
  **Listed As:** Unliquidated
  **Reason:** Debtor Representative "could not explain why this is undetermined" and did not know how much was owed to Brex, Inc. as of the Petition Date.  *See* 341 Tr. 105:13-106:6.

- **International Revenue Service** – Schedule D, § 2.3
  **Claim Amount:** $243,000.00
  **Listed As:** Contingent and Disputed
  **Reason:**  Liability pre-dated Debtor Representative's arrival at QLess. *See* 341 Tr. 49:13-106:6.  The Debtor failed to remit payroll taxes to the IRS so a lien was filed.  *Id.*  The Debtor paid the IRS the payroll taxes, penalties, and interest but the lien was not removed and the Debtor did not follow up.  *Id.*  Debtor Representative stated that the IRS still has a lien against the Debtor.  *Id.*

- **State of Washington** – Schedule E/F, § 2.1
  **Claim Amount:** Undetermined
  **Listed As:** Unliquidated
  **Reason:**  Debtor Representative did not know what tax period this claim referred to, the amount of these taxes, or when these taxes need to be paid. *See* 341 Tr. 108:12-109:12.

- **US Small Business Administration** – Schedule E/F, § 3.18
  **Claim Amount:** $127,237.00
  **Listed As:** Contingent and Disputed
  **Reason:**  This amount pre-dated Debtor Representative's "time with QLess." *See* 341 Tr. 110:16-111:8.  Debtor Representative understood this amount to be for a PPP, that the Small Business Administration asserts QLess owes and that QLess "disputed [] because [QLess] did not agree that [QLess] owed that amount." *Id.*  Debtor Representative could not remember when the dispute was submitted to the Small Business Administration.  *Id.*

26.     Although Debtor Representative signed Debtor's Schedule and SOFA, Debtor Representative was unresponsive or claimed not to know the answers to the many of the questions at the 341 Meeting.  *See* 341 Tr. 22:12-20 (number of Debtor's shareholders); 23:15-17 (how many shareholders Debtor had one year ago); 36:25-37:2 (who conducted the 2023 appraisal of the Debtor); 41:1-12 (Debtor's privacy policy); 45:2-17 (whether there has been any counterclaims filed in the pending litigation with the Debtor and the position on lawsuits being contingent and unliquidated); 68:24-69:10 (Debtor's net income for the last three years and last profitable year); 79:4-24 (how long amounts owed to Hogan Lovells were outstanding); 82:10-23 (payments made to auditor prepared for investors and lender); 84:14-23 (payment made to Ellucian Company, LP day before Petition Date); 86:2-13 ($18,904.11 made to Brex, Inc. on Petition Date); 88:6-9 (payments made to Morris Nichols); 88:18-90:17 (payments made to ClearPoint, LLC for financial services); 92:10-14 (prospective payment to ClearPoint, LLC); 94:22-96:19 (payments made to Debtor's director Mr. Tapling); 100:22-101:10 (value provided under valuation); 103:7-12 (what constitutes long term liabilities on Debtor's schedule);   104:21-105:9 (whether the Debtor's liability included amounts Debtor listed as contingent, undisputed, and disputed); 105:19-106:6

(what secured Brex. Inc.'s secured claim and how much money was owed to Brex, Inc. on the Petition Date); 106:7-108:2 (the outstanding amount owed to Celtic Bank, what the scheduled claim for Celtic Bank included, the interest rate for the loan, and the monthly payment amounts for the loan); 108:20-109:22 (the period for the scheduled sales tax claim owed to the State of Washington, the typical amount of such sales taxes, and when such taxes are due); 109:17-110:11 (whether the $250,000 "loan" from Palisades was included in the Debtor's balance sheet, whether there was a written agreement accompanying this loan, and whether there are any repayment terms for this loan); 111:14-112:18 (how payments to QLess AM were structured, whether QLess AM was owed amounts as of the Petition Date, and whether QLess AM has a claim that was scheduled); 115:22-117:5 (whether the Debtor was current on payments to vendors who did not appear on the schedules).[6]

27.    Furthermore, despite the United States Trustee stating that amounts should be included on the Schedules for the Shareholder Litigation Arbitration Claim as that amount is known by the Debtor and the purpose of the Schedules is disclosure, the Debtor refused to update the Schedules to reflect such an amount as such claims, characterizing the Arbitration Claim as "broad-reaching and frivolous." *See* Tr. 341 49:9-51:15.

**D.    Palisades as DIP Lender**

28.    Predating the filing of this bankruptcy and since the Petition Date, Palisades has exerted control over the Debtor.  On the day before the Petition Date, Palisades purportedly provided the Debtor with a $250,000 undocumented unsecured loan, which the Debtor lists as an

---

[6] In response to informal discovery requests from the Objectors, the Debtor produced certain explanations and responsive documents shortly before the deadline to object to the Plan.  Objectors continue to review and evaluate the materials produced by the Debtor and reserve all rights to seek other and further discovery, and to raise additional arguments arising from the ongoing discovery process in an amended objection or at any hearing with respect to the Debtor's eligibility for subchapter V or confirmation of the Plan.

unsecured claim rather than an equity investment, despite having testified at the 341 Meeting that the Debtor Representative did not know if there was a written agreement or repayment terms accompanying the infusion of $250,000 into the Debtor's business. *See* Amended Schedule E/F, § 3.10; 341 Tr. 59:22-61:7; 110:1-12.

29.     On the Petition Date, the Debtor filed an *Emergency Motion of the Debtor for Interim and Final Orders (I) Authorizing and Approving Debtor to (A) Obtain Debtor in possession Financing on a Junior Secured Basis and (B) Use Cash Collateral of Pre-Petition Secured Lender; (II) Scheduling a Final Hearing; and (III) Granting Related Relief* [D.I. 7] (the "Financing Motion"), seeking approval of $1 million in secured financing on an interim basis and a total of $3.5 million on a final basis from a newly formed entity owned and controlled by Palisades.  On June 21, 2024, the Court approved the Financing Motion on an interim basis [D.I. 27], and on July 17, 2024, the Court approved the Financing Motion on a final basis [D.I. 59].

**E.     The Plan**

30.     On July 19, 2024, the Debtor filed the Plan, and on July 23, 2024, the Debtor filed a *Notice of: (A) Hearing to Consider Confirmation of Debtor's Chapter 11 Plan; (B) Deadline for Voting to Accept or Reject Plan; and (C) Related Matters* [D.I. 76] which established August 21, 2024 as the deadline for parties to object to confirmation of the proposed Plan, and scheduled a hearing to consider confirmation of the proposed Plan for August 27, 2024 at 2:00 p.m. (ET).

*i.     Claim Treatment and Classes*

31.     Under the Plan, the Debtor seeks to reorganize "through among other things, an elimination of litigation that has been burdening the Debtor's liquidity and profitability and a conversion of the debt the Debtor has incurred during the Case into equity." *See* Plan, p. 3.

32.     Under the Plan, there are six classes of creditors.  Class 1 consists of Celtic Bank's Secured Claim which the Debtor estimates to be approximately $6,500,000[7] as of the Effective Date.  *See* Plan, § 4.1.3.

33.     Class 2 is comprised of Palisades' DIP Loan claim, which is estimated to be $3,800,000 as of the Effective Date, including accrued and unpaid interest and fees.  Plan, § 4.2.3.  As treatment for its Class 2 claim, Palisades will receive senior preferred capital stock in the Debtor ("New Preferred Shares") that will constitute 30% of the fully-diluted equity capital of the Debtor if Class 4, General Unsecured Claims vote in favor of the Plan.  Plan, § 4.2.2.  However, if Class 4 votes to reject the plan, Palisades will receive $3,050,000 in New Preferred Shares constituting 24% of the Debtor's stock on a fully-diluted basis and an allowed administrative expense claim of $750,000 with accruing interest.  Plan, § 4.2.2.

34.     Class 4 consists of General Unsecured Claims, which includes the Shareholder Lawsuit Claim, the Palisades Claim, the Arbitration Claim, and all Rejection Damages Claims. This class also includes claims that arise under obligations of the Debtors to indemnify any person where such obligation is not subject to an applicable Insurance Policy [Plan, § 2.56] —these "Non-Insured Indemnity Claims" were not included on the Debtor's Schedules.  Plan, § 4.4.

35.     The Debtor estimates the value of the claims in Class 4 to be $738,000, and of this amount, $338,000 is attributed to vendors and other general unsecured creditors and $150,000 is attributed to Rejection Damages Claims. Plan, § 4.4.3.  The remaining $250,000 is not expressly

---

[7] The Debtor's estimation of Celtic Bank's Secured Claim is $55,487.00 more that the scheduled amount for this claim [*see* Amended Schedule D, § 2.2], and Debtor's Representative was not able to answer questions about the outstanding amount of this claim at the 341 Meeting.  *See* 341 Tr. 45:23-46:12 (Debtor Representative cannot confirm why value of collateral supporting Celtic's claim is listed as undetermined); 106:7-107:4 (Debtor Representative cannot confirm or remember whether Celtic's Secured Claim included interest, fees, and other charges, Debtor's counsel stating that scheduled amount included principal and anything else).

allocated in the Plan as the valuation for the Palisades Claim; however, it appears that the Debtor did not estimate any claim value at all for the Shareholder Lawsuit Claim, the Arbitration Claim, or the Non-Insured Indemnity Claims in the Plan or the Schedules.  Plan, § 4.4.3.

36.     The Plan also contains a gratuitous, punitive death trap provision for General Unsecured Claim Holders.  Plan, § 4.4.2.  Although subchapter V permits a plan to be confirmed even if a class votes to reject the plan so long as the plan does not discriminate unfairly and is fair and equitable with respect to any class that does not accept the plan, the Debtor, nonetheless, incorporated a death trap provision for Class 4 General Unsecured Claims.  11 U.S.C. § 1191(b).  Under the death trap, if Class 4 votes to accept the Plan, Palisades will waive its $250,000 purported general unsecured claim and, assuming that the Arbitration Claim and Shareholder Lawsuit Claims are entirely disallowed, General Unsecured Claim Holders will receive a projected recovery of 88.75% of the claims, subject to dilution by any Allowed Non-Insured Indemnity Claims, which are not valued under the Plan.  If Class 4 votes to reject the Plan, Palisades will receive its Allowed Administrative Claim of $750,000 and will not waive its purported $250,000 unsecured claim and, assuming that the Arbitration Claim and Shareholder Lawsuit Claims are entirely disallowed, General Unsecured Claim Holders will receive a projected recovery of 6.9% of the claims, which is still subject to dilution by any Allowed Non-Insured Indemnity Claims, which are not valued under the Plan.

ii.     _Liquidation Analysis and Projected Disposable Income_

37.     The Debtor claims that it "easily satisfies the Best Interests Test with respect to any holder of an Allowed General Unsecured Claim that may Vote."  _See_ Plan, § 1.3.5(c).  To satisfy the best interest test, the Debtor attached a liquidation analysis to the Plan that assumes that the Debtor's assets have a "gross liquidation value between $168,000 and $915,000" so that no

recoveries would be possible for any creditors aside from the Debtor's secured debt holders.  *See* Plan, § 1.3.5(a).

38.    Following questioning at the 341 Meeting, where testimony referred to a February 2023 valuation of which Mr. Harvey was unable to recall any details, and shortly before the deadline to object to the Plan, the Debtor produced to the Objectors a copy of a valuation dated January 31, 2023 and prepared by Carta Valuations LLC on May 5, 2023 (the "<u>2023 Valuation</u>"), a copy of which is attached hereto as **<u>Exhibit B</u>**..  The 2023 Valuation concluded that **the market value of QLess was $27,692,000**.  The Plan's Liquidation Analysis does not adequately detail how the liquidation value of the business was reached—**a liquidation value which represents a nearly 97% decline in value over approximately 18 months with no explanation**—especially given the 2023 Valuation and the bids that the Debtor received in connection with the sale that was conducted as part of the Merger Transaction.

39.    The Plan, the Liquidation Analysis, and the Projected Disposable Income, do not value the "Allowed Non-Insured Indemnity Claims," which will dilute the recovery for General Unsecured Claims under the Plan.

40.    Although the Debtor reports making $2,469,749.33 in payments during 90 days before the Petition Date, the Plan and the Liquidation Analysis also do not account or provide for any value for preference or avoidance actions, contain no discussion of any investigation into the potential value of these actions, and contain no estimate of the value of these claims.

iii.    _The Overbroad Injunction and Exculpation and Targeted Gatekeeping Provisions_

41.    The Plan also implements broad injunction, exculpation, and gatekeeping provisions that essentially carve out a non-consensual third-party release for the benefit of Palisades and its representatives.

42.    Under the Plan's injunction, "all entities who have ever held or will ever hold any Claims are permanently enjoined from . . . (i) commencing or continuing in any manner any action or other proceeding against any property dealt with by the Plan, . . . (iv) commencing or continuing any action that does not comply with or is inconsistent with the Plan or the Bankruptcy Code." Plan, § 10.1.1.

43.    Pursuant to the proposed exculpation under the Plan, in addition to the Debtor and the estate, Palisades and "all of their respective directors, officers, employees, managers, managing members, members, financial advisors, attorneys, accounts, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives" would be exculpated for any act or omissions arising from the Petition Date through the Effective Date connected with, related to, or arising out of this case, except those that would be a crime, actual fraud, willful misconduct, or gross negligence.  Plan, §§ 2.42 & 10.2.

44.    Furthermore, under the gatekeeping provision in the Plan, Gated Parties may not commence or pursue any claim or cause of action of any kind—including negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence—relating to, _inter alia_, the Case or property to be distributed under the Plan against any Protected Party, which includes Palisades and its representatives, until this Court determines such claim is colorable and specifically authorized the Gated Party to bring that claim or cause of action.  Plan, § 10.3.  "Gated

Parties" are limited and defined to directly target Bäcker and the plaintiffs in the Shareholder Litigation and the Bäcker Arbitration.  Plan, § 2.46.

## ARGUMENT

### A.    The Debtor is Not Eligible to Proceed Under Subchapter V

45.    Despite its best efforts to orchestrate and otherwise manufacture eligibility, the Debtor is not eligible for relief under subchapter V because its non-insider debt exceeds the $7.5 million debt cap.

46.    As of the Petition Date, Section 1182, which governs the eligibility of a debtor to proceed under subchapter V of the Bankruptcy Code, required that a debtor have less than $7,500,000 in aggregate non-contingent, liquidated, secured and unsecured debts (excluding debt owed to one or more affiliates or insiders).  QLess does not meet this requirement, and, therefore cannot confirm a plan under subchapter V.

47.    Under Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 1020(b), a party in interest may file an objection to a debtor's election to proceed under subchapter V of chapter 11 within 30 days after the conclusion of the 341 Meeting, which in this case would be September 11, 2024, as the 341 Meeting concluded on August 12, 2024.

48.    It has generally been held that the debtor bears the burden of proof for establishing eligibility, and numerous courts have specifically held that a debtor bears the burden to "demonstrate satisfaction of the eligibility requirements for subchapter V."  *In re Sullivan*, 626 B.R. 326, 330 (Bankr. D. Colo. 2021); *see also In re Zhang Med. P.C.*, 655 B.R. 403, 409 (Bankr. S.D.N.Y. 2023); *In re Blue*, 630 B.R. 179, 187 (Bankr. M.D.N.C. 2021) ("When a party challenges debtor's eligibility to file under a particular chapter of the United States Bankruptcy Code, the debtor carries the burden of establishing such eligibility."); *In re Offer Space, LLC*, 629 B.R. 299, 304 (Bankr. D. Utah 2021); *In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233, 235 (Bankr. S.D.

Tex. 2021) ("If a party-in-interest objects, the debtor bears the burden of proving eligibility under Subchapter V."); *In re Ruthellen W. Rickerson,* 636 B.R. 416, 422 (Bankr. W.D. Pa. 2021) ("It has generally been held that the burden of proof in establishing eligibility for bankruptcy relief lies with the party filing the bankruptcy petition.  The large majority of the cases that have considered issues of eligibility specific to Subchapter V have adopted that same view.") (citations omitted); *In re Dille Family Trust*, 598 B.R. 179, 189 (Bankr. W.D. Pa. 2019).

49.    Although expediency is intended for subchapter V debtors, "when Congress expanded the reach of Subchapter V to debtors who have up to $7.5 million in debts, it made Subchapter V available to entities having more complex creditor relationships than a debtor in a typical Chapter 12 or 13 case."  *In re Parking Mgmt., Inc.*, 620 B.R. 544, 551 (Bankr. D. Md. 2020).  As such, "[t]he court need not find a lack of good faith or candor to conclude it should review the claims" in a case where there are reasonable grounds to dispute whether specific claims were contingent and/or unliquidated as of the petition date.  *Id.*  Nonetheless, because the debt limitation that applies in a chapter 13 bankruptcy is similar to the debt limitation that applies in a subchapter V case, courts have looked to chapter 13 case law when considering the eligibility of a subchapter V debtor.  *In re Blue*, 630 at 192 n.12 (looking to chapter 13 case law interpreting a debtors eligibility under chapter 13 in subchapter V case); *In re Zhang Med. P.C.*, 655 B.R. 403, 408 (Bankr. S.D.N.Y. 2023) ("That case was not a subchapter V case; instead, it arose in the analogous context of the debt limit for chapter 13 eligibility."); *In re Parking Mgmt., Inc.* 620 B.R. at 550.

50.    Disputed debt is considered when evaluating whether the Debtor has exceeded the subchapter V cap.  *See In re Corson,* No. 03-18160F, 2004 WL 5865045, at *12 (Bankr. E.D. Pa. June 25, 2004) (explaining that a disputed debt is considered for chapter 13 eligibility purposes);

*In re Knight*, 55 F.3d 231, 234 (7th Cir. 1995) ("a disputed claim is a debt to be included when calculating § 109(e) requirements"); *In re Leggett*, 335 B.R. 227, 229–30 (Bankr. N.D. Ga. 2005) ("A dispute over the debtor's liability does not make a debt contingent or unliquidated.") (citations omitted); *In re Claypool*, 142 B.R. 753, 755 (Bankr. E.D. Va. 1990) ("[a] liquidated, noncontingent claim whose validity is in dispute must nevertheless be included in determining eligibility").

51.    Furthermore, "when it appears that the debtor has not exercised reasonable diligence or good faith in completing and filing the schedules, the bankruptcy court may look to other evidence, including post-petition events, to determine eligibility." *In re De Jounghe*, 334 B.R. 760, 768 (B.A.P. 1st Cir. 2005) (citations omitted).  In evaluating eligibility, the Court can consider whether debt may have been understated or omitted by the Debtor.  *In re Barcal*, 213 B.R. 1008, 1015 (B.A.P. 8th Cir. 1997) ("it is appropriate for a court considering eligibility to rely primarily upon a debtor's schedules and proofs of claim, checking only to see if these documents were filed in good faith.  In so doing, however, the court should neither place total reliance upon a debtor's characterization of a debt nor rely unquestionably on a creditor's proof of claim, for to do so would place eligibility in control of either the debtor or the creditor.") (citations omitted); *In re Perkins,* 581 B.R. 822, 834 (B.A.P. 6th Cir. 2018) (a debtor whose scheduled debts can nonetheless fall below the debt limit "if from the face of the schedules it is apparent to a legal certainty that the debtor is beyond the debt limit, and second, if evidence shows that the amounts were inaccurately scheduled in bad faith for the purpose of making the debtor eligible for Chapter 13."); *In re Ollis*, 609 B.R. 459, 465 (Bankr. D.S.C. 2019) (looking beyond the schedules to determine a chapter 13 debtor's aggregate debt "because the evidence demonstrates that certain amounts on [debtor's] Schedules were grossly inaccurate and numerous debts were omitted"); *In re Kelly*, Case No. 18-13244, 2018 WL 4354653, at *5 (Bankr. D. Md. 2018) ("[I]t would

eviscerate the Chapter 13 eligibility requirements if a court could only consider a debtor's schedules regardless of their completion and apparent inaccuracies.").

52.     In the context of considering a debtor's eligibility and reviewing whether the debt limit cap has been met, "a bankruptcy court can 'scrutinize and redesignate the characterization by a debtor of any given debt when that characterization is the subject of a case or controversy.'"  *In re Kelly*, 656 B.R. 541, 580 (Bankr. D. Md. 2023) (quoting *In re Stern*, 266 B.R. 322, 326 (Bankr. D. Md. 2001).

53.     In this case, based on the Debtor's Amended Schedules alone, it is undisputed that the Debtor has aggregated noncontingent, liquidated, secured and unsecured debt as of the Petition Date in the amount of $7,032,645.41.   If the Court determines that the Debtor erroneously scheduled more than $467,354.59 of its debts as contingent and/or unliquidated, or failed to schedule such additional debt in any amount at all, the Debtor does not meet the definition of a "debtor" under Section 1182 and is ineligible to proceed under subchapter V of chapter 11.

54.     Here, the Court should not rely solely on the debtor's characterization of debts, as it is clear from the face of the Schedules and the Amended Schedules as well as the testimony at the 341 Meeting that the schedules were compiled to manufacture the Debtor's alleged subchapter V eligibility.

     i.     *The Undetermined and Unliquidated Amounts on the Schedules Provide a Ready Basis for the Debtor to Exceed the Statutory Cap*

55.     The Debtor listed both (i) Brex, Inc.'s secured claim and (ii) the priority claim held by the State of Washington Department of Revenue for Q2 2024 sales taxes as undetermined and unliquidated.  *See* Amended Schedule D, § 2.1; Amended Schedule E/F, § 2.1.

56.     Although whether a claim is "liquidated" for purposes of a debtor's eligibility is not defined in the Bankruptcy Code, "courts have generally held that a debt is liquidated if its

amount is readily and precisely determinable, as where the claim is determinable by reference to an agreement or by a simple computation." 2 Collier on Bankruptcy P109.06[2][c] (16th 2024).

57.    Debt that is owed to Brex, Inc. under a credit card agreement is unquestionably readily and precisely determinable.  The Debtor included in their Amended SOFA several payments that were made to Brex, Inc. in the 90 days prior to the Petition Date and the payments to Brex, Inc. in the eleven days prior to the Petition Date alone totaled $300,361.91—this does not even include the $18,904.11 payment that was made to Brex, Inc. on the Petition Date.  Yet as reported in the Debtor's Schedules, they purport to be unable to determine what they owe to Brex, Inc?

58.    Similarly, the amount that is owed to the State of Washington Department of Revenue for sales taxes should be readily able to be computed by the Debtor based on its known Q2 2024 sales and prior sales taxes that were paid in Q1 2024—this claim is not unliquidated (certainly not by August 2, 2024 when the Debtor filed its Amended Schedules).

59.    Therefore, these debts, which are able to be determined readily and precisely, should be calculated and would count towards the Debtor's subchapter V cap as these claims are not marked contingent.  The failure to include these amounts evidences that the Debtor conveniently understated its debts right before the $7.5 million cap was scheduled to sunset and it would no longer have a chance to maneuver itself into this subchapter of the Bankruptcy Code to evade responsibility in litigation and to benefit Palisades.

ii.    _The Large Payments Made on the Eve of Filing to Manufacture Eligibility_

60.    Despite not being valued in the Debtor's liquidation analysis included in the Plan, the Debtor made $2,469,749.33 in payments during 90 days before the Petition Date.[8]  _See_ SOFA pp. 26-28; Amended SOFA pp. 26-28.  If the Debtor had paid just 18.92% less during this period, the Debtor would not qualify as a subchapter V debtor.

61.    The timing of these payments is particularly illuminating as shown below:

- During the first 19 days of June 2024, the Debtor made payments totaling $931,475.51.

- Of that amount, the Debtors made three payments totaling $216,199.31 on June 17, 2024—only two days before the Petition Date.

- On June 18, 2024, the day before the Petition Date, the Debtors made eight large payments totaling $350,230.34.

- Finally, on the Petition Date, the Debtors made an $18,904.00 payment to Brex, Inc. based on a credit card agreement.

62.    If the $585,333.76 that was paid by the Debtor during the three days prior to the Petition Date on the eve of this bankruptcy filing had not been paid, based solely on the claims that the Debtor listed as non-contingent and liquidated on its Schedules, the Debtor would have been $117,979.17 over the $7.5 million subchapter V limit.[9]

iii.    _The Debtor's 341 Testimony Raised More Questions Than It Answered_

63.    Mr. Harvey's testimony at the 341 Meeting raised, for the first time, the existence of a contractual relationship between the Debtor and QLess AM, an Armenian company that

---

[8] This total does not even take into account the additional $996,534.23 in payments made to insiders in the year prior to the Petition Date, which could provide additional valuable estate claims.  Amended SOFA, pp. 29-30.

[9] Alternatively, if the Debtor had waited two more days until June 21, 2024 to file the case—even with the payments made in the days prior to the Petition Date—they would have been $4,007,920.41 over the new subchapter V debt limit.

provides a significant number of employees to the Debtor necessary to operate the Debtor's business.  *See* 341 Tr. 12:5-15:11.  Curiously, no executory contract with QLess AM is listed on the Debtor's Schedules G—not even when they amended the Schedules after the 341 Meeting.  Moreover, Mr. Harvey was unable to testify as to the terms of the contract, nor did he know whether the Debtor owed any money to QLess AM as of the Petition Date (which amounts should have also been listed on Schedule E/F but were not).  *See* 341 Tr. 111:14-112:18.  It was also unclear from Mr. Harvey's testimony what the relationship is between QLess and QLess AM, and whether QLess AM, through its direct or indirect ownership, would qualify as an "insider" of QLess.  *See* 341 Tr. 13:10-14:10.  In fact, the only mention of QLess AM in the Debtor's Schedules or SOFA was the $640,155.00 in transfers made to QLess AM in the 90 days before the Petition Date, including $200,000.00 paid just two days before the bankruptcy filing.

**B.    The Plan Has Not Been Proposed In Good Faith and Does Not Meet the Best Interest Test**

64.    Section 1190 provides that at a minimum, a subchapter V plan must, *inter alia*, include "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed plan or reorganization."  11 U.S.C. § 1190(1)(A).  In addition to the requirements under Section 1190, a subchapter V plan must further satisfy the requirements of Section 1129(a), which includes a good faith standard and a best interest of creditor's test.  11 U.S.C. §§ 1191; 1129(a); *In re 303 Invs., Inc.*, No. 22-14267-JGR, 2024 WL 3355169, at *5 (Bankr. D. Colo. June 24, 2024).

*i.    The Good Faith Standard Has Not Been Met*

65.    In any voluntary chapter 11 case, the debtor bears the burden of proving good faith.  *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999) (chapter 11 petitions are subject to

dismissal unless filed in good faith); *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003).

66.    The determination regarding the good faith requirement "is a 'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) (quoting *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 211 (3d Cir. 2003).

67.    This good faith inquiry focuses on "whether the petitioner sought 'to achieve objectives outside the legitimate scope of the bankruptcy laws' when filing for protection under Chapter 11." *Primestone Inv. Partners L.P. v. Vornado PS, L.L.C.* (*In re Primestone Inv. Partners L.P.)*, 272 B.R. 554, 557 (D. Del. 2001) (quoting *In re SGL Carbon*, 200 F.3d at 165).

68.    As the court explained in *In re Team Sys. Int'l LLC*, "while the fact that a bankruptcy case was filed to take advantage of a provision of the Bankruptcy Code does not, in and of itself, show either good faith or bad faith—it is a truism every voluntary case is filed because the debtor sees an advantage to filing—the circumstances of that filing can give rise to an inference in either direction."   640 B.R. 296, 311 (Bankr. D. Del. 2022).  In that case, the court reasoned that "the bankruptcy filing made immediately prior to a hearing at which the debtor faced the prospect of being held to account for its failure to comply with an order granting post-judgment discovery to the judgment creditors, coupled with the filing of the motion to dismiss, is more than sufficient to put the question of good faith 'at issue.'" *Id.*

69.    Courts have considered numerous factors when examining whether a debtor filed their petition in good faith, which include "whether the debtor: (a) has only a single asset; (b) has few unsecured creditors; (c) has no ongoing business or employees; (d) filed the petition on the

eve of foreclosure; (e) is engaged in a two-party dispute which can be resolved in pending state court action; (f) has no cash or income; (g) has no pressure from non-moving creditors; (h) has filed a previous bankruptcy petition; (i) has engaged in improper prepetition conduct; (j) has no possibility of reorganization; (k) was formed immediately prepetition; or (l) filed solely to create automatic stay. *In re BYJU's Alpha, Inc.*, No. 24-10140 (JTD), 2024 WL 3738150, at *2 (Bankr. D. Del. Aug. 8, 2024) (citing *Primestone Inv. Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.)*, 272 B.R. 554, 557 (D. Del. 2002) (applying the above factors); *In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 298-99 (Bankr. D. Del. 2011) (same)). Although a debtor's subjective intent is considered in this analysis, the good faith inquiry "depends 'more on [an] objective analysis of whether the debtor has sought to step outside the "equitable limitations" of Chapter 11.'" *Id.* (citing *In re SGL Carbon Corp.*, 200 F.3d at 165).

70.     Here, the Debtor paid off numerous creditors on the eve of filing (in addition to understating its liabilities) so that it could facially qualify as a subchapter V debtor right before the debt limit adjusted down, with the stated goal of pursuing this case to (1) eliminate the Shareholder Litigation and the Arbitration Claim (which the parties had already litigated for five days and was poised for closing briefing and judgment) and (2) provide Palisades with further equity in the Debtor. *See* Plan, p. 3.

71.     The factors that courts consider in this context militate toward a finding that the Debtor filed this case in bad faith.  First, the Debtor only has 21 unsecured creditors—including Palisades and nine individuals or entities who may have claims relating to the Merger Transaction. Second, the Petition was filed on the eve of the sunset of the expanded subchapter V cap, and in a circumstance where subchapter V provides the Debtor with its only viable opportunity to present the Plan, which would otherwise not be able to be confirmed.  Third, the case was filed to provide

the Debtor—*and Palisades*—an opportunity to utilize the automatic stay and escape liability for the litigation surrounding the Merger Transaction, which is currently pending in Chancery Court. Fourth, as discussed above, the Debtor improperly engineered this subchapter V filing by, *inter alia*, making $2,469,749.33 in payments during 90 days before the Petition Date (and $931,475.51 in payments during the first 19 days of June alone). *See* SOFA pp. 26-28; Amended SOFA pp. 26-28. Fifth, the Schedules, SOFAs, and testimony at the 341 Meeting failed to provide relevant and necessary information related to the Debtor's assets and liabilities, including, but not limited to, the relationship with QLess AM and key terms of and complete current balance outstanding as of the Petition Date of the Celtic Bank secured debt. *See* 341 Tr. 106:7-108:2; 111:14-112:18. For these reasons, the Debtor exceeded the equitable limitations of Chapter 11 when filing this case and did not do so in good faith.

   ii.    *The Plan is Not in the Best Interest of Creditors*

72.    The best interest of creditors requirement that a creditor must receive at least as much in a reorganization as it would in a liquidation established under Section 1129(a)(7) is "one of the cornerstones of chapter 11 practice" and is the plan proponent's burden. 7 Collier on Bankruptcy P 1129.02[7] (16th 2024); *In re W.R. Grace & Co.*, 475 B.R. 34, 142 (D. Del. 2012) ("the plan proponent bears the burden of proof to establish by a preponderance of the evidence that its plan is within the creditors' best interests"). This foundational guarantee to creditors applies in equal measure in a subchapter V bankruptcy. *In re Wetter*, 620 B.R. 243, 255 (Bankr. W.D. Va. 2020) (citing 11 U.S.C. § 1181(a)).

73.    "To satisfy the best interests of creditors test, the court looks at a hypothetical chapter 7 liquidation." *In re Boteilho Hawaii Enterprises, Inc.*, No. 22-00827, 2023 WL 7117223, at *1–2 (Bankr. D. Haw. Oct. 24, 2023) (considering a liquidation analysis presented in a

subchapter V case).  This liquidation analysis must be based on evidence; however, this analysis "is, by nature, inherently speculative and is often replete with assumptions and judgments." *In re PC Liquidation Corp.*, 383 B.R. 856, 868 (E.D.N.Y. 2008).

74.    A trustee's avoidance powers may affect the liquidation analysis.  *In re Wetter*, 620 B.R. 243, 255 (Bankr. W.D. Va. 2020); *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (The liquidation analysis "requires an estimation of the value of all of the bankruptcy estate's assets, including such hard to determine values as disputed and contingent claims, *id.*, the potential disallowance of claims (under § 502(d)), *id.*, the probability of success and value of causes of action held by the estate, *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1158 (5th Cir.1988), and, in this case, potential preference actions.").

75.    Here, the Debtor—who bears the burden of proof—states in conclusory fashion that it "easily satisfies the Best Interests Test with respect to any holder of an Allowed General Unsecured Claim that may Vote."  *See* Plan, § 1.3.5(c).  This is not true.  The Debtor's Liquidation Analysis does not provide sufficient support for its depressed valuation of a business at a "gross liquidation value between $168,000 and $915,000," when Palisades purchased the Debtor at an undervalued enterprise value of $24.7 million in 2021, and the 2023 Valuation paced the market value of QLess at $27,692,000.  The Plan, as filed, contains no explanation of how the business purportedly lost 97% of its value within the 18 months before the Petition Date, at a time when the Debtor brought its newer, better product to market and had implemented "significant" expense reductions.  *See* Harvey Decl., D.I. 9, at ¶ 21.  There is no evidentiary support for the liquidation value included in the Liquidation Analysis—the sole basis upon which the Debtor relies to assert that creditors receive more under the Plan than in a hypothetical liquidation scenario.

76.     Moreover, despite the Plan expressly preserving avoidance actions as assets of the estate, the Liquidation Analysis fails to mention avoidance action claims at all, therefore ascribing no value to those claims whatsoever, despite the nearly $3 million in known transfers made during the 90-day preference period.[10]  Mr. Harvey testified at the 341 Meeting that he had not evaluated any avoidance actions or potential preference actions.

77.     Given these large unknowns, which unquestionably impact the liquidation analysis, the Debtor has not met its burden and has not satisfied the best interests test.

*iii.*     *The Punitive Death Trap Provision in the Plan Should Not Be Approved*

78.     In addition to not meeting the best interest test, the Plan, which primarily benefits Palisades, needlessly foists a strictly punitive death trap provision on General Unsecured Creditors. Plan, § 4.4.2.

79.     "A 'death-trap' provision is a coercive provision that seeks to encourage claimants to vote in favor of a plan with promises—in return for a favorable vote—of treasure and/or favorable treatment.  Should the claimants vote against the plan, the claimants will receive less or no treasure and/or is otherwise penalized."  *In re MPM Silicones, L.L.C.*, 596 B.R. 416, 424 (S.D.N.Y. 2019) (citing Douglas E. Deutsch., *Chapter 11 Plan Confirmation Issues: Settlements, Releases, Gifting and Death Traps*, 29-OCT Am. Bankr. Inst. J. 54, 91 (2010)).

80.     While in a traditional chapter 11 cases, the carrot and stick approach that a death trap provision offers may serve a purpose, here, the Debtor gains *nothing* by offering creditors a treasure.  Subchapter V permits a plan to be confirmed even if a class votes to reject the plan, so

---

[10] Since the Debtor has failed to schedule an executory contract for QLess AM, the $640,155.00 in transfers made to QLess AM during this time may be particularly ripe for collection by a chapter 7 trustee.

long as the plan does not discriminate unfairly and is fair and equitable with respect to any class that does not accept the plan—a standard the Debtor says it "easily" meets.  11 U.S.C. § 1191(b).

81.    While it is unclear whether a death trap provisions is even appropriate in a subchapter V plan, it certainly serves no coercive purpose since unlike a traditional chapter 11 case, no impaired accepting class is necessary for confirmation.  Therefore, Objecting Creditors can only conclude that the deathtrap is intended to be punitive to holders of General Unsecured Claims in Class 4—coincidentally largely comprised of the plaintiffs in the Shareholder Litigation and Bäcker Arbitration.

## C.    The Injunction and Gatekeeping Provisions Under the Plan are Disguised Third-Party Releases for Palisades

82.    The Debtor, as the proponent of the Plan, has the burden to establish that Plan complies with the requirements of Section 1129 and that the Bankruptcy Code's statutory requirements for confirmation are met by a preponderance of evidence.  *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 132 (Bankr. D.N.J. 2010); *In re Danny Thomas Properties II L.P.*, 241 F.3d 959, 963 (8th Cir. 2001); *In re Charter Communications,* 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009); *In re Hurricane Memphis, LLC*, 405 B.R. 616, 624 (Bankr. W.D. Tenn. 2009).

83.    Exculpation provisions "have their genesis in two different sources": (i) the *Barton Rule*, which provides that "a party cannot bring a suit against a bankruptcy trustee or the trustee's attorneys for acts within the trustee's duties of recovering assets for the estate without first obtaining leave of court" and (ii) Section 1103(c), which is interpreted by Courts to imply a fiduciary duty and a corresponding limited grant of immunity to members of a creditors committee. *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 701 (E.D. Va. 2022) (citing *Barton v. Barbour*, 104 U.S. 126, 26 L. Ed. 672 (1881); 11 U.S.C. § 1103(c).

84.    In the context of exculpations, the Third Circuit had explained that –

> Section 524(e), by its terms, only provides that a discharge of the debtor does not affect the liability of non-debtors on claims by third parties against them for the debt discharged in bankruptcy. ***Thus, for example, § 524(e) makes clear that a discharge in bankruptcy does not extinguish claims by third parties against guarantors or directors and officers of the debtor for the debt discharged in bankruptcy. Indeed, Continental II held that a plan that enjoined plaintiffs' actions against the debtor's directors and officers who "ha[d] not formally availed themselves of the benefits and burdens of the bankruptcy process," violated § 524(e)***. The injunction in that plan protected directors and officers from actions taken prior to bankruptcy that allegedly violated the securities laws and thus abrogated the liability of third parties.

*In re PWS Holding Corp.*, 228 F.3d 224, 245–47 (3d Cir. 2000) (citations omitted).  In *PWS,* the Third Circuit did not treat section 524 as a per se rule barring provisions in a plan limiting liability, and found that such a provision was appropriate where it set forth the applicable standard for liability.  *Id; see also, In re Washington Mut., Inc.*, 442 B.R. 314, 350 (Bankr. D. Del. 2011) ("The Third Circuit has held that a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence.  The Third Circuit reasoned that such a provision merely stated the standard to which such estate fiduciaries were held in a chapter 11 case.") (citations omitted).

85.    However, recently, in *Purdue Pharma,* the Supreme Court held that the Bankruptcy Code "does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of the affected claimants."  *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2088 (2024).  As the court also recently explained in *In re Parlement Techs., Inc.*, "non-debtors may not receive permanent injunctive relief in the form of a third-party release, under a plan of reorganization, even when a bankruptcy court finds that the release is necessary to facilitate the debtor's reorganization."  No. 24-10755 (CTG), 2024 WL 3417084, at *1 (Bankr. D. Del. July 15, 2024)

(finding that there was not a sufficient basis to grant a *temporary* preliminary injunction to debtor's former officers who were the subject of litigation).

86.    Although not in line with Third Circuit precedent prior to *Purdue Pharma*, in light of the *Purdue Pharma* opinion, the Fifth Circuit's reasoning, examination, and limitation of exculpation and gatekeeping provisions in *In re Highland Capital Management, L.P.* is persuasive. 48 F.4th 419, 437 (5th Cir. 2022).

87.    In *Highland,* the Fifth Circuit explained that the exculpation that was provided for in the plan "partly runs afoul of that statutory bar on non-debtor discharge by reaching beyond Highland Capital, the Committee, and the Independent Directors."  The court found that—

> [O]ur precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties. And so, excepting the Independent Directors and the Committee members, the exculpation of non-debtors here was unlawful. Accordingly, the other non-debtor exculpations must be struck from the Plan.

*Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 437–38 (5th Cir. 2022), *cert. denied sub nom. Highland Cap. Mgmt v. Nexpoint Advisors*, No. 22-631, 2024 WL 3259692 (U.S. July 2, 2024), and *cert. denied sub nom. Nexpoint Advisors v. Highland Cap. Mgmt*, No. 22-669, 2024 WL 3259697 (U.S. July 2, 2024)) (citations omitted).

88.    The Fifth Circuit struck the terms in the exculpation and the gatekeeping provision that would have extended these terms to parties outside of the debtor, the creditor committee and its members and the independent directors.  *Id.*  In *In re Galleria 2425 Owner, LLC*, the Bankruptcy Court for the Southern District of Texas considered a gatekeeping provision that it determined was appropriately limited under *Highland*, as no non-debtor party would be releasing direct and

independent claims against the debtor.  No. 23-34815, 2024 WL 3170626, at *9 (Bankr. S.D. Tex. June 22, 2024).

89.     Although on its face, the Plan contains no third-party releases, careful review reveals that the Debtor in this case attempts to utilize the overbroad injunction, exculpation, and gatekeeping provisions to collectively act as a release for itself and Palisades from the Shareholder Litigation and Bäcker Arbitration.  Indeed, the only "Gated Parties" under the proposed Plan are the plaintiffs in the Shareholder Litigation and Bäcker Arbitration, and their parents or subsidiaries. Plan, § 2.46.  Meanwhile, the "Protected Parties" against whom Gated Parties would be forced to come to the Bankruptcy Court for blessing on whether its claims are "colorable" are broadly defined to include "(a) the Debtor; (b) the Reorganized Debtor; (c) the Professionals retained by the Debtor in the Case; (d) the DIP Lender; (e) the defendants in the Shareholder Litigation; and (f) the Related Persons (including the Debtor's Chief Restructuring Officer) parties listed in (a) through (e) other than a Gated Party." Plan, § 2.66.  The definition of what claims would be subject to this Gatekeeper provisions is similar broad, including "any claim or cause of action of any kind, including negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence, against any Protected Party that arose or arises from or is related to the Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, or any transaction in furtherance of the foregoing." Plan, § 10.3.

90.     Although gating provisions have been approved in this jurisdiction, it is not clear whether such provisions have ever been approved in a subchapter V case.  Taken together, the broad protections sought for Palisades and all of its related parties would unquestionably interfere with the valid claims and causes of action asserted against non-debtors in the Shareholder Litigation, amounting to an impermissible non-consensual third party release. The transparency of

the Debtor's efforts to hinder the Objecting Creditor's claims against related non-debtor third parties (and insurance proceeds, which are not property of the estate) should not be rewarded.

91.    Further, the terms of the injunction as drafted would act as a total bar to the Shareholder Litigation and Bäcker Arbitration as it permanently enjoins "(i) commencing or continuing in any manner any action or other proceeding against any property dealt with by the Plan, . . . (iv) commencing or continuing any action that does not comply with or is inconsistent with the Plan or the Bankruptcy Code."  Plan, § 10.1.1.

92.    The exculpation provision improperly includes tangential parties who had no fiduciary relationship to the Debtor—notably including all of following parties as they relate to the Debtor and Palisades in this exculpation "all of their respective directors, officers, employees, managers, managing members, members, financial advisors, attorneys, accounts, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives."  Plan, §§ 2.42 & 10.2.

## CONCLUSION

93.    For the reasons stated above, the Objecting Creditors respectfully request that the Court strike the Debtor's designation as a subchapter V debtor, terminate the appointment of the subchapter V trustee in this case, and deny confirmation of the Plan consistent with this Objection.

Dated:  August 21, 2024
Wilmington, Delaware

*/s/ Laurel D. Roglen*
Matthew G. Summers (DE No. 5533)
Laurel D. Roglen (DE No. 5759)
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
E-mail: summersm@ballardspahr.com
          roglenl@ballardspahr.com

*Counsel for Alex Bäcker, Cerocaru Investment Trust,*
*Ricardo Bäcker, Tom Mitchell and Xianzhong Chen*