# EXHIBIT A

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3

4    In re:                        :

5                                  :    Chapter 11

6    QLESS, INC.,                  :

7                                  :    Case No. 24-11395 (BLS)

8           Debtor.                :

9    _____   :

10

11                               Office of the United States Trustee

12                               United States Bankruptcy Court

13                               824 North Market Street

14                               Wilmington, Delaware

15                               July 19, 2024

16                               2:00 PM

17

18

19    341 Meeting of Creditors

20

21

22

23    B E F O R E :

24    MALCOLM M. BATES

25    TRUSTEE

Page 2

1 A P P E A R A N C E S :

2

3 PACHULSKI STANG ZIEHL & JONES LLP

4     Attorney for the Debtors

5

6 BY: JAMES E O'NEILL ESQ.

7     JEFFREY N. POMERANTZ ESQ.

8

9 BALLARD SPAHR

10     Attorney for Alex Backer

11

12 BY: LAUREL D. ROGLEN, ESQ.

13

14 STATE OF COLORADO

15     Attorney for Colorado Department of Revenue

16

17 BY: CAROLYN CORDEAN, ESQ.

18

19 ESCAMBIA COUNTY

20     Attorney for Colorado Department of Revenue

21

22 BY: BRIAN JACKSON, ESQ.

23

24

25

Page 3

1 ALSO PRESENT:

2

3 JAMES HARVEY

4 ANDREW DE CAMARA

5 JAROD WADA

6 RONALD BAECKER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                P R O C E E D I N G S

2     MR. BATES: Okay. Great. My computer's working.

3 That's a great sign. Okay. Once again, we're here for the

4 341 meeting for QLess, Inc., a debtor in Chapter 11 case

5 Number 24-11395-BLS now pending before Judge Shannon in the

6 U.S. Bankruptcy Court for the District of Delaware. It is

7 July 19, 2024 a little bit after 2 p.m. Eastern Time. My

8 name is Malcom Bates. I'm a trial attorney with the Office

9 of the United States Trustee for the District of Delaware.

10     Before we get started, I'm just going to do a

11 brief roll call and go over some ground rules and parameters

12 of the meeting today, and then I'll get into the United

13 States trustee's examination. So let's start with

14 appearances by debtor's counsel please.

15     MR. O'NEILL: Hi. This is James O'Neill, and I'm

16 appearing today with Jeff Pomerantz and we're from Pachulski

17 Stang Ziehl and Jones.

18     MR. BATES: Okay. And the debtor's

19 representatives?

20     MR. O'NEILL: Debtor's representative is James

21 Harvey, who is the CEO of QLess.

22     MR. BATES: Okay. And I believe we're also being

23 joined by the CRO from Sherwood. Sir, would you like to

24 enter your appearance?

25     MR. DE CAMARA: Yes, this is Andrew De Camara of

Page 5

1 Sherwood Partners, Chief Restructuring Office of QLess.

2     MR. BATES: Thank you, sir. Okay. Anybody else

3 on behalf of the debtors today? Okay. Hearing nothing,

4 let's go to the other parties --

5     MR. WADA: I --

6     MR. BATES: Sorry?

7     MR. WADA: Apologies. And Jarod Wada with

8 Sherwood Partners.

9     MR. BATES: Oh, okay.

10     MR. WADA: (indiscernible) debtor.

11     MR. BATES: Thanks, Jarod. Okay. Let's go to

12 counsel for creditors on the line. Do me a favor and please

13 state your name, spell your name for the record, your law

14 firm, and the name of the party you represent in these

15 cases. And let's start with counsel for Alex Becker.

16     MS. ROGLEN: Hi, this is Laurel Roglen, R-O-G-L-E-

17 N. I'm with the firm of Ballard Spahr on behalf of Allen

18 Stafford.

19     MR. BATES: Okay. Thank you, Ms. Roglen. And

20 let's go to Ms. Cordean on behalf of the Colorado Department

21 of Revenue for the record please.

22     MS. CORDEAN: This is Carolyn Cordean, C-O-R-D-E-

23 A-N, with the Colorado Department of Revenue.

24     MR. BATES: Thank you, Ms. Cordean. And I believe

25 we're joined by another Department of Revenue. I forgot

Page 6

1 your names, gentlemen. You can make your appearances,
2 please.
3 MR. JACKSON: Brian Jackson (indiscernible),
4 Escambia County Tax Collector.
5 MR. BATES: You said Camden County?
6 MR. JACKSON: Escambia County, E-S-C-A-M-B-I-A.
7 MR. BATES: Thank you.
8 MR. JACKSON: Florida.
9 MR. BATES: Okay. And are there any other counsel
10 on the line? Okay. Can I also get appearances from any
11 creditors who are here on their own behalf starting with Mr.
12 Ron Becker?
13 MR. R. BAECKER: I'm sorry?
14 MR. BATES: Sir, could you just state your name
15 for the record please and who you're representing today? I
16 guess you're representing yourself.
17 MR. R. BAECKER: My name is Ronald Baecker, B-A-E-
18 C-K-E-R, and I'm representing myself.
19 MR. BATES: Okay. Thank you, sir. Are there any
20 other unrepresented creditors on the line right now? Okay.
21 I will check in periodically throughout my examination to
22 see if we've been joined by anyone. But for now we're going
23 to get going. Would anybody other than Ms. Roglen on behalf
24 of Alex Baecker like to question the witness once I've
25 concluded my examination? Okay. Hearing nothing, let's get

Page 7

1 started. So could I please have debtor's counsel briefly
2 introduce the witness who will be testifying today?
3 MR. POMERANTZ: Sure. This is Jeff Pomerantz
4 introducing James Harvey, who is the debtor's chief
5 executive officer.
6 MR. BATES: Okay. Thank you. Okay. Just some
7 quick ground rules and parameters of the examination. All
8 lines other than my own and the debtor's representative will
9 be muted if there's too much background noise. Once I've
10 concluded my examination I will ask parties that wish to
11 speak to send me an email to Malcolm.M.Bates at the
12 USDOJ.gov other than those who have party-entered
13 appearances to receive instructions to unmute so that
14 questions may be asked regarding the debtor's financial
15 condition. That email address is also included in the
16 notice you received regarding the 341 meeting.
17 Please note that neither my office nor the
18 debtor's counsel can give legal advice to members of the
19 general public. Additionally, the debtor may not be able to
20 answer all specific questions regarding individual claims,
21 and parties should consider making arrangements off the line
22 with debtor's counsel directly to discuss some issues
23 further.
24 To the extent any line of questioning begins to
25 get too far afield from the purposes of the 341 meeting,

Page 8

1 which is assessing the financial condition of the debtor, I
2 will ask that party to cease that line of questioning and
3 either move on to other appropriate inquiries or move on to
4 the next party. Although we appreciate everyone's
5 participation, please note that listening to the 341 meeting
6 is not required in order to preserve any legal rights a
7 party may have with respect to the debtor. If you have
8 called in to avoid any impairment of your rights and do not
9 wish to listen to my examination or ask any questions of
10 your own, please feel free to disconnect from the call.
11 You will still be able to listen even when your
12 phone is muted. When speaking please identify yourself for
13 the record and any entity you represent. Do not put the
14 phone on hold at any time after the call is connected. Once
15 the meeting of creditors is finished, please hang up. If
16 you come -- if you become disconnected before the meeting is
17 finished, please call back in.
18 The Section 341 meeting of creditors will be
19 recorded by the U.S. trustee. Any other recordings are
20 prohibited. So before I swear in the witness, are there any
21 questions about what I've just said? Okay. Hearing none,
22 Mr. Harvey, are you prepared to be sworn in?
23 MR. HARVEY: Yes, Mr. Bates, I am.
24 MR. BATES: Okay. Thank you, sir. Mr. Harvey,
25 would you please swear or affirm that the testimony you are

Page 9

1 about to give will be the truth, the whole truth, and
2 nothing but the truth under penalty of perjury?
3 MR. HARVEY: Yes.
4 MR. BATES: Okay. Thank you, sir. With that, I
5 will begin my examination. To start, would you please just
6 state your name and title for the record again?
7 MR. HARVEY: Absolutely. James Harvey, CEO of
8 QLess.
9 MR. BATES: Okay. Thank you, sir. How long have
10 you held that position?
11 MR. HARVEY: Just over two years.
12 MR. BATES: Okay. And who appointed you to the
13 role of CEO?
14 MR. HARVEY: The QLess board of directors.
15 MR. BATES: And that was two years ago?
16 MR. HARVEY: Yes. That was April, late April of
17 2022.
18 MR. BATES: Okay. And what is your current
19 salary, sir?
20 MR. HARVEY: My current salary is $350,000
21 annually.
22 MR. BATES: Were you fully paid up for all pre-
23 petition salary immediately prior to the filing?
24 MR. HARVEY: Yes.
25 MR. BATES: And have you been paid your salary

1  since the filing?

2      MR. HARVEY:  Yes, I have.

3      MR. BATES:  And would you please briefly describe

4  your duties at your current position, sir?

5      MR. HARVEY:  Yes.  My duties would be to set the

6  strategy and direction of the company, to oversee the

7  company's business operations, to meet with our existing

8  customers and ensure high quality service to our customers.

9      MR. BATES:  Okay.  And are you currently a

10  creditor of the debtor?

11      MR. HARVEY:  No.  I am not to the best of my

12  knowledge.

13      MR. BATES:  Okay.  Are you a shareholder of the

14  debtor?

15      MR. HARVEY:  I am.

16      MR. BATES:  Okay.  Are you indebted to the debtor?

17      MR. HARVEY:  No, I am not indebted to the debtor.

18      MR. BATES:  Have you ever leant money to the

19  debtor?

20      MR. HARVEY:  No, I have not leant money to the

21  debtor.

22      MR. BATES:  Okay.  Does the debtor have any claims

23  against you that you are aware of?

24      MR. HARVEY:  None that I'm aware of.

25      MR. BATES:  And have you personally guaranteed any

1  debts to the debtor at any time?

2      MR. HARVEY:  I'm sorry, Mr. Bates.  Could you

3  restate the question?

4      MR. BATES:  Yes, I apologize.  Have you personally

5  guaranteed any debts of the debtor at any time?

6      MR. HARVEY:  No, I have not.

7      MR. BATES:  Thank you, sir.  I've got a few

8  questions about other officers and directors of the company.

9  Are there currently any other officers other than yourself?

10      MR. HARVEY:  There are no declared officers of the

11  company.  There could be implied officers of the company.

12  We have an executive vice president of products and

13  technology, but he's not been declared an officer of the

14  company.

15      MR. BATES:  Okay.

16      MR. POMERANTZ:  I think Mr. Bates (indiscernible)

17  title of officer, but he is not actually a corporate officer

18  as we take them to be in the corporate governance use.

19      MR. BATES:  Okay.  Who was that speaking?  Sorry.

20      MR. POMERANTZ:  That was Jeff Pomerantz.

21      MR. BATES:  Okay.  So no other declared officers.

22  In other words, it's just the CEO right now?

23      MR. HARVEY:  Yes, that's correct.

24      MR. BATES:  Okay.  About how many employees does

25  the debtor currently have?

1      MR. HARVEY:  Around 32 employees.

2      MR. BATES:  Okay.  And how about a year ago?

3      MR. HARVEY:  A year ago we were at or around 65

4  employees.

5      MR. BATES:  Okay.  And so there were some layoffs

6  pre-petition?

7      MR. HARVEY:  My apologies.  There were.  My

8  apologies.  I should've offered clarification.  I'm

9  accustomed to answering that question in a non-legal sense,

10  so I answered that question in a business sense.  We do work

11  with an outsource company that is a separate entity, and we

12  often refer to them in the business sense as employees.  So

13  I am assuming you wanted me to answer in a clear legal sense

14  of employees.

15      MR. BATES:  Yeah.  I mean, I would prefer all the

16  answers be answered in the legal sense that I -- yes.

17      MR. HARVEY:  Yeah.  Okay.  Apologies for that.

18  That was -- that is (indiscernible).  In a legal sense, we

19  were I believe roughly around 45 (indiscernible).

20      MR. BATES:  45 you said?

21      MR. HARVEY:  Around 45 employees a year ago.  Yes.

22  And today we are between 25 and 30 employees today.  I may

23  need to get back to you on the precise number.

24      MR. BATES:  Okay.

25      MR. HARVEY:  I'm accustomed to tracking this

1  number including both entities.  My apologies.

2      MR. BATES:  And what is the other entity?

3      MR. HARVEY:  The other entity is a company called

4  QLess AM, which is in Armenia, the agents for our media.

5  They are an outsourced development organization.  We

6  effectively work with them the same way that we work with

7  employees, but they work directly for QLess AM, and that

8  QLess pays QLess AM for their operating costs on a monthly

9  basis.

10      MR. BATES:  Okay.  That -- I'm going to come back

11  to that later.  So QLess AM employees, certain employees,

12  and the debtor pays QLess' monthly operating costs?

13      MR. HARVEY:  Yes, that is correct.

14      MR. BATES:  And so do those operating costs

15  include employee salaries?

16      MR. HARVEY:  They do.

17      MR. BATES:  But the employment agreements are with

18  the QLess AM.

19      MR. HARVEY:  That is correct.

20      MR. BATES:  Okay.  And what's the relationship

21  between the debtor and QLess AM in the business sense?  Like

22  are they an affiliate, a subsidiary?

23      MR. HARVEY:  We treat them as a subsidiary, but we

24  do not technically own them.  It's just how we operate in a

25  business sense.

1    MR. BATES: Okay. So --

2    MR. POMERANTZ: And just to be clear -- this is

3 Jeff Pomerantz -- Mr. Harvey is saying that there is no

4 corporate ownership. So there is no affiliate subsidiary

5 relationship, but there is a close relationship between the

6 two companies. And that's what I think he meant by use of

7 the "we treat them as a subsidiary". But there's no

8 corporate ownership between the two.

9    MR. BATES: Not formally then, right?

10    MR. HARVEY: That is correct.

11    MR. BATES: Do you know who does own QLess? Is it

12 privately held? Or QLess AM. I apologize.

13    MR. HARVEY: Yes. Yes. So QLess AM --

14 (indiscernible). QLess AM is owned by a woman by the name

15 of Mary Harutyunyan. Mary is in -- the owner and she also

16 works on a daily basis as a part of QLess AM.

17    MR. BATES: Okay. And what kind of services are

18 they providing for you? I understand that they're providing

19 labor, but is -- are these local jobs in Armenia? Or I

20 guess what's the benefit of the relationship to the debtor?

21    MR. HARVEY: Yes, exactly. They are local in

22 Yerevan, Armenia's capital, and they provide product

23 development for engineering types of services to us --

24    MR. BATES: Okay.

25    MR. HARVEY: -- which is to say that they are

1 actively helping us build our product.

2    MR. BATES: Okay. I think I understand. Okay.

3 Thank you very much for that explanation. So let's I guess

4 take a step back to the originating question here, which is

5 how many employees are there currently versus a year ago?

6 So currently, I'll call them the debtor's employees, right,

7 as opposed to QLess AM employees. There's about 25 to 30

8 currently, and a year ago there were approximately 45? Do

9 those numbers sound in the vicinity?

10    MR. HARVEY: Roughly correct, and I -- we can

11 follow up with precise numbers if that's okay.

12    MR. BATES: Sure. That's totally fine. And so

13 there were some layoffs pre-petition. Is that correct?

14    MR. HARVEY: Yes, that is correct.

15    MR. BATES: Okay. And about when did those occur?

16    MR. HARVEY: Those occurred mostly on April 1st of

17 2024 this year with a few additional on July 1, 2024 this

18 yar.

19    MR. BATES: Okay. Okay. And how many directors

20 are there currently?

21    MR. HARVEY: There are five directors.

22    MR. BATES: Okay. And is that different from the

23 pre-petition period?

24    MR. HARVEY: There have been five directors both

25 pre-petition and post-petition.

1    MR. BATES: Okay. And let me just check something

2 here. Okay. And yeah. Those are all -- these -- the

3 directors -- the current directors are the ones listed in

4 Attachment 28 to the SOFA. Is that correct?

5    MR. HARVEY: Give me just one minute.

6    MR. BATES: I'm jumping ahead here. Sorry.

7    MR. HARVEY: That's okay. Can you tell me what

8 page that is?

9    MR. BATES: That would be PDF Page -- oh, wait.

10 That's the very last page of the document, sir.

11    MR. HARVEY: Thank you. Yes. That is the correct

12 list.

13    MR. BATES: Okay. Great. And just for the

14 record, when I say SOFA, I am referring to the debtor's

15 Statement of Financial Affairs for QLess, Inc. filed at

16 Docket Number 67 in the case. Okay. And who appointed the

17 directors?

18    MR. HARVEY: The board of directors appointed

19 myself. The board of directors appointed Freddie Reiss.

20 The board of directors appointed Mark Tapling. I am unaware

21 of who appointed (indiscernible) Richardson or Nathaniel

22 Hoffman. They are non-operating investors on our board.

23    MR. BATES: Got it. Okay. And do you have any

24 independent directors?

25    MR. HARVEY: Yes. Freddie Reiss is an independent

1 director.

2    MR. BATES: Okay. And I'm going to run through

3 basically the same litany of questions that I gave you about

4 your relationship with the company, sir. So are any of the

5 -- I understand there are no other officers, so I'm just

6 going to limit these questions to directors. Are any of the

7 directors creditors of the debtor?

8    MR. HARVEY: Yes. Palisades I believe is a --

9 that we are a debtor. We owe a debt to Palisades.

10    MR. BATES: Mm-hmm. And they're the DIP lender,

11 right?

12    MR. HARVEY: (indiscernible) debtor-in-possession.

13    MR. POMERANTZ: This is Jeff Pomerantz. Just to

14 clarify, Palisades is not a director. I think

15 (indiscernible) the mistake was asking Mr. Harvey is

16 (indiscernible) Richardson a member of the board or any of

17 the members of the board are creditors or not whether

18 entities for whom they may work.

19    MR. BATES: Yeah, thanks, Jeff. I do appreciate

20 that. So Mr. Harvey, when I'm asking this series of

21 questions I'm about to run through, I'm referring to any of

22 the five entities listed on that schedule that you were just

23 referring to, okay?

24    MR. HARVEY: Understood. Thank you for the

25 clarification. That's helpful.

Page 18

1    MR. BATES: And thank you, Jeff.
2    MR. HARVEY: I am not aware of --
3    MR. POMERANTZ: Yes.
4    MR. HARVEY: I am not aware of -- is the question
5 does QLess owe a debt to any of these individuals who are
6 directors?
7    MR. BATES: At a -- yeah, at a very high level,
8 yes. So do any of the entities on that list have some kind
9 of claim against the debtor?
10    MR. HARVEY: Not that I'm aware of.
11    MR. BATES: Okay. Are any of the directors
12 shareholders of the debtor? It looks like the answer is
13 yes.
14    MR. HARVEY: Yes.
15    MR. BATES: Okay. Are any of the directors
16 indebted to the debtor?
17    MS. WALKLEY: May I speak with Justin
18 (indiscernible)?
19    MR. BATES: I'm sorry. Could you repeat that,
20 ma'am?
21    MS. WALKLEY: Hi, Justin. This is Mary Walkley.
22 I don't know if you (indiscernible), but we received
23 (indiscernible) --
24    MR. BATES: Hi. Excuse me. Whoever is leaving a
25 voicemail right now, you are currently --

Page 19

1    MS. WALKLEY: -- (indiscernible).
2    MR. BATES: Sorry. Excuse me. Hi. Did somebody
3 join the line? This is the 341 meeting in QLess. Okay.
4 Justin's going to get an interesting voicemail. I apologize
5 for the interruption. Are any of the debtor's directors --
6    WOMAN: Oh, no. That's probably (indiscernible).
7    MR. BATES: What?
8    MR. POMERANTZ: Malcolm, is there (indiscernible)
9 people?
10    MR. BATES: Yeah. I think we're going to have to
11 go ahead and mute. She does not seem to able to hear me.
12 Okay. So before -- well, okay, here.
13    AUTOMATED VOICE: Mute on.
14    MR. BATES: Okay. To all the creditors and
15 counsel on the line, I do apologize for the interruption.
16 I've muted all lines to cut out the background noise.
17 Debtor's counsel and Mr. Harvey, please just let me know
18 when you have unmuted your lines and I can forward the email
19 that I sent earlier if need be. Okay. Mr. Harvey, are you
20 there?
21    AUTOMATED VOICE: I'm sorry. This option is not
22 available. Mute off. The conference is now in silent mode.
23    MR. BATES: Okay. I apologize for the delay.
24 I've muted all the lines. That was a first for me as far as
25 background noise goes. Debtor's counsel and Mr. Harvey,

Page 20

1 could you please confirm when you have unmuted?
2    AUTOMATED VOICE: Mute on. Mute off.
3    MR. BATES: Mr. Harvey, are you there?
4    MR. POMERANTZ: (indiscernible).
5    MR. BATES: Okay, great. We've got Jeff. And Mr.
6 Harvey, is that you in the background?
7    MR. O'NEILL: Just -- this is James O'Neill again.
8 Just to confirm, press star 6 in order to unmute your line.
9    MR. BATES: Yes, that's correct, Jamie.
10    MR. O'NEILL: Okay. So maybe Mr. Harvey can do
11 that and then I think that you should have debtor's counsel
12 and Mr. Harvey still able to speak while the other parties
13 are muted.
14    MR. BATES: Yeah, that would work.
15    MR. HARVEY: Mr. Bates, this is James Harvey from
16 QLess.
17    MR. BATES: Oh, thank you, Mr. Harvey. Okay.
18 Great. Apologies to everybody again. That was a first for
19 me as far as interruptions during a 341. That was
20 interesting. Okay. We're currently in silent mode. If you
21 would like to be unmuted and did not hear the instructions
22 from Mr. O'Neill, please just go ahead and send me an email.
23 I can send you the instructions, but I'm going to jump back
24 in at this point. Mr. Harvey, where we left off I was
25 asking if any of the directors who are listed on that

Page 21

1 schedule at the end of the debtor's SOFA are currently
2 indebted to the debtor.
3    MR. HARVEY: Not that I'm aware of.
4    MR. BATES: Okay. Have any of them made loans to
5 the debtor?
6    MR. HARVEY: Not that I'm aware of. I don't
7 believe so.
8    MR. BATES: Okay. And does the debtor have claims
9 against any of the directors?
10    MR. HARVEY: No. No claims that I'm aware of.
11    MR. BATES: And have any of the directors
12 personally guaranteed any debts of the debtor?
13    MR. HARVEY: No, not that I'm aware of.
14    MR. BATES: Okay. And does the debtor currently
15 use any independent contractors, consultants, or temporary
16 employees?
17    MR. HARVEY: Yes, we do.
18    MR. BATES: Okay. Which category? All three
19 or...
20    MR. HARVEY: Independent contractors.
21    MR. BATES: Okay. And I saw some references to
22 consulting services in some of the schedules in the SOFA.
23 Are those employees considered independent contractors,
24 consultants, both?
25    MR. HARVEY: They are considered both. We do have

1  -- I'll probably -- just I'll clarify.  We have independent
2  contractors and then we do have temporary consultants.
3          MR. BATES:  Okay.  Who are they?
4          MR. HARVEY:  Temporary consultants would be -- an
5  example of that would be ClearPoint, which provides finance
6  consulting services to us.
7          MR. BATES:  Okay.
8          MR. HARVEY:  Independent contractors would be
9  folks that -- I'll say some names here.  Harry Lufson, Lucas
10  Sherbin, Nakias Sherbin.  Those would be examples of
11  independent contractors.
12          MR. BATES:  Okay.  Thank you.  And I'll come back
13  to that when we get into some of the actual filings.  Okay.
14  Pivoting a little bit here, as far as the equity structure
15  of the debtor, how many shareholders does the debtor have?
16          MR. HARVEY:  I need to get back to you on the
17  exact number.  I believe it is --
18          MR. POMERANTZ:  It's only if (indiscernible).
19          MR. HARVEY:  Yeah, not off the top of my head.
20  Thank you.
21          MR. BATES:  Okay.  And who was that in the
22  background?
23          MR. POMERANTZ:  It's Jeff Pomerantz.  Sorry about
24  that.
25          MR. BATES:  No worries.  What's up, Jeff?  Did you

1  have something to add or...
2          MR. POMERANTZ:  No, I just asked him -- I told
3  him, you know, he doesn't need to guess.  If he knows the
4  answer, he knows the answer.
5          MR. BATES:  Yeah.  Thank you for that --
6          MR. POMERANTZ:  (indiscernible) --
7          MR. BATES:  -- clarification.
8          MR. POMERANTZ:  -- (indiscernible).  Yeah, and I
9  also assume that there's a list of equity holders that's
10  attached to one of those similar statements or somewhere.
11  So --
12          MR. BATES:  I think that's right.  It might've
13  been filed with the petition.
14          MR. POMERANTZ:  Okay.
15          MR. BATES:  But at any rate, Mr. Harvey, do you
16  know how many shareholders the debtor had a year ago?
17          MR. HARVEY:  I do not.
18          MR. BATES:  Okay.  Okay.  And I know that Ms.
19  Roglen's on the line.  I'll probably getting into some
20  questions about that shareholder litigation before she
21  starts her examination.  But I'm going to jump down to the
22  debtor's business generally.  Can you confirm that the
23  debtor is currently operating?
24          MR. HARVEY:  Yes, I can.
25          MR. BATES:  Okay.  And could you briefly describe

1  the nature of the debtor's business for me please?
2          MR. HARVEY:  Yes.  QLess is a technology business.
3  We provide software and sometimes, not often, but sometimes
4  hardware to customers.  Our software operates out of the
5  cloud, so we operate the software on behalf of our
6  customers.  Our customers use our software to meet with
7  their customers.  Those meetings could be folks who walk
8  into their locations, folks who set appointments, and those
9  appointments can be in person or virtual over Zoom, Teams,
10  Webex, or they'd be for customers via a callback queue over
11  the phone.  And our customers use our services to work with
12  their customers roughly just over 30 million times a year.
13          MR. BATES:  Okay.  Perfect.
14          MR. HARVEY:  Collectively.
15          MR. BATES:  And how long has the debtor been in
16  business?
17          MR. HARVEY:  The debtor has been in business since
18  2009.
19          MR. BATES:  And where are its operations located?
20          MR. HARVEY:  Operations are located in multiple
21  locations.  The headquarters is in Pasadena.
22          MR. BATES:  Okay.
23          MR. HARVEY:  We also have employees who work
24  remotely throughout the U.S.  We have contractors who
25  operate out of Argentina and the U.K.  And not employees, we

1  have an outsourced development organization that we
2  discussed earlier (indiscernible) that operates out of
3  Yerevan, Armenia.
4          MR. BATES:  Okay.  And why did this case file in
5  Delaware?
6          MR. HARVEY:  We are incorporated in Delaware.
7          MR. BATES:  And do you know at the moment
8  what the costs of the debtor's operations are?
9          MR. HARVEY:  (indiscernible) --
10          MR. POMERANTZ:  (indiscernible) --
11          MR. HARVEY:  Go ahead.
12          MR. POMERANTZ:  Could you be a little more
13  specific (indiscernible)?
14          MR. BATES:  Yeah, I guess I'm looking for like an
15  aggregate cost of operations number that you might have as a
16  line item in financial statements.
17          MR. POMERANTZ:  Are you looking for on that of a
18  marketing basis?  Are you talking on annual basis?
19          MR. BATES:  Yeah, I guess --
20          MR. POMERANTZ:  An accrual basis?
21          MR. BATES:  Well, I mean, I have questions about
22  that in a minute, but I guess high level -- we've only been
23  in the case for about a month.  So speaking -- sitting -- as
24  we sit here today, I guess on a monthly basis would be most
25  useful.

1    MR. HARVEY:  We have -- it's difficult for me to
2  answer that question because we have a lot of
3  (indiscernible) in our cost.
4    MR. BATES:  Mm-hmm.
5    MR. HARVEY:  We have high-cost months and we have
6  low-cost months.  And so I didn't come prepared to -- I
7  don't want to provide an estimate.  I'd rather provide a
8  precise number.
9    MR. BATES:  Sure.
10    MR. HARVEY:  Is that something we could follow up
11  maybe per se the month -- the most recent month, the month
12  of June?
13    MR. BATES:  Yeah, absolutely.  And I'm going to
14  get into some other questions that I think will nibble at
15  the edges of this.  So that's -- I'm fine with that.
16    MR. POMERANTZ:  And let me also -- I'd suggest one
17  thing.  Our monthly reports too.  I suspect our monthly op
18  reports will have that information in there.  So
19  (indiscernible) file the monthly operating report, and
20  obviously if you have any questions we could follow up with
21  additional (indiscernible).
22    MR. BATES:  Sure.  And I'll skip ahead to that
23  question.  I can't remember -- I also can't remember.  I
24  think it's technically this weekend that would be the first
25  MOR due date.  Are you -- do you -- well, you know what?

1  I'll -- I will actually just save that for later.  I think
2  that's going to be more beneficial later.  Okay.  And then
3  let me jump into post-petition obligations.  Okay.  Is the
4  debtor current on all post-petition obligations, taxes,
5  insurance premiums, things like that?
6    MR. HARVEY:  Yes, we are.
7    MR. BATES:  Okay.  And does the debtor have any
8  taxes, any like accrued or unpaid taxes?
9    MR. HARVEY:  I'm sorry, Mr. Bates.  Could you
10  repeat the question?
11    MR. BATES:  Yeah.  Does the debtor have any
12  accrued or unpaid taxes?
13    MR. HARVEY:  None that I'm aware of.
14    MR. BATES:  Okay.  Approximately how much revenue
15  is currently coming in through the debtor's operations?
16    MR. HARVEY:  Revenue under contract with our
17  customers is roughly 9.1 million.
18    MR. BATES:  Okay.  Have there been any changes to
19  the debtor's cash management system since the filing?
20    MR. HARVEY:  When you say cash management system,
21  I am -- well, maybe you could tell me more specifically what
22  you mean.
23    MR. BATES:  Sure.  Why don't I get a little more
24  granular?  Has the debtor opened any new bank accounts?
25    MR. HARVEY:  No.  Not that I'm aware of.

1    MR. BATES:  Okay.  And the debtor doesn't have
2  like a DIP account for example?
3    MR. HARVEY:  To (indiscernible) --
4    MR. O'NEILL:  This is James O'Neill.  I just want
5  to jump in.
6    MR. HARVEY:  -- (indiscernible).
7    MR. O'NEILL:  Sorry.  So we filed a cash
8  management system --
9    MR. BATES:  Right.
10    MR. O'NEILL:  -- a cash management motion.  We got
11  an interim cash management order.  We have a final cash
12  management order.
13    MR. BATES:  Mm-hmm.
14    MR. O'NEILL:  To my knowledge, the debtor has
15  complied with the terms of the cash management order
16  throughout the case to date.
17    MR. BATES:  Okay.  Okay.  Thanks for that.  I'm
18  still -- I've got a couple of more specific questions on
19  that.  Has there been a debtor-in-possession legend printed
20  on checks and other business forms?
21    MR. O'NEILL:  This is James O'Neill speaking.  In
22  terms of the cash management order, we agreed that the
23  debtor would change or put debtor-in-possession on the
24  checks.  Now, I don't know whether Mr. Harvey is
25  knowledgeable about the checks that have gone out from the

1  debtor or not.  If he is, we can certainly respond to that
2  question.  If he is not knowledgeable about the checks that
3  have gone out, we can -- we'll follow up with you.
4    MR. BATES:  So yes, I think that's the
5  question that's pending, Mr. Harvey.
6    MR. HARVEY:  I am not aware of the text on the
7  checks that have gone out.
8    MR. O'NEILL:  Okay.  So this is James O'Neill.
9  Yeah, we will follow up with you and -- with this.  And with
10  any other questions that we don't have the answer to, I'm
11  kind of keeping a list.  And we can go back and follow up
12  and give you any information you need.  We are -- and so,
13  again, if Mr. Harvey doesn't know the answer to something,
14  we will -- I will jot it down.  We'll follow up and get you
15  the information that you need.
16    MR. BATES:  Okay.  Great.  Thanks, Jamie.  Okay.
17  And Mr. Harvey, where -- no, you know what?  I'm good on
18  that.  Bah, bah, bah.  Mr. Harvey, can you just briefly tell
19  me why the debtor filed a bankruptcy case?
20    MR. HARVEY:  Yes.  QLess as a business has been
21  operating for years earning cash, which is to say that it's
22  been operating with significant net operating losses.  We
23  have narrowed those net operating losses over the past two
24  years significantly and have been headed towards a path to
25  profitability particularly with a new product that we've

Page 30

1  introduced.
2      However, over the past year to year and a half, we
3  have incurred significant legal fees as a result of multiple
4  lawsuits that have been brought against QLess by its former
5  founder and a few shareholders. Those lawsuits we have
6  spent -- not only have we spent a lot of money already on
7  those lawsuits, but the estimates to continue fighting those
8  lawsuits would put the company out of business. And that's
9  what led us to pursue bankruptcy.
10     MR. BATES: Okay. Thank you. And when did the
11  debtor decide to file?
12     MR. HARVEY: There was (indiscernible) --
13     MR. O'NEILL: (indiscernible). So Mr. Harvey, you
14  can answer that question if it doesn't involve disclosure of
15  attorney-client information.
16     MR. BATES: And Mr. Harvey, you can consider that
17  consult applicable to any question I ask you. I'm not
18  seeking any attorney-client privilege information here.
19     MR. HARVEY: Understood. No, I don't feel like --
20  I mean, these are public items. So I don't feel like we're
21  disclosing any attorney-client privileged information.
22  There was a filing in 2022. There was one of the legal
23  matters that was filed by the former founder. And there was
24  a second in 2023 filed end of 2023 in December filed by the
25  former founder and a few shareholders.

Page 31

1      MR. BATES: Sorry. And when you say -- you're
2  referring to shareholder lawsuits?
3      MR. HARVEY: One shareholder lawsuit, yes.
4      MR. BATES: Okay.
5      MR. O'NEILL: (indiscernible) --
6      MR. BATES: I apologize --
7      MR. O'NEILL: -- (indiscernible).
8      MR. BATES: -- Mr. Harvey. My question was when
9  did this debtor QLess decide to file its Chapter 11 case?
10     MR. HARVEY: Oh, my apologies. We made that
11  decision in June of this year.
12     MR. BATES: Okay. And who made the decision on
13  behalf of the company?
14     MR. HARVEY: The board of directors.
15     MR. BATES: Okay. And was the board constituted
16  with the same members that it is today? In other words,
17  including the same members that are listed on the schedule
18  to the debtor's SOFA?
19     MR. HARVEY: We had a change in one of our board
20  of directors -- one of our directors.
21     MR. BATES: Okay.
22     MR. HARVEY: And one director leaving and another
23  joining. And I cannot remember exactly on the date of
24  voting to make the decision if our new board member has been
25  a board member, Freddie Reiss, was part of that vote. So

Page 32

1  I'll have to come back to you on that.
2      MR. BATES: Okay. That's fine. Okay. Has QLess
3  ever filed a prior bankruptcy case?
4      MR. HARVEY: Not that I'm aware of.
5      MR. BATES: Has QLess ever used any other names?
6      MR. HARVEY: Not that I'm aware of.
7      MR. BATES: Okay. And before the company filed
8  for bankruptcy, did it make any transfers of property in the
9  12 months preceding bankruptcy? Other -- well, let me take
10  a step back. The debtors filed a pretty extensive schedule
11  listing payments made in the 90 days before the bankruptcy
12  case as well as transfers to insiders in the one year before
13  the bankruptcy case. I'm curious if the debtor made any
14  transfers of property other than the transfers listed in
15  those schedules in the 12 months preceding this bankruptcy
16  case.
17     MR. HARVEY: No, not that I'm aware of.
18     MR. BATES: Thank you. Okay. Mr. Harvey, do you
19  have the debtor's Chapter 11 petition in front of you? This
20  would be Docket Item 1 filed in the case.
21     MR. HARVEY: Give me just one moment.
22     MR. BATES: No problem.
23     MR. HARVEY: I do. It's not in the documents I
24  have right in front of me, so I am collecting it now.
25     MR. BATES: Okay. Just let me know when you're

Page 33

1  prepared to answer questions about that.
2      MR. HARVEY: Yeah. Apologies. I have the
3  Schedule of Assets and Liabilities along with the SOFA in
4  front of me, the (indiscernible) of filings, but I now have
5  the filing including my declaration.
6      MR. BATES: Okay. Excellent. I'm looking at Page
7  4 of the petition, Item Number 17.
8      MR. HARVEY: I don't believe I am looking at that
9  particular document. This was part of the January 19th
10  filing. Is that correct?
11     MR. BATES: That's correct. And you know, I can
12  ask you some questions without having the document in front
13  of you, and I think we should be able to accomplish the same
14  purpose. Let me ask you this. It's -- is it correct that
15  you signed the debtor's Chapter 11 petition this case, sir?
16     MR. HARVEY: That is correct.
17     MR. BATES: And did you read the document before
18  you signed it?
19     MR. HARVEY: I did.
20     MR. BATES: And did counsel and the debtor explain
21  or answer any questions you had about the document to your
22  satisfaction before you signed it?
23     MR. HARVEY: Yes, they did.
24     MR. BATES: And when you signed the document, did
25  you understand the contents of the document?

9 (Pages 30 - 33)

Page 34

1    MR. HARVEY: I did.

2    MR. BATES: Okay. Thank you, sir. So at this

3 point, Mr. Harvey, I'm going to jump into the Statement of

4 Financial Affairs and -- or excuse me, the Schedules of

5 Assets and Liabilities followed by the Statement of

6 Financial Affairs that the debtor filed in this case on July

7 17, 2024. The first document I'm going to reference is

8 Docket Item 66, the Schedules of Assets and Liabilities for

9 QLess, Inc. And just let me know when you're ready to

10 answer questions about that.

11    MR. HARVEY: I have it in front of me. I'm ready.

12    MR. BATES: Okay. Great. So to start off, I'm

13 looking at the -- I'm going to jump right past the Summary

14 of Assets and Liabilities, and I'm going to go straight into

15 the Schedule AB. And I just have some really high-level

16 questions about the schedule first. So I'm aware that the

17 --

18    MR. POMERANTZ: I'm sorry, Mr. Bates?

19    MR. BATES: Yes.

20    MR. POMERANTZ: I'm sorry, Mr. Bates. I hate to

21 interrupt, but I'm just going to be efficient. What page

22 are we looking at?

23    MR. BATES: I am looking at Page 4. If you're

24 going by the legend on the top of the document from the

25 Pacer system.

Page 35

1    MR. POMERANTZ: Okay. My Page 4 has the

2 investment.

3    MR. BATES: Hmm. The Page 4 I'm looking at says

4 Schedule AB Assets, Real and Personal Property at the top.

5 Oh, I see what you're looking at. Yes, sir. Yes. You're

6 in the -- bah, bah, bah. So if you look at the top of the

7 page on the document it should say Case 24-11395-BLS Doc 66

8 filed on July 17, 2024, Page blank of 48. And I'm on Page 4

9 going by that legend.

10    MR. POMERANTZ: (indiscernible). My print-out of

11 this doesn't have that information (indiscernible) --

12    MR. BATES: Oh, okay. I see.

13    MR. POMERANTZ: -- the filing print-out of the

14 document that was submitted for the filing. So that's

15 (indiscernible), but I'm on Schedule -- I do see it on here.

16 Schedule AB Assets, Real and Personal Property.

17    MR. BATES: Okay. Terrific. So I am looking at

18 that. And just generally speaking, I'm aware that the

19 debtor has a pre-petition secured lender. And just at a

20 very high level, what assets are covered by that secured

21 lender's liens? Is it substantially all of the debtor's

22 assets?

23    MR. HARVEY: Yes, substantially all of the

24 debtor's assets.

25    MR. BATES: Okay. I'll have some more specific

Page 36

1 questions about that later, but I don't want to burn time on

2 that now. And another general question, have any appraisals

3 been performed of the debtor's property in the last two

4 years?

5    MR. HARVEY: My apologies. My phone cut out, Mr.

6 Bates. Have any appraisals of what specifically?

7    MR. BATES: Sorry. Have any appraisals of any of

8 the debtor's property been conducted in the last two years?

9    MR. POMERANTZ: From -- this is Jeff Pomerantz,

10 Mr. Bates. You're asking him in the years prior to the

11 petition date, correct?

12    MR. BATES: That's correct.

13    MR. HARVEY: Jim, I have a question. Would this

14 include from a legal response (indiscernible) valuation?

15    MR. O'NEILL: If you know, right, for pre-

16 petition. The two years leading up to the bankruptcy, was

17 there any valuation done of the debtor's assets leading up

18 to the bankruptcy --

19    MR. HARVEY: Yes.

20    MR. O'NEILL: -- (indiscernible) petition?

21    MR. HARVEY: Yes, there was.

22    MR. BATES: Okay. And when was that performed?

23    MR. HARVEY: That was performed in February of

24 2023.

25    MR. BATES: And who was the appraiser?

Page 37

1    MR. HARVEY: We used the appraiser of -- you know

2 what? I need to check to give you a precise answer.

3    MR. BATES: Okay.

4    MR. HARVEY: So I'll follow up with a precise

5 answer.

6    MR. BATES: Yes, no problem. Just getting that

7 down. Okay. Sticking with Part 1 of the AB, I just wanted

8 to confirm. I'm looking at item -- Part 1, Item 3, which

9 lists the debtor's bank accounts. I know we talked about

10 the cash management system a little bit, but just for the

11 record today, could you just confirm basically which

12 accounts these are in Items 3.4 and 3.5? In other words,

13 what are these accounts used for?

14    MR. HARVEY: Yes. These accounts -- Celtic Bank

15 is used for the collection of customer receipts --

16    MR. BATES: Mm-hmm.

17    MR. HARVEY: -- per the loan agreement. So

18 customer receipts, electronic customer receipts are

19 deposited into the account for Celtic Bank. Bridge Bank is

20 used as our operating account. And so as an example, we pay

21 employees, employee paychecks, payroll --

22    MR. BATES: Mm-hmm.

23    MR. HARVEY: -- is funded by, amongst other

24 things, but that's one of the biggest ones funded out of the

25 Bridge Bank account.

10 (Pages 34 - 37)

1    MR. BATES: Great. Okay. I'm going to jump to
2  Part 3 of the Schedule AB.
3    MR. HARVEY: Okay.
4    MR. BATES: And I'm looking at Item 11B, which
5  aged AR over 90 days. It looks like there's just about 6K
6  there in face amount. Could you just tell me what, if you
7  know, what this relates to and why it isn't doubtful?
8    MR. HARVEY: Yes. Those are those that we've sent
9  to customers, and we sent those bills, and they were due
10 greater than 90 days ago.
11    MR. BATES: Okay. And is it common for the
12 debtor's customers to take more than 90 days to pay their
13 invoices?
14    MR. HARVEY: No. As you can see by the balance
15 here, it does happen.
16    MR. BATES: Mm-hmm.
17    MR. HARVEY: It is a very small percentage of
18 total billings. So yes, it's common, but it is a very small
19 -- typically a very small number of customers.
20    MR. BATES: Okay. But typically the debtor is
21 able to recover those amounts?
22    MR. HARVEY: I'm sorry, Mr. Bates. Could you
23 repeat the question?
24    MR. BATES: Yes. But typically the debtor is able
25 to recover those amounts?

1    MR. HARVEY: Typically.
2    MR. BATES: Okay. I'm going to jump now, sir, to
3  Part 7 of the AB.
4    MR. HARVEY: Okay.
5    MR. BATES: And I'm looking at the valuations
6  provided in Items 39 and 41 for some of the debtor's hard
7  assets. And I am -- no, you know what? I think after
8  further review of the filings this got answered for me. So
9  we can strike that. And I'm going to go to Part 9 instead.
10 And I'm looking at Item 55.
11    MR. HARVEY: I'm with you.
12    MR. BATES: I just wanted to clarify if both of
13 these leased spaces are with Providence.
14    MR. HARVEY: No.
15    MR. BATES: Okay. So can you --
16    MR. HARVEY: Providence is the --
17    MR. BATES: Okay.
18    MR. HARVEY: Yes, it's the office space in
19 Englewood, Colorado.
20    MR. BATES: Okay. And who's the landlord in
21 Pasadena?
22    MR. HARVEY: Give me one second for the technical
23 name. We work out of a shared office --
24    MR. BATES: Oh, okay.
25    MR. HARVEY: -- location. It's like a

1  (indiscernible).
2    MR. BATES: I was just about to ask.
3    MR. HARVEY: Yeah. But with the actual -- who we
4  pay the bill to --
5    MR. BATES: Mm-hmm.
6    MR. HARVEY: -- it would be a different name from
7  Industrious. It is in one of our filings. I just don't
8  have it right here.
9    MR. BATES: Okay. No worries.
10    MR. HARVEY: (indiscernible) pages I think, but
11 (indiscernible).
12    MR. BATES: Okay. That's fine. I'm looking at
13 Part 10. I had some questions about, to start with, IP. So
14 Item 64.
15    MR. HARVEY: Yes.
16    MR. BATES: So capitalized proprietary software,
17 does this refer to what I think the debtor has called its
18 old software at the first-day hearing?
19    MR. HARVEY: No. This is mostly items with the
20 exact percentage, but this is largely the building of the
21 new software.
22    MR. BATES: Okay.
23    MR. HARVEY: And this would be, you know, on a gap
24 basis wages, income factors that we use and those costs are
25 capitalized.

1    MR. BATES: Okay. Okay. Well, you anticipated my
2  next question. I'm going to jump down to Item 67. And I'm
3  going to have I think a little bit more of a specific point
4  on this later, but I did want to ask basically what the
5  debtor's privacy policy says, if anything, about transfers
6  of personally identifiable information, which I'll call PII
7  from now on.
8    MR. POMERANTZ: This is Jeff Pomerantz. If you
9  know, Mr. Harvey.
10    MR. HARVEY: (indiscernible) in a business sense,
11 but I don't feel comfortable answering that in a legal
12 sense.
13    MR. BATES: Okay.
14    MR. HARVEY: Can we follow up with a response to
15 that later?
16    MR. BATES: Yeah, that's no problem. I -- and I
17 -- you know, Jeff and Jamie, all have my -- they will
18 probably know better with that. This may ultimately not be
19 an issue in this case, but it's just something I had to ask
20 about. So I'll come back to this in a little bit. I might
21 have a question you can't answer for me, but if one of the
22 lawyers could, I don't know, maybe they'll flip a copy of
23 the privacy policy or something, that might be helpful and
24 just resolve the issue.
25    MR. POMERANTZ: Yeah. I can clarify that these

11 (Pages 38 - 41)

Page 42

1 (indiscernible) we filed today would not contemplate a sale
2 of the company's assets.
3        MR. BATES:  Okay.  Is there anything coming down
4 the pike like that?
5        MR. POMERANTZ:  No.
6        MR. BATES:  Okay.  Great.  Thank you.  That
7 answers my question.  I'm going to go to Part 11.
8        MR. HARVEY:  Okay.
9        MR. BATES:  So I'm looking at Item 72.  This deals
10 with tax refunds and unused NOLs, non-operating losses,
11 excuse me, which I'll refer to NOLs from now on.  The debtor
12 obviously included a Schedule AB72 attachment that provides
13 that the unused tax refunds and NOLs have a face value of
14 $15 million with a caveat that that may not reflect current
15 values.  So I'm just wondering if the debtor has a position
16 on current value of unused tax refunds and NOLs or a
17 ballpark.
18        MR. POMERANTZ:  If you know, Mr. Harvey.  If you
19 don't know, you could say I don't know.
20        MR. HARVEY:  Yes, I know, but again, we track on
21 what we're tracking in the ballpark on a -- in a business
22 definition.  So for example, how we would discuss it at a
23 board level, I know what roughly the ballpark is.
24        MR. BATES:  Okay.  What would that be?
25        MR. HARVEY:  But I don't know how it reconciles to

Page 43

1 this particular list, but that is cumulatively 35 million of
2 net operating losses since the -- since 2009.
3        MR. BATES:  Okay.  So the business' position is
4 that as we sit here today, the all-in value of the unused --
5 or excuse me, tax refunds and unused NOLs is 35 million?
6 Did I hear that correctly?
7        MR. HARVEY:  Yes (indiscernible).
8        MR. POMERANTZ:  (indiscernible).
9        MR. HARVEY:  Go ahead.
10        MR. POMERANTZ:  I think Mr. Harvey said that's
11 what's reflected in the books and records as to what it's
12 done.  They are available (indiscernible).
13        MR. BATES:  What was the last part of that, Jeff?
14 Sorry.
15        MR. POMERANTZ:  Yeah.  I'm looking at where it's
16 reflected.  As you know, NOLs and their availability are a
17 lot of (indiscernible) analysis.  I think Mr. Harvey would
18 agree that there hasn't been a formal analysis by an
19 accountant as to the availability of the (indiscernible).
20 So I think he could testify as to what is in the books and
21 records.  But beyond that, in terms of any analysis or
22 evaluation of those and their availability is something I
23 don't think he's (indiscernible) testify about.
24        MR. BATES:  Well, let me ask this then.  Has there
25 been a formal analysis by accountants of the value of these

Page 44

1 assets?
2        MR. HARVEY:  I'm going to defer to my counsel on
3 that.
4        MR. POMERANTZ:  Yeah, I'm not aware of any
5 analysis of the available (indiscernible).
6        MR. BATES:  Sorry.  I didn't mean the
7 availability.  I -- well, I understand that there is -- to
8 an extent of availability and value go hand in hand, but let
9 me -- to maybe broaden the scope a little bit, has there
10 been any analysis at all of the potential of value of these
11 NOLs by an accountant or other auditor or financial advisor?
12        MR. POMERANTZ:  Yeah, I'm not aware of any.  As
13 you know, there have been corporate transactions that were
14 reflected in the bankruptcy filings that are part of the
15 issues of the lawsuit that's filed.  So what -- and those
16 transactions have an impact on the valuation.  I'm unaware
17 of any that's been done to determine whether the NOLs that
18 are otherwise on the books and records are still available.
19        MR. BATES:  Okay.  And Mr. Harvey, as the witness,
20 is that also your understanding?
21        MR. HARVEY:  That is also my understanding.  Yes,
22 Mr. Bates.
23        MR. BATES:  Okay.  Thanks, guys.  The -- no, you
24 know what?  I don't need that answered.  On Item 74 -- and
25 we'll take Items 74 and 75 together, I'm just wondering

Page 45

1 about contingent claims here or unliquidated claims and
2 causes of action.  Obviously there's been a lot of
3 litigation here.  I'm wondering if there's been any
4 counterclaims filed or positions taken on contingent or
5 unliquidated claims in these lawsuits, pre-petition
6 lawsuits.
7        MR. POMERANTZ:  If you know, Mr. Harvey, since
8 you're not a lawyer.
9        MR. BATES:  Yeah.  Mr. Harvey, I'll just -- let's
10 just make a standing comment that I'm only asking about
11 things you know about.  I'm not interested in you making
12 guesses about thing you don't know about, and I'm not
13 seeking any information that's protected by the attorney-
14 client privilege.  We can just assume that that applies to
15 all questions.
16        MR. HARVEY:  Okay.  Thank you, Mr. Bates.  I don't
17 know --
18        MR. BATES:  Okay.
19        MR. HARVEY:  -- in response to 74 and 75.
20        MR. BATES:  Okay.  Terrific.  Okay.  I'm going to
21 jump to the Schedule D.
22        MR. HARVEY:  Okay.
23        MR. BATES:  And I'm at Item 2.2, which is the
24 secured claim of Celtic Bank Corporation.  So --
25        MR. HARVEY:  Yes, I'm here.

12 (Pages 42 - 45)

1  MR. BATES:  Okay.  Great.  I think the first issue
2  I have is I just wanted to -- let me start with this.  Can I
3  -- can you confirm why in Column B the value of the
4  collateral that supports this claim is listed as
5  undetermined?
6  MR. HARVEY:  I cannot.
7  MR. BATES:  Okay.
8  MR. POMERANTZ:  If I could just interject
9  (indiscernible), since they have substantially all of the
10  assets of the company, and since the company has not done a
11  recent valuation of its assets, I believe that's why
12  undetermined (indiscernible).
13  MR. BATES:  Okay.  And I'm looking at -- in the --
14  I guess you could call it the second line here under
15  "describe the lien", there's a reference to a California UCC
16  filing.  Do you see that?  Mr. Harvey?
17  MR. HARVEY:  Apologies.  I was looking at it.
18  Yes, I do.
19  MR. BATES:  Okay.  So this is -- I guess I should
20  confirm this, but this appears to be an expired UCC, and I
21  should be more specific and say it's (indiscernible) UCC.
22  And it looks like the UCC one that currently reflects Celtic
23  Bank's security interest is File Number U230011554320.  Is
24  that also your understanding, Mr. Harvey?
25  MR. HARVEY:  I can't confirm that because I don't

1  have those UCC numbers available to me.
2  MR. BATES:  Okay.  That -- if you can confirm
3  that, debtors or debtor's counsel, that was something that
4  should probably be updated.  And that UCC is --
5  MR. POMERANTZ:  Yeah.
6  MR. BATES:  -- dated February 16, 2023.  That UCC,
7  the February 16, 2023 UCC, so that pre-dates the date
8  that was incurred by about five days.  I'm guessing this is
9  because that was when the loan was actually funded, the
10  21st?  Is that correct?
11  MR. HARVEY:  I don't know that answer specifically
12  to the date.
13  MR. BATES:  Okay.
14  MR. HARVEY:  But I know that it was February of
15  2023.
16  MR. BATES:  Okay.  All right.  I'm going to jump
17  to the -- oh, actually -- no, yeah, I did have one more
18  question on that.  So I did look at the -- I took a look at
19  the UCC.  I think you've already answered this.  So it looks
20  like the lien encumbered substantially all of the debtor's
21  assets like you said.  I wanted to ask specifically does the
22  lien cover the debtor's software, other IP, including the
23  software that's being developed now?
24  MR. HARVEY:  Yes, it does.
25  MR. BATES:  Okay.  Okay.  Now I'll jump to the EF.

1  And I'm looking at Schedule EF, Part 1.  This is priority
2  unsecured claims.  And I'm curious about the IRS' claim.  So
3  it's listed as contingent and disputed.  And the basis for
4  the claim is a tax lien.  So -- and there's no priority
5  amount listed.  So I guess I've got a couple of questions
6  here.  The first is why is this listed as contingent and
7  disputed?
8  MR. HARVEY:  This pre-dates my arrival, so the
9  following is my understanding.  This dates back to 2018.
10  MR. BATES:  Okay.
11  MR. HARVEY:  And at that time in 2018, the company
12  failed to remit payroll taxes to the IRS.  There was an IRS
13  lien that was filed, which is (indiscernible) in question
14  here.  The company paid the IRS for those payroll taxes and
15  penalties and interest is my understanding.  And the IRS
16  failed to remove the lien, and the company never followed up
17  to have the lien removed.  So it is my understanding that we
18  have no liability to the IRS, but still we have a lien
19  against the company.
20  MR. BATES:  Okay.  Well, if there's a lien, I
21  mean, it should probably be in the Schedule D.  I think
22  that's probably another (indiscernible) that we would need.
23  MR. POMERANTZ:  And we're happy to reflect that.
24  MR. BATES:  Okay.  But bottom line is the
25  company's position is that has been paid.  So there's a lien

1  out there, but the company's position is that it's baseless
2  basically because it's already been paid back?
3  MR. HARVEY:  That is correct.
4  MR. BATES:  Okay.  I'm going to jump down to Part
5  2 of the EF, Mr. Harvey, which is non-priority unsecured
6  claims, also called general unsecured claims.  I might refer
7  to them in that way interchangeably.
8  MR. HARVEY:  Okay.
9  MR. BATES:  The first one I wanted to -- I know
10  this -- I'm just going to run through a couple of the
11  specific ones here.  I'm looking at Item 3.2, which is the
12  claim asserted by Alex Baecker.
13  MR. HARVEY:  Yes.
14  MR. BATES:  So I see there's no amount listed
15  here.  I'm wondering if there's a -- and I see it's listed
16  as unliquidated, but there's no amount and no like unknown.
17  So I guess I'm curious why this was left blank or if there's
18  been a pre-petition amount asserted in any of the litigation
19  or anything like that.  I'm just wondering why it was left
20  in blank at eye level.
21  MR. POMERANTZ:  Yeah.  And so I can -- there's a
22  complaint with no demand amount, which is why it was listed
23  as contingent and unliquidated (indiscernible) anything
24  (indiscernible) --
25  MR. BATES:  Okay.

1    MR. POMERANTZ:  -- (indiscernible) is that there
2 is no liability.
3    MR. BATES:  And Jeff, my understanding was there
4 was also an arbitration where there was an asserted
5 liquidated claim.  Is that right?
6    MR. POMERANTZ:  Well, there's -- there is --
7 again, we dispute.  We think they're contingent,
8 unliquidated, and disputed.  There is an arbitration going
9 on unrelated to the (indiscernible) litigation.  But we
10 dispute any claims in reality whether it's an item amount
11 listed or not.  It's a disputed, unliquidated, and
12 contingent.  I am -- and if Mr. Baecker wants to file a
13 proof of claim that would probably be objected to.
14    MR. BATES:  Well, I -- listen, we can take it as a
15 given that the debtor thinks it's contingent, unliquidated,
16 and disputed, and all that.  But I mean, the debtor also
17 thinks the IRS claim is contingent, disputed, and --
18 contingent and disputed, but there's a claimant out there.
19 So I think if there's amounts that are asserted out there,
20 at a minimum, something should be included.
21    MR. POMERANTZ:  Oh, yeah.  But is your question
22 that the arbitration is not listed here for reason?  Is that
23 the question?
24    MR. BATES:  No.  I mean, it says arbitration
25 plaintiff, and I think there was at least an amount asserted

1 there.  And look, again, I completely understand the
2 debtor's position.  I'm not taking a position on that at all
3 and whether this claim exists and what amount.  It actually
4 -- if -- to the extent there is a claim, what the amount of
5 that claim may be.  I just think that the purpose of the
6 schedules is for there to be disclosures made on this point.
7 So if there's been a claim asserted, I think it should be
8 included.
9    MR. POMERANTZ:  Okay.  That could be the trustee's
10 position.  We don't believe that we understand the nature
11 and extent of those arbitration claims.  They're broad-
12 reaching and frivolous.  So we would not be intending to
13 modify the schedules to reflect that.  If Mr. Baecker files
14 his own claim, then that would be deemed allowed until we
15 object to it.
16    MR. BATES:  Okay.  I'm going to jump to 3.3, Mr.
17 Harvey.  This is Serocaro Investment Trust.
18    MR. HARVEY:  Yes, Mr. Bates.
19    MR. BATES:  I just have a general question about
20 the basis for the claim here, and this is applicable to
21 several of the claims listed.  So I wanted to use this one
22 to kind of get some color here.  Could you just give me some
23 background on the 2021 recapitalization event?
24    MR. O'NEILL:  Well, again, the background of this
25 issue is the subject of litigation.  I do not want Mr.

1 Harvey to be describing the history of any transactions that
2 are subject to litigation.  I can tell you that basically
3 several claims listed are certain shareholders who claimed
4 they were entitled to certain merchant consideration, but
5 they failed to miss or comply with the prerequisites to
6 actually getting that consideration.
7    So they are not -- from the debtor's perspective,
8 not entitled to that consideration.  That -- those are
9 issues that are raised in the lawsuit.  And given that
10 there's a very -- a pending active lawsuit, I do not want
11 Mr. Harvey testifying anything about the specifics of any of
12 the transactions.
13    MR. BATES:  Okay.  Give me one second.  Mr.
14 Harvey, did you say that you had your first day declaration
15 in front of you?
16    MR. HARVEY:  Yes, I do.
17    MR. BATES:  Okay.  Could you go to Paragraph 14
18 please?
19    MR. HARVEY:  Absolutely.  I'm looking at that
20 Paragraph 14.
21    MR. BATES:  Okay.  In the paragraph there's a
22 sentence that begins about halfway through.  "At its
23 essence, the shareholder lawsuit alleges various forms of
24 wrongdoing associated with a merger transaction in October
25 2021 in which, among other things, QLess was recapitalized

1 with considerable new equity investment by Palisades," and
2 so on.  Is this the 2021 recapitalization event that's
3 described in the Schedule EF?
4    MR. HARVEY:  Jeff, am I allowed to answer this
5 question?
6    MR. POMERANTZ:  Yeah, you can say that's what you
7 (indiscernible), yes.
8    MR. HARVEY:  Yes.  This is related to the previous
9 item we were discussing 3 point -- sorry, I lost track of
10 which one it is, but --
11    MR. BATES:  It's 3.3.  It applies to several, but
12 yeah.  But generally speaking, this is the basis for what
13 was referred to as the 2021 recapitalization event?
14    MR. HARVEY:  Yes, Mr. Bates.  That's right.
15    MR. BATES:  Okay.  Thank you.  And would you look
16 at Paragraph 15 now?
17    MR. HARVEY:  Okay.
18    MR. BATES:  And that paragraph -- this is your
19 declaration, and it says that that -- in that paragraph Alex
20 Baecker has asserted a claim for approximately $500,000 plus
21 interest in arbitration against QLess.
22    MR. HARVEY:  Yes, I see that.
23    MR. BATES:  Plus $4,000 for -- $400,000 for
24 severance?
25    MR. HARVEY:  Yes.

1    MR. BATES: Plus $660,000 for alleged compensation
2 for work as a consultant?
3    MR. HARVEY: I don't see the 660,000.
4    MR. BATES: Sorry. That goes -- that bleeds onto
5 the next page as a write-on.
6    MR. HARVEY: Okay. I'm looking at Paragraph 15.
7 I see the 500,000. I see the 400,000. I'm looking at the
8 actual filing from 6/19. I do not see the 600,000.
9    MR. BATES: Yeah, the paragraph continues onto
10 Page 7.
11    MR. HARVEY: Oh, hold on one second. My -- yes, I
12 see it. 600,000 for alleged compensation for work as a
13 consultant.
14    MR. BATES: Okay. And is that -- are those
15 amounts -- you understand those to be the amounts that Mr.
16 Baecker is asserting in that arbitration?
17    MR. HARVEY: Yes.
18    MR. BATES: And -- but I understand that the
19 debtors dispute that those amounts are valid and that they
20 believe these claims are contingent and disputed. Is that
21 correct?
22    MR. HARVEY: That is correct.
23    MR. BATES: And these amounts were known to the
24 debtors when they prepared their schedules and statements?
25    MR. HARVEY: Yes, the filing (indiscernible) my

1 declaration was known during the completion of the
2 schedules.
3    MR. BATES: Okay. Again, I think the schedules
4 should be updated to include these amounts. I don't
5 understand why you would leave this in blank. But I will
6 drop that for right now.
7    MR. POMERANTZ: We understand your position.
8    MR. BATES: Okay. Great. Mr. Harvey, I'm going
9 to jump to Item 3.4. This is Chipman Brown.
10    MR. HARVEY: I am here.
11    MR. BATES: Okay, great. I'm going to have
12 questions. I see several law firms listed here, so just to
13 preview this I'm going to have similar questions for a lot
14 of the law firm claims. So basis for the claim is
15 professional services. And I should take a step back. Can
16 I just have you confirm that Chipman Brown is a law firm?
17    MR. HARVEY: Yes, that is my understanding.
18    MR. BATES: Okay. Do you know what -- well, did
19 Chipman Brown provide litigation services for the debtor?
20    MR. HARVEY: No. They provided the sale of QLess
21 -- services related to the sale of QLess --
22    MR. BATES: Okay.
23    MR. HARVEY: -- to a company called Drake Star.
24 Oh, I'm sorry. Trick Star provided services to QLess for
25 the 2021 transaction, and Chipman Brown is representing

1 Drake Star.
2    MR. BATES: Can you spell the name of that entity?
3 Sorry.
4    MR. HARVEY: Yes. D as in David, R as in Robert,
5 A as in apple, K as in Kansas, E as in Edward, S as in Sam,
6 T as in Tom, A as in apple, R as in Robert.
7    MR. BATES: Okay. And Drake Star was involved in
8 this 2021 transaction and QLess is on the hook for their
9 fees?
10    MR. HARVEY: Yes. QLess pre-petition indemnified
11 Drake Star.
12    MR. BATES: Got it.
13    MR. HARVEY: That is my understanding.
14    MR. BATES: Okay. Thank you. That's helpful.
15 Okay. I'm going to jump to it looks like 3.6. This is
16 Dailey LLP.
17    MR. HARVEY: Yes.
18    MR. BATES: And did Dailey -- is Dailey a law
19 firm? Sorry.
20    MR. HARVEY: That is my understanding.
21    MR. BATES: Okay. Do you know if they provided
22 litigation services for the debtor?
23    MR. HARVEY: Not directly. They provide
24 litigation services for the former CEO of QLess named Kevin
25 Grauman is my understanding. And Kevin Grauman was named in

1 the shareholder suit, and QLess indemnifies Kevin Grauman
2 pre-petition.
3    MR. BATES: Okay. Got it. Okay. I'm going to
4 jump to 3.8. It says KBB Capital.
5    MR. HARVEY: Which item number is that again?
6    MR. BATES: It's 3.8.
7    MR. HARVEY: I see it. 3.8, yep. I see it.
8    MR. BATES: Just wanted to confirm. And why don't
9 we do -- yeah, let's do the -- let's do it this way. Can
10 you confirm that the 2021 recapitalization event here is the
11 same 2021 recapitalization event that we were discussing
12 with respect to Serocaro Investment Trust?
13    MR. HARVEY: That is my understanding, yes.
14    MR. BATES: Okay. And Mr. Harvey, there are
15 several other places in the Schedule EF that refer to a 2021
16 recapitalization event. Can you confirm that they all refer
17 to the same "2021 recapitalization event"?
18    MR. HARVEY: Yes, I can.
19    MR. BATES: Okay. Great. All right. I'm going
20 to jump -- I'm going to get to Palisades in a second, but I
21 wanted to ask first. I didn't see -- I'm curious. Did
22 Morris Nichols Arsht and Tunnell, which is a law firm,
23 provide any services for the debtor pre-petition?
24    MR. HARVEY: Yes, they did provide services pre-
25 petition.

15 (Pages 54 - 57)

1    MR. BATES:  And what was the nature of those
2  services?
3    MR. HARVEY:  Those services were related to the
4  shareholder lawsuit that was related to the 2021
5  recapitalization appeals.
6    MR. BATES:  Okay.  And I should repeat that when
7  I'm asking you questions about law firms and the services
8  they provided and anything like that, I'm not asking you to
9  disclose anything that's attorney-client privileged.  So if
10  my question would elicit information that you discussed
11  privately with your lawyers, please just tell me that and
12  I'm not going to press that.  Did they represent QLess in
13  that litigation?
14    MR. HARVEY:  Yes, they represented QLess in
15  litigation.
16    MR. BATES:  Do they currently represent QLess in
17  that litigation understanding that it's currently stayed?
18    MR. HARVEY:  I am going to defer to my counsel.
19    MR. POMERANTZ:  The answer's yes.
20    MR. BATES:  Okay.  Okay.  And do they have any
21  outstanding claims against the estate?
22    MR. POMERANTZ:  You're talking about the petition
23  (indiscernible)?
24    MR. BATES:  Yes.
25    MR. POMERANTZ:  The answer's no.

1    MR. BATES:  Okay.  And are they paid pursuant to a
2  retainer or do they invoice the debtor?
3    MR. O'NEILL:  This is James O'Neill.  I'm just
4  going to jump in.  I believe that they listed them on the --
5  on our OCP motion.  So they will be -- they're going to file
6  their (indiscernible) and that information.  If there's any
7  relevant information it would be disclosed in that, and then
8  there'll be seen as no objection to (indiscernible).  And in
9  terms of providing services, they'll be paid in accordance
10  with the procedures outlined in the (indiscernible) motion.
11    MR. BATES:  Okay.  Thanks, Jamie.  I appreciate
12  the clarification.  All right.  Then I'm going to jump to
13  Palisades.  And Mr. Harvey, can you confirm that Palisades
14  growth capital -- I'm sorry.  Let me take a step back.  Mr.
15  Harvey, I'm looking at Item 3.10 in the debtor's Schedule
16  EF.
17    MR. HARVEY:  Yes, Mr. Bates.
18    MR. BATES:  Can you confirm for me, sir, that
19  Palisades Growth Capital 2LP is the debtor's DIP lender in
20  this case?
21    MR. HARVEY:  Yes, I can.
22    MR. BATES:  Okay.  And looking at this, it looks
23  like the debt was incurred on June 18, 2024, which is the
24  day before the petition date and the basis is listed as
25  unsecured debt.  So I'm wondering what was the 250K that the

1  DIP lender leant to the debtor the day before the case
2  filed.
3    MR. HARVEY:  Jeff, (indiscernible).
4    MR. POMERANTZ:  Yeah.
5    MR. HARVEY:  Great.  The 250,000 was to assist
6  QLess in operating costs, which included cost to make the
7  payroll as we were heading into the filing.  So there was
8  several days where we needed access to capital and
9  resources, you know, money.  And so that's the $250,000.
10    MR. BATES:  Okay.  So basically a bridge loan to
11  get into the filing?
12    MR. HARVEY:  I don't know if it would be legally
13  (indiscernible) --
14    MR. BATES:  Yeah.  You know what?  Let me --
15    MR. HARVEY:  -- (indiscernible).
16    MR. BATES:  -- not be flippant there.  I don't
17  want to bind you to anything on that.  I don't -- I won't
18  characterize it, but do you happen to know -- I saw the plan
19  got filed today.  Do you know how this claim is being
20  treated in the plan?
21    MR. POMERANTZ:  Yes, it was unsecured.
22  (indiscernible).  Malcolm, you want me to answer that?
23    MR. BATES:  Yeah, that's fine.
24    MR. POMERANTZ:  Sure.  So it's an unsecured claim.
25  The (indiscernible) two options under the plan.  If the

1  unsecured creditors accept the plan, then the Palisades
2  claim was going to be (indiscernible) in the sum of $300,000
3  to be made available pro rata for all unsecured creditors.
4  If basically the unsecured creditors do not accept the plan,
5  the $250,000 is not going to be waived, and the unsecured
6  creditors are going to receive the disposable -- three-year
7  disposable income, which is $50,000.
8    MR. BATES:  Okay.  And what's the (indiscernible)?
9  Sorry, what's the size of the general unsecured claims?
10    MR. POMERANTZ:  A few hundred thousand dollars if
11  you (indiscernible) Palisades (indiscernible) zero claims
12  that would be allowed by Mr. Baecker and with relations
13  pending in the (indiscernible) lawsuit.
14    MR. BATES:  Oh, yeah.
15    MR. POMERANTZ:  (indiscernible).
16    MR. BATES:  Sorry.  And again, you know, Jeff, I
17  totally understand the debtor's position.  But as far as
18  what's included in the plan, you said it's about a few
19  hundred thousand.
20    MR. POMERANTZ:  Yeah.
21    MR. BATES:  And subject to all the caveats about
22  the --
23    MR. POMERANTZ:  Yeah.
24    MR. BATES:  -- this being in litigation.
25    MR. POMERANTZ:  Yeah.  I think -- and don't hold

1 me to it. We have enough room in there that I think with
2 like roughly 340, $350,000 of trade for lawyers and such
3 (indiscernible) --
4         MR. BATES: Okay.
5         MR. POMERANTZ: -- there's an estimate of 170,000
6 in profession claims and 270 of Palisades claims. And
7 there's a little bit unquantified amount of unreimbursed
8 (indiscernible) cost.
9         MR. BATES: Okay.
10        MR. POMERANTZ: So that's where the -- it's in
11 $100,000.
12        MR. BATES: Okay. And then, Mr. Harvey, was there
13 a loan agreement executed with respect to this amount or any
14 other loan documents?
15        MR. POMERANTZ: I can answer that. There was and
16 (indiscernible) amount.
17        MR. BATES: Okay.
18        MR. POMERANTZ: (indiscernible).
19        MR. BATES: Just like an -- you know, I don't want
20 to characterize it. If there's no loan docs, that's fine.
21 That answers the question. Okay. I'm going to move on.
22 I'm going to go to 3.11.
23        MR. HARVEY: Yes.
24        MR. BATES: And I think we already discussed this.
25 This is separate from the arbitration. This is the pre-

1 petition and shareholder litigation. Is that right?
2         MR. HARVEY: Yes, that is correct.
3         MR. BATES: Okay. I saw there was an amount in
4 blank here. I actually did look at the complaint in this
5 lawsuit, and I think Jeff confirmed this earlier that
6 there's actually not a specific demand for liquidated
7 damages in the prayer. Is that right?
8         MR. POMERANTZ: (indiscernible).
9         MR. O'NEILL: Go ahead, Jeff.
10        MR. POMERANTZ: Go ahead. I think he wants to
11 hear you.
12        MR. HARVEY: Yeah, I was going to say he -- yes,
13 that is my understanding.
14        MR. BATES: Okay. So is that why this was left in
15 blank?
16        MR. HARVEY: Yes, that is my understanding.
17        MR. BATES: As the claimant amount. Okay. Thank
18 you. In 3.12, I'm looking at Potter Anderson and Corroon.
19        MR. HARVEY: Yes, I see it.
20        MR. BATES: Okay. Potter Anderson's a law firm,
21 right?
22        MR. HARVEY: That is correct.
23        MR. BATES: And do they provide litigation
24 services to the debtor?
25        MR. HARVEY: No. Not directly to the debtor.

1 They provide litigation services, it is my understanding, to
2 Palisades. And Palisades is pre-petition indemnified by
3 QLess.
4         MR. BATES: Okay. Is Palisades covered by the
5 debtor's DNO insurance? Or I guess where does the
6 indemnification obligation come from if you know?
7         MR. POMERANTZ: Again, I would -- just again, DNO
8 insurance and (indiscernible) is an issue in connection with
9 the litigation. I would instruct Mr. Harvey not to answer
10 any questions about what he knows about who's covered and
11 not covered, but --
12        MR. BATES: Oh, okay.
13        MR. POMERANTZ: -- (indiscernible).
14        MR. BATES: Okay.
15        MR. O'NEILL: He could say there is DNO.
16        MR. POMERANTZ: I think he could testify to that,
17 but not to go into the specifics of who's covered and who's
18 not covered.
19        MR. BATES: No, that's fair. I won't press that.
20 That's fine. Okay. I'm going to jump ahead a little bit,
21 Mr. Harvey, down to Number 3.16.
22        MR. HARVEY: Yes.
23        MR. BATES: Okay. And Stubbs Alderton and
24 Markiles a law firm?
25        MR. HARVEY: Yes, they are.

1         MR. BATES: Okay. Did they provide legal services
2 to the debtor, or is this another indemnification
3 obligation?
4         MR. HARVEY: They provide legal services to the
5 debtor.
6         MR. BATES: Okay. And do they provide litigation
7 services?
8         MR. HARVEY: Give me one second.
9         MR. BATES: Yeah, no problem.
10        MR. HARVEY: I cannot answer that. Prior to my
11 arrival.
12        MR. BATES: Mm-hmm.
13        MR. HARVEY: But since my arrival, they have
14 provided more business and operational legal advice in
15 support.
16        MR. BATES: Okay. And I'm going to Item 3.19.
17 This is Wilks Law LLC.
18        MR. HARVEY: Yes, I see.
19        MR. BATES: Okay. Wilks Law is a law firm?
20        MR. HARVEY: Yes, they are.
21        MR. BATES: Do they represent the debtor, or is
22 this an indemnification obligation argument?
23        MR. HARVEY: I struggle with that word all the
24 time. Glad to hear somebody else struggle with it.
25        MR. BATES: A word no less.

17 (Pages 62 - 65)

1     MR. HARVEY:  Yes, they -- yep.  They do not
2 provide services to QLess.  It is an indemnification of
3 QTech and Scopia.
4     MR. BATES:  Q-Tech and you said Scopia.  Is that
5 S-C-O-P-I-A?
6     MR. HARVEY:  That is correct.
7     MR. BATES:  Okay.  And is our -- and I'll just
8 ask.  So is that also related to the shareholder litigation?
9     MR. HARVEY:  Yes, it is.
10     MR. BATES:  Okay.  Who are Q-Tech and Scopia?
11     MR. HARVEY:  Those are investors (indiscernible).
12     MR. BATES:  Okay.  I'll leave that there.  And
13 then the --
14     MR. POMERANTZ:  And just to be accurate, Q-Tech is
15 an investor in QLess and I believe Scopia is the investor in
16 Q-Tech.
17     MR. BATES:  Got it.  Okay.  And 3.20 the very next
18 entry, sir, Wolflick Khachaturian, I hope I'm saying that
19 right.
20     MR. HARVEY:  Yes, you are.
21     MR. BATES:  Is that also a law firm?
22     MR. HARVEY:  That is a law firm, yes.
23     MR. BATES:  Okay.  And then just same question.
24 Are they -- do they provide services to the debtor or is
25 this an indemnity obligation?

1     MR. HARVEY:  They provide services to QLess.
2     MR. BATES:  Okay.  And litigation services or
3 something else?
4     MR. HARVEY:  Litigation.  This is related to the
5 arbitration.
6     MR. BATES:  Okay.  And I'll head off in an
7 interjection from Jeff here.  Understanding that I am under
8 the impression that the arbitration is confidential, to the
9 extent you can answer this question, has QLess asserted any
10 counterclaims or anything like that in the arbitration?
11     MR. POMERANTZ:  You can answer that.
12     MR. BATES:  You said it's a no, Jeff?
13     MR. POMERANTZ:  I didn't believe -- I believe the
14 answer is no, but what I'm saying is he can answer that.
15     MR. BATES:  Oh, okay.  Yeah.  Go ahead, Mr.
16 Harvey.
17     MR. HARVEY:  Yeah.  I believe the answer is no as
18 well.
19     MR. BATES:  Okay.
20     MR. HARVEY:  Not to my knowledge.
21     MR. BATES:  And then, Mr. Harvey, I just
22 have a couple of general questions about the Schedules D and
23 EF together.  Do the Schedule D and the Schedule EF reflect
24 all claims as of the petition date, including any claims
25 that were paid post-petition by way of first-day orders?  So

1 priority wage claims, critical vendors, whatever else was
2 filed here.
3     MR. HARVEY:  Yes, that is my understanding.
4     MR. BATES:  Okay.  Great.  I'm going to jump to
5 your Schedule G, and I'm going straight to Item 2.12, which
6 is on the last page of that schedule.
7     MR. HARVEY:  I have it in front of me, Mr. Bates.
8     MR. BATES:  Okay.  There is really no question
9 here.  It just says various holders of warrant agreements.
10 List of holders of warrants can be provided upon request.
11 I'd like to request that list.  That's really all I've got
12 on this one.
13     MR. HARVEY:  Okay.
14     MR. BATES:  All right.  Now I'm going to jump --
15     MR. POMERANTZ:  (indiscernible).
16     MR. BATES:  Thank you.  I appreciate that.  I'm
17 going to jump to the Schedule AB 72.  You know what?  No,
18 I'm not.  I think you already answered all my questions on
19 this to my satisfaction.  Okay.  I'm going to go to the
20 debtor's Statement of Financial Affairs for QLess, Inc.
21 This is Docket Item 67.  And just let me know when you're
22 ready to answer questions about that, sir.
23     MR. HARVEY:  Yes, I'm ready.
24     MR. BATES:  Okay.  Well, you beat me, so give me
25 one second.  So I see -- I'm looking at Part 1, gross

1 revenue from business going back to 2022.  And if you know,
2 do you know what the debtor's net income for the last three
3 years was?
4     MR. HARVEY:  Not off the top of my head precisely.
5 I would like to follow up with that.
6     MR. BATES:  Okay.  And what was the last year the
7 debtor was profitable?
8     MR. HARVEY:  I am not aware of any year in which
9 QLess has been profitable, but I have only been here for two
10 years.
11     MR. BATES:  Mm-hmm.  Okay.  And then do you happen
12 to know the debtor's projected revenue over the next 120
13 days?  And you've got -- I think you've answered a similar
14 question before, but I'll let you answer it here as well.
15     MR. POMERANTZ:  So what I would say, Malcolm, is
16 the attachment and plan are the projections for the next
17 three years.
18     MR. BATES:  Oh, okay.
19     MR. POMERANTZ:  So rather than just -- so what I
20 propose is why don't you take a look at those and then
21 obviously if you ask Jeff a question, you'll have to have
22 him answer.  But all creditors should have the three-year
23 projected projections to be able to give them a sense of
24 where the business is headed.
25     MR. BATES:  No, I think that's fair.  Okay.  And

Page 70

1 then earlier, Mr. Harvey, you mentioned that the company
2 seasonality. So I'm curious what are the, I guess, you
3 know, slow and busy times of the year for the company?
4      MR. HARVEY: Yes. From a cost perspective, the
5 busy times are in two, three, in particular August and
6 September, where we see a material rise in our operating
7 cost to support customers. And then the second business
8 period from an operating perspective is January too, which
9 has a significant number of customers in higher education.
10      MR. BATES: Okay.
11      MR. HARVEY: And that represents students
12 returning to school for fall and winter.
13      MR. BATES: Okay. You pre-empted my next
14 questions. Okay. Interesting. And this next question I
15 think is going to be answered in the plan, so I'm going to
16 skip that. I did want to ask just from looking at this Part
17 1, it looks like year-to-date revenues was actually trending
18 up a little bit. Is that your understanding?
19      MR. HARVEY: Yes, that is my understanding. That
20 is related to the new product that I referred to earlier.
21      MR. BATES: Mm-hmm. Okay. And currently, is the
22 debtor positive or negative cashflow?
23      MR. HARVEY: Negative.
24      MR. BATES: Okay. And is the debtor currently
25 showing a profit or a loss?

Page 71

1      MR. HARVEY: a loss.
2      MR. BATES: Okay. Thank you. I wanted to jump to
3 the next page, Item 2, non-business revenue.
4      MR. HARVEY: Yes.
5      MR. BATES: And I just wanted to ask about --
6 interest is kind of all over the place. It looks like this
7 year is tracking to be closer to 2023. I guess I'm just
8 really interested in the discrepancy between 2022 and 2023
9 and any color you can give me on that.
10      MR. HARVEY: Yes. In 2023, we had a cash
11 injection from our investors. We did what we referred to as
12 a Series A1 round.
13      MR. BATES: Okay.
14      MR. HARVEY: And so that cash came in, and that
15 was mostly interest for that -- to that cash injection.
16      MR. BATES: Okay. Got it. And I guess on that
17 point, do the investors who provided the cash injection have
18 claims in this case?
19      MR. HARVEY: No. No. I do not think so.
20      MR. BATES: Okay. I'm going to jump down to Part
21 6. I'm looking at Item 11.2. And these are payments or
22 transfers to Saul Ewing LLP in May 2024. Do you know what
23 the basis for these transfers was? Mr. Harvey?
24      MR. HARVEY: I -- my apologies. I was looking at
25 it.

Page 72

1      MR. BATES: Not a problem.
2      MR. HARVEY: Yes. Yes, I do know what the
3 transfers are for. Would you like me to describe them?
4      MR. BATES: Yes. Yes, please, sir.
5      MR. HARVEY: Okay. This was the original
6 representation for QLess related to the shareholder lawsuit
7 we started with Saul Ewing. And once the location of the
8 (indiscernible) was determined, we switch to Morris Nichols
9 --
10      MR. BATES: Okay.
11      MR. HARVEY: -- for representation in the
12 shareholder lawsuit.
13      MR. BATES: When you say the location --
14      MR. HARVEY: (indiscernible) shareholder lawsuit.
15      MR. BATES: Okay. When you say the location --
16      MR. POMERANTZ: Actually --
17      MR. BATES: Sorry, I'm not as familiar with that
18 as (indiscernible). Was there a venue dispute?
19      MR. POMERANTZ: I'm on -- I'd like to refresh Mr.
20 Harvey's recollection (indiscernible) with counsel that
21 (indiscernible).
22      MR. BATES: Sorry?
23      MR. POMERANTZ: I don't believe (indiscernible).
24      MR. HARVEY: Oh, my apologies. My apologies.
25 You're right, Jeff. (indiscernible) all of these law firms

Page 73

1 since (indiscernible), well, at least in this one case
2 (indiscernible). It's not Morris Nichols. It's Pachulski.
3      MR. POMERANTZ: Yeah, so to be clear, Malcolm --
4      MR. BATES: Thank you, yes.
5      MR. POMERANTZ: -- the company was originally
6 talking to some and then ultimately made the decision to
7 move over to (indiscernible). And we took over from Saul
8 Ewing.
9      MR. BATES: Okay. So this relates to the Chapter
10 11, not the shareholder litigation.
11      MR. POMERANTZ: Correct.
12      MR. BATES: Okay. And Mr. Harvey, I mean, well,
13 how far did the debtor get in those talks with Saul Ewing?
14 Was Saul Ewing actively working on the case? Were they
15 working on filings, things like that? I'm just kind of
16 wondering how they got 167K. Like what -- like how far in
17 the file did they make it? Just out of curiosity.
18      MR. POMERANTZ: Again, (indiscernible), Mr.
19 Harvey. (indiscernible) the transfers out. Didn't they
20 return a portion of that money?
21      MR. HARVEY: They returned a majority of the
22 money.
23      MR. POMERANTZ: Okay. So this is the gross that's
24 being --
25      MR. BATES: Got it.

19 (Pages 70 - 73)

1    MR. POMERANTZ: -- reflected in that.  Right?  Is
2 that correct, Mr. Harvey?
3        MR. HARVEY:  I'm not walking with those numbers in
4 my head.  I would have to come back to answer that.
5        MR. BATES:  Well, let me ask this.
6        MR. POMERANTZ:  Well, I can tell you when it came
7 to us there was very little done in terms of preparations
8 and that.
9        MR. BATES:  Okay.
10        MR. POMERANTZ:  And some (indiscernible).
11        MR. BATES:  So this might simplify it.  Mr.
12 Harvey, did you pay Saul Ewing a retainer when you initially
13 decided to use them for your Chapter 11 case when the
14 company did?
15        MR. HARVEY:  Yes.
16        MR. BATES:  Okay.
17        MR. HARVEY:  Yes, we did.
18        MR. BATES:  And I understand that you received a
19 refund of we'll say most of that retainer?
20        MR. HARVEY:  Yes.
21        MR. BATES:  Okay.  I'm going to jump to Part 9.
22        MR. HARVEY:  Yes, I have it in front of me.
23        MR. BATES:  Okay.  And you already answered this
24 question, so I apologize for the false start there.  Yeah,
25 okay.  So you answered the question about PII, but I did

1 have a couple more.  In Item 17, you answered that the
2 debtor does provide some kind of pension or profit-sharing
3 plan.  I think this is probably in the wages motion, but can
4 you just confirm what you were referring to in this section
5 of the SOFA?
6        MR. HARVEY:  Yes.  401K.
7        MR. BATES:  Okay.  Great.  And does the debtor
8 provide or have a self-funding healthcare plan?
9        MR. HARVEY:  Yes.
10        MR. BATES:  Okay.  All right.  I'm going to jump
11 to Part 13.
12        MR. HARVEY:  Yes, Mr. Bates.  I'm ready.
13        MR. BATES:  Great.  I'm looking at Item 26A.  I
14 don't think these questions are specifically listed in this
15 section, but they're relevant to it.  These are just general
16 accounting questions.  Are the debtor's books maintained on
17 a cash or accrual basis?
18        MR. HARVEY:  Both, actually.
19        MR. BATES:  Oh, okay.  And where are they
20 maintained?
21        MR. HARVEY:  They are maintained in a software
22 program called QuickBooks.
23        MR. BATES:  Okay.  And then it looks like from the
24 26A attachment that the only current entity that maintains
25 the books is ClearPoint, LLC.  Is that right?

1        MR. HARVEY:  Pre-petition, yes.
2        MR. BATES:  Okay, but currently --
3        MR. HARVEY:  To the best of my knowledge.
4        MR. BATES:  -- are there more entities that
5 maintain the books and records now?
6        MR. HARVEY:  Yeah, there's (indiscernible) from
7 another consultancy which is called Interim CFO.
8        MR. BATES:  Okay.  And they're going to be an OC
9 -- well, they're listed as an OCP in this case, right?
10        MR. HARVEY:  Can you remind me what the term OCP
11 stands for?
12        MR. BATES:  I am so sorry.  Yes.
13        MR. O'NEILL:  This is James O'Neill.  They are
14 listed as an ordinary course professional.  We do have them
15 listed on that.
16        MR. BATES:  Thank you, Jamie.
17        MR. O'NEILL:  (indiscernible).
18        MR. BATES:  Okay.
19        MR. O'NEILL:  Mm-hmm.
20        MR. BATES:  Okay.  And then let me see.  How often
21 were income statements and balance sheets prepared pre-
22 petition?
23        MR. HARVEY:  I would say annually.
24        MR. BATES:  Okay.  And what's the debtor's fiscal
25 year?

1        MR. HARVEY:  Calendar year January 1st.
2        MR. BATES:  Okay.  And does the debtor have --
3 actually, it looks like that's answered here, so I can skip
4 that.  Okay.  I'm going to go to Item 29 in this same
5 schedule.
6        MR. HARVEY:  Yes, I'm here.
7        MR. BATES:  Okay.  I'm looking at Item 29.  This
8 is -- first this is just kind of a general comment.  The
9 addresses need to be listed or there needs to be relief
10 sought to seal addresses.  So if you want to amend this
11 really, you can file a motion.  Really up to you, but --
12        MR. HARVEY:  Okay.
13        MR. BATES:  -- and then you made a comment that
14 there was a change in directors.  There was one director who
15 left and was replaced.  Is that Neil Hudspeth?  Is he the
16 one that was replaced pre-petition?
17        MR. HARVEY:  Yes, Mr. Bates, it is.
18        MR. BATES:  Okay.  And then do you know -- I mean,
19 this is pretty close to the petition date.  Is there any
20 info you can provide on the decision to relieve Mr.
21 Hudspeth?
22        MR. HARVEY:  I think just we either --
23        MR. POMERANTZ:  (indiscernible) --
24        MR. HARVEY:  Go ahead, Jeff.
25        MR. POMERANTZ:  I think that's due to the fact

1 (indiscernible) that he was relieved.  My recollection
2 (indiscernible) is he was on (indiscernible).
3         MR. HARVEY:  Yes.  Yes, he left voluntarily.
4         MR. BATES:  He left voluntarily.  Oh, okay.
5         MR. HARVEY:  Yes.
6         MR. BATES:  Okay.  And I'm going to go to
7 Attachment 3, which is pre-petition transfers.
8         MR. HARVEY:  Is this the one within 90 days?
9         MR. BATES:  Yes, that's correct.
10         MR. HARVEY:  Okay.  I'm looking at it.
11         MR. BATES:  Okay.  This is a big list, but
12 generally to the best of your knowledge were any of the
13 payments listed here made outside of the debtor's ordinary
14 course of business?
15         MR. HARVEY:  I'm just doing a quick rereview.  No,
16 I don't see any that are outside the normal ordinary course
17 of business.  So I -- yeah.
18         MR. BATES:  Okay.  All right.  I'm going to go
19 through some of the specific ones.  I understand that this
20 is a pretty detailed and extensive schedule, so I'll do my
21 best to flag them.  I'm on Page 1 of 3 pretty near the
22 bottom, and it looks like there are two payments to -- two
23 transfers to Hogan Lovells U.S., LLP.
24         MR. HARVEY:  I see them, 6,900 and 2,900?
25         MR. BATES:  Correct.  And it just -- it says

1 services.  Hogan Lovells is counsel for the DIP lender in
2 this case.  Is that right?
3         MR. HARVEY:  Yes.
4         MR. POMERANTZ:  Just to clarify, I (indiscernible)
5 some point for counsel for the company.
6         MR. BATES:  Hogan Lovells was?
7         MR. POMERANTZ:  (indiscernible) the company.
8 Well, at one point they were counsel to the company, but
9 they did not provide any services relating -- and that was
10 way before the bankruptcy was even contemplated.  I believe
11 that those transfers were for some debts that were owed to
12 them in connection with their performance of work for the
13 company not in connection with any of their services as DIP
14 lender's counsel.
15         MR. HARVEY:  That is correct.
16         MR. BATES:  So they represented the company.  It
17 was long before the bankruptcy was contemplated, but they're
18 getting paid in May.  I guess my question is how long were
19 the amounts outstanding?
20         MR. HARVEY:  I don't know --
21         MR. BATES:  Okay.
22         MR. HARVEY:  -- of the top of my head.  It is my
23 understanding that these were related to supporting QLess in
24 the arbitration.
25         MR. BATES:  Okay.  Okay.  Hmm.  Okay.  And then

1 the bottom of that same page, Mr. Harvey, Lucas Chairvin and
2 then if you look at Page 2 there's also a Matias Chairvin.
3 And it sounds like based on the location these are two of
4 the debtor's independent contractors.  Is that right?
5         MR. HARVEY:  That is correct.
6         MR. BATES:  What services did they provide for the
7 debtor?
8         MR. HARVEY:  They provide services that help us
9 support our customers so if there's a customer issue that --
10 where a customer contacts to us and has an issue or needs
11 help, that goes into our support organization and they work
12 in the support organization.
13         MR. BATES:  Okay.  Okay.  Near the bottom of Page
14 3 I'm looking at QLess AM, LLC.  I think you've probably
15 already answered these -- my questions about this entity to
16 my satisfaction, but just because there was a 200K payment
17 two days before the petition date, it looks like from the
18 other payments listed here that this is like the -- if I'm
19 understanding it correctly, this is the normal monthly
20 payment to cover operating costs for QLess AM.  Is that
21 right?
22         MR. HARVEY:  That is absolutely correct.  Sorry,
23 that would be -- that's for -- that's their monthly pay that
24 includes -- that's for their payroll.
25         MR. BATES:  Okay.  Okay.  And then I'm going to go

1 back to the top of Page 1 and just run through a couple of
2 things here.  So these are -- there were a pretty extensive
3 number of payments that were made on June 18, 2024 or the
4 day before the petition date.  So I just want to get some
5 color on those.  The first one is at the very top.  This was
6 a $35,447 payment to AWS.  Can you just give me some
7 background on that?
8         MR. HARVEY:  Yes, I can.  This is trying to pay
9 the estimated amount.  Let me back up.  Our software runs in
10 AWS, and so AWS is critical --
11         MR. BATES:  Mm-hmm.
12         MR. HARVEY:  -- to -- we can't serve our customers
13 with AWS.  They bill us on a monthly basis and we did our
14 best to estimate the cost from June 1st to June 19th.  And I
15 believe that's what is represented here in this statement.
16         MR. POMERANTZ:  Yeah, and in my experience
17 (indiscernible) that if you don't see the people like Amazon
18 Web Services happy --
19         MR. BATES:  Mm-hmm.
20         MR. POMERANTZ:  -- you're going to have trouble.
21 And so not to avoid a critical vendor (indiscernible) we
22 wanted to just make sure that we would pay that.
23         MR. BATES:  Okay.  Hmm.  Okay.  And they would
24 normally, what, bill you at the end of the month?
25         MR. HARVEY:  Yes.

Page 82

1      MR. BATES:  Okay.

2      MR. HARVEY:  Towards -- the billing period, I

3  believe, is on a monthly basis.

4      MR. BATES:  Okay.  And it was estimated for June 1

5  to June 18th you said?

6      MR. HARVEY:  That is correct.

7      MR. BATES:  Okay.

8      MR. HARVEY:  (indiscernible) would be turned off

9  it could've been disastrous for the company.

10      MR. BATES:  No, I don't doubt that at all.  Okay.

11  Going down a few lines it looks like there's two payments to

12  Armanino LLP, one for $28,350 and one for $29,400.

13      MR. HARVEY:  Yes.  Armanino is our auditor, and we

14  are currently -- not only was this towards the end of the

15  audit, not the very end, but towards the end of the audit.

16  And their activities picked up quite significantly in the

17  May/June timeframe.  And so these are payments to Armanino

18  for that audit.  We have a June 30th date for having audited

19  financial statements prepared already for our investors and

20  our lender.

21      MR. BATES:  Okay.  Is there any reason why there

22  were two payments?

23      MR. HARVEY:  I don't know.

24      MR. BATES:  And the debtor's going to seek to

25  retain them as an OCP in this case?  Sorry, an ordinary

Page 83

1  course professional.

2      MR. HARVEY:  That's correct.  We (indiscernible)

3  --

4      MR. BATES:  I'll try to avoid the vernacular.  I

5  apologize.  Okay.

6      MR. HARVEY:  It's okay.  I have it now.  Ordinary

7  course of business.

8      MR. BATES:  That's right.

9      MR. HARVEY:  Or ordinary course professional.

10      MR. BATES:  That's right.  Yes.

11      MR. HARVEY:  Yeah.

12      MR. BATES:  Okay.  If you go down a little bit

13  further on the same page about midway down, there's three

14  transfers to Brex, two on the 18th and one on the petition

15  date.  One's for about 24K, one is for 70K, and one's for

16  about 19K.

17      MR. HARVEY:  I'm looking at Brex Card

18  transactions.  I'm sorry.  Could you repeat the dates of the

19  transactions?

20      MR. BATES:  Sure.  There is two on June 18th and

21  one on June 19th.

22      MR. HARVEY:  I see them.  I see it as 23,832 --

23      MR. BATES:  Mm-hmm.

24      MR. HARVEY:  -- for the 18th and 18,904 for the

25  19th.

Page 84

1      MR. BATES:  Yeah, and one for 70,000 on the 18th

2  as well.

3      MR. HARVEY:  I see it, yes.

4      MR. BATES:  Do these all relate to the same credit

5  card?  Are there multiple credit cards?  Like what's the

6  story here?

7      MR. HARVEY:  There are multiple credit cards.

8      MR. BATES:  Okay.  So the -- are -- is it fair to

9  say these represent payments on account of different credit

10  card accounts?

11      MR. HARVEY:  Yes.  And they -- these are used for

12  operating costs, and we pay Amazon.  We pay (indiscernible)

13  usually off of these cards.

14      MR. BATES:  Okay.  I'm jumping down to closer to

15  the bottom of the page.  This is -- it looks like Ellucian

16  Company, LP, a $10,000 payment on June 18th?

17      MR. HARVEY:  Yes.  Ellucian is a partner of ours.

18  It's a software company that we partner with, and this is

19  our annual partnership fee.

20      MR. BATES:  Got it.  Is that typically due on or

21  about June 18th?

22      MR. HARVEY:  I don't know and I don't want to

23  guess.

24      MR. BATES:  Okay.

25      MR. HARVEY:  I believe it is, but I'd like to come

Page 85

1  back (indiscernible).

2      MR. BATES:  Okay.  I'm on Page 2 now.

3      MR. HARVEY:  Okay.

4      MR. BATES:  And about a third of the way down the

5  page there's a payment to Morris, Nichols, Arsht and Tunnel,

6  LLP on June 18, 2024 for $150,000.

7      MR. HARVEY:  Yes.

8      MR. BATES:  Okay.  So what was that for?

9      MR. HARVEY:  This is for services that Morris

10  Nichols provided to QLess in representing us in the Delaware

11  shareholder case.

12      MR. BATES:  Okay.  Be nice and scroll up.  Okay.

13  And they're also listed in the ordinary course professional

14  motion?

15      MR. HARVEY:  Jamie, I believe they are?

16      MR. O'NEILL:  I believe so, yes.  Yeah.

17      MR. BATES:  Okay.  And I think Jamie also said

18  that there'll be some disclosures in that declaration, so

19  that's fine.  I'll move off of that for now.  Okay.  A

20  little bit further down actually.  Oh, there it is.  Yeah.

21  A little closer to the bottom Rimon PC in Boise, Idaho.

22      MR. HARVEY:  Yes.

23      MR. BATES:  These are -- these look like pretty

24  small payments.  I'm just curious what these were for.

25      MR. HARVEY:  These are for operating expenses.

Page 86

1 This is a legal firm that provides legal services to us.

2     MR. BATES: Okay. And so I guess I -- just really

3 quickly to jump back up to the Brex credit cards, on June 19

4 there was payment of $18,904.11. I'm just wondering whether

5 you know when this payment was made relative to the actual

6 filing of the case.

7     MR. HARVEY: I don't know.

8     MR. BATES: Okay.

9     MR. HARVEY: I don't (indiscernible).

10     MR. POMERANTZ: Malcolm, I believe our -- my

11 recollection is the case was filed today (indiscernible).

12 So I suspect this was -- was this a (indiscernible), James?

13     MR. HARVEY: I don't know.

14     MR. POMERANTZ: Okay. (indiscernible). I know

15 where you're going with it. It was a post-petition payment.

16 I don't believe it was.

17     MR. BATES: Okay. If you could -- if there's any

18 way you could follow up on that, I would certainly

19 appreciate it. And then I guess just high level, there were

20 on June 18th $350,000 in transfers submitted before the

21 petition date including 150K to a law firm. There's another

22 2000 on the 17th and another 20 or so on the petition date.

23 So I don't know. We're out like half a mil in the two or --

24 two days or so between the filing. But there was a --

25 sorry, go ahead.

Page 87

1     MR. POMERANTZ: No. Yeah, I'm sorry.

2     MR. BATES: Oh, okay. I guess how much of this

3 was the -- we'll call it short-term loan from Palisades

4 meant to cover? Or was that meant to cover the sums?

5     MR. POMERANTZ: How much -- I mean,

6 (indiscernible), right?

7     MR. BATES: Yeah.

8     MR. POMERANTZ: There was money coming in and

9 money going out.

10     MR. BATES: Yeah, fair enough.

11     MR. POMERANTZ: Because the company needed the

12 money. It wasn't going to really get access to the DIP

13 until after to fund it, what it needed to pay to keep the

14 wheels on the bus in operations, and to make the bankruptcy

15 smoother and not have to worry about critical vendor motions

16 and whatnot, which, you know, are issues to deal with. So I

17 think you asked what money was coming in. The company made

18 the determination of what it needed to pay. It had a

19 shortfall from what revenues, and that's where the Palisades

20 money funded the shortfall.

21     MR. BATES: Okay. I -- and Jeff, I do appreciate

22 the background. But Mr. Harvey, could I get your response

23 to that?

24     MR. HARVEY: Yes. That is absolutely correct.

25 And so these -- where it's just timing you can see from the

Page 88

1 payment to the 209 -- I'm sorry, you can see from the

2 $200,000 payment to QLess AM on the 17th, the dates that you

3 look in the previous numbers are almost right there. But

4 that's normally the time that we (indiscernible) money to

5 them.

6     MR. BATES: Mm-hmm. And how often were you making

7 payments to Morris Nichols?

8     MR. HARVEY: I don't know the answer to that

9 question.

10     MR. BATES: Okay. Is it -- I'll just ask this.

11 For the Morris Nichols payment, is it your understanding

12 that that was a payment made on account of accrued legal

13 fees?

14     MR. HARVEY: Yes. That is my understanding.

15     MR. BATES: Okay. I'm going to jump to Attachment

16 4.

17     MR. HARVEY: Okay.

18     MR. BATES: Okay. ClearPoint LLC, you've given a

19 little bit of background on this already, but can you just

20 explain to me again what this entity is exactly?

21     MR. HARVEY: Yes. This entity is really a person

22 who's name is Al Sajak and he provides finance services to

23 QLess. Bookkeeping, tracking of our books, and also just

24 running the finance option for us.

25     MR. BATES: Okay. And is this entity related to

Page 89

1 interim CFOs or are those distinct entities?

2     MR. HARVEY: Separate entities.

3     MR. BATES: And no affiliation?

4     MR. HARVEY: No affiliation.

5     MR. BATES: Okay. And how is this entity paid?

6 Like is it prospective? Is it invoiced? Is there a

7 retainer?

8     MR. HARVEY: Invoice.

9     MR. BATES: Okay. So you get invoiced for

10 services rendered and then you pay?

11     MR. HARVEY: That is correct.

12     MR. BATES: Do the payment terms ever change?

13     MR. HARVEY: When you say payment terms, do you

14 mean like due dates or payments that are not charged?

15     MR. BATES: I guess either. Like I'm looking at

16 this and it looks like at first it was maybe monthly

17 invoices then maybe biweekly.

18     MR. HARVEY: Yes, it did change. We had someone

19 who -- in our finance function that was (indiscernible) on

20 the company. And there were some increases and decreases in

21 workload that were happening.

22     MR. BATES: Okay. And so are they billed hourly?

23     MR. HARVEY: They are usually billed hourly unless

24 there is a -- really high in workload. And when there's a

25 really high workload, then there is an adjustment that is

1 based loosely on an hourly -- (indiscernible) an hourly

2 rate.

3          MR. BATES: Okay. And is that -- are those terms

4 like those -- that kind of like bifurcated payment scheme,

5 is that documented in an agreement?

6          MR. HARVEY: I believe it is documented in an

7 agreement.

8          MR. BATES: Okay.

9          MR. HARVEY: Yes.

10          MR. BATES: Okay. That answers a lot of my

11 questions. What -- I'm looking about halfway down the

12 schedule. It looks like there were three payments for

13 February 2024. I think that's the only month where there

14 were three payments for the monthly period. I'm just

15 wondering what happened there.

16          MR. HARVEY: I don't know off the top of my head.

17 I'll come to (indiscernible).

18          MR. BATES: Okay.

19          MR. HARVEY: But I -- what I do know is this is

20 roughly -- I believe that this is almost exactly the same

21 month as the person that we relieved from the company --

22          MR. BATES: Okay.

23          MR. HARVEY: -- (indiscernible) part of the

24 company.

25          MR. BATES: Got it.

1          MR. HARVEY: But I -- you can follow up.

2          MR. BATES: Sure. And then last question about

3 that, I'm looking at the payment on June 3, 2024. So that's

4 $31,200 for June 2024 consulting. So I guess I had a few

5 questions about this. So if the entity of ClearPoint's

6 invoicing you for services rendered, was this meant to cover

7 services between June 1 and June 3?

8          MR. HARVEY: June 1 and June 3, yes.

9          MR. BATES: Okay.

10          MR. HARVEY: I'm sorry. June 1 and June 19 I

11 believe. I can't remember if it was June 1 to June 3 or

12 June 1 to June 19. I think it is June 1 to June 19. But I

13 can come back to you with more specifics.

14          MR. BATES: Sure.

15          MR. O'NEILL: And also, Mr. Harvey, the date --

16 the services needed from ClearPoint expanded significantly

17 in light of the filing Chapter 11 bankruptcy. So

18 (indiscernible), correct?

19          MR. BATES: So --

20          MR. HARVEY: That is correct. So not only that,

21 but also the audit as well in addition to the operational

22 finance needs on a day-to-day basis.

23          MR. BATES: Okay. So did you switch to the like

24 adjustment fee rate or whatever that study you were just

25 describing earlier?

1          MR. HARVEY: That is correct.

2          MR. BATES: Okay. Is that like -- is that rate

3 three times higher than the normal monthly rate?

4          MR. HARVEY: Yes. The normal monthly rate tends

5 to be at a much lower hourly number of hours. I don't

6 remember the number of hours off the top of my head, but

7 this was -- this is very (indiscernible) for 31,000 because

8 at that time there were 80-hour -- 75- to 80-hour, sometimes

9 over 80-hour work weeks.

10          MR. BATES: Mm-hmm. Okay. And was this the first

11 time that you had paid ClearPoint prospectively as opposed

12 to being invoiced?

13          MR. HARVEY: I don't know the answer to that. I

14 would have to follow up.

15          MR. BATES: Okay. Okay. Coming to the end here.

16 Again, just a general comment for the individuals. You

17 know, with respect to the addresses, those need to be either

18 unsealed or there needs to be a motion filed. And then same

19 with the amount or value of the payments. There either

20 needs to be a motion to seal or this needs to be unsealed.

21          MR. HARVEY: Understood.

22          MR. O'NEILL: Yeah, understood.

23          MR. BATES: Okay. And I -- you know, I'm not

24 saying that to pass judgment. I think that the motion to --

25 but I would point out I believe the motion to seal would be

1 due on this coming Monday. Under the local rules that is.

2 Okay. With respect to Derek Francis, what kind of

3 commissions does a chief revenue officer earn?

4          MR. HARVEY: Mr. Bates, would you asking your

5 question again?

6          MR. BATES: Sure. Yeah. I just see a bunch of

7 line items for commissions and I'm curious what kind of

8 commissions Mr. Francis earned in his capacity as chief

9 revenue officer.

10          MR. HARVEY: Okay. Yeah. Those would be

11 commissions on the sales of our software products. So --

12          MR. BATES: Oh, okay.

13          MR. HARVEY: -- when we sell our software products

14 to the customers as an example --

15          MR. BATES: Mm-hmm.

16          MR. HARVEY: -- he earns a commission on that.

17          MR. BATES: Got it. Okay. I'm looking at Page 3

18 of 3.

19          MR. HARVEY: Yes.

20          MR. BATES: And there is a line item for M.

21 Freddie Reiss, the independent director.

22          MR. HARVEY: Yes.

23          MR. BATES: When was he retained? Or what's the

24 word? When was he appointed?

25          MR. HARVEY: I do not know the date of June off

1 the top of my head, but it was June of this year.

2      MR. BATES:  Oh, it was June.  Okay.  And what are

3 the director fees for?

4      MR. POMERANTZ:  He was (indiscernible).

5      MR. BATES:  Sorry?

6      MR. POMERANTZ:  (indiscernible).  He was hired to

7 be an independent director.

8      MR. BATES:  Okay.  So this is just his fee for

9 being --

10      MR. POMERANTZ:  (indiscernible).

11      MR. BATES:  Sorry.  Mr. Harvey, is this his fee

12 for being an independent director?  Is that what I'm

13 hearing?

14      MR. HARVEY:  Yes, Mr. Bates.  (indiscernible).

15      MR. BATES:  Okay.  Okay.  And who authorized the

16 director fees?

17      MR. HARVEY:  The board of directors authorized the

18 appointment of Mr. Reiss and QLess authorized the payment to

19 Mr. Reiss.

20      MR. BATES:  Okay.  And none of the other directors

21 received director fees?

22      MR. HARVEY:  Mr. Tapling advises QLess.  I don't

23 know the definition if it's referred to as a director fee

24 not.  I could follow up with that, but he provides -- he is

25 a former interim CEO of QLess, and in that capacity provides

1 advisory services to QLess because of his knowledge of the

2 markets and the company.

3      MR. BATES:  Okay.  Sure.  So actually that's an

4 easy enough transition to Mr. Tapling.  So could you just --

5 I think you just answered this, but what kind of consulting

6 does he do?  I see a number of payments listed as some kind

7 of monthly consulting fee.

8      MR. HARVEY:  That's right.  He provides

9 advisements on (indiscernible) market, but also on other

10 matters related to restructuring that we've done.  The

11 financial forecasting of the business that we can engage in

12 investors (indiscernible) examples of services.

13      MR. BATES:  Okay.  And is he paid pursuant to, I

14 don't know, a consulting agreement or some other contract?

15      MR. HARVEY:  That is correct.

16      MR. BATES:  Okay.  And it looks like scrolling

17 through these, he's typically paid on the last day of the

18 month?  Is that right?  Or last business day?

19      MR. HARVEY:  Yes.  That is correct.

20      MR. BATES:  And that the -- those payments cover

21 the services rendered for the entire month?

22      MR. HARVEY:  Yes, for the entire month.

23      MR. BATES:  Okay.  And then for June 2024 he gets

24 paid on June 18th, correct?

25      MR. HARVEY:  Yes, that is my understanding.

1      MR. BATES:  Okay.  And without disclosing the

2 amount because that's an open issue, I'll represent to you

3 that he received the same amount that he received for every

4 other month that's listed in the schedule.  Is that also

5 your understanding?

6      MR. HARVEY:  I don't know the amount for June off

7 the top of my head.

8      MR. BATES:  Mm-hmm.

9      MR. HARVEY:  That is something I would need to

10 follow up with.

11      MR. BATES:  Okay.  I'll represent to you that's

12 true.  So I'm curious whether this was intended to be a pre-

13 payment for the full month.

14      MR. HARVEY:  I don't know the answer for that

15 particular payment.

16      MR. BATES:  Okay.  Do you know if his payment

17 terms changed for June 2024?

18      MR. HARVEY:  I don't know.  I will need to follow

19 up.

20      MR. BATES:  Okay.

21      MR. HARVEY:  This was largely handed by our head

22 of finance, and so I was not close to this payment.

23      MR. BATES:  Okay.  And is that ClearPoint that's

24 head of finance or is that someone else?

25      MR. HARVEY:  ClearPoint, yes.

1      MR. BATES:  Okay.  All right.  Those are all my

2 questions about the filings.  I've got some quick questions

3 about the state of play in the case, and I'm going to jump

4 through.  I think you've already answered most of them.  I'm

5 going to skip all my questions about the plan because that

6 just got filed.  You already answered my questions about any

7 sale.  Are there any plans to offer bonuses to directors or

8 officers or employees in the case?

9      MR. HARVEY:  (indiscernible).

10      MR. POMERANTZ:  (indiscernible).

11      MR. HARVEY:  Go ahead.

12      MR. POMERANTZ:  I think the answer is no.  We

13 don't contemplate any (indiscernible).

14      MR. BATES:  Okay.  I -- thank you.  That's

15 helpful.

16      MR. POMERANTZ:  I will say that the plan does

17 reference (indiscernible) than the plan that exists now to

18 it wouldn't even be calibrated based upon the emergence from

19 Subchapter V, but that was not (indiscernible) motion if you

20 were (indiscernible).

21      MR. BATES:  Yeah, no.  You're absolutely right.

22 And I won't get into any plan stuff right now that's been

23 filed, so I'm happy to review that and reach out with any

24 questions.  So -- but I do appreciate the color.  Okay.  I

25 think I know the answer to this.  Are there any

Page 98

1 environmental issues with the company that need to be
2 disclosed?
3     MR. HARVEY: None that I am aware of.
4     MR. BATES: Okay. I would be shocked. Okay. I
5 already asked that. Okay. Your -- the debtor has already
6 received the IDI requests from the U.S. trustee, correct?
7 The initial debtor interview requests. I apologize.
8     MR. O'NEILL: Yes. Yes. Those were received and
9 we responded to them.
10     MR. BATES: Okay. You guys produced everything
11 already?
12     MR. O'NEILL: We did.
13     MR. BATES: Okay. Thank you. I think we already
14 addressed this, but do you have an idea when the initial MOR
15 will be filed? The initial monthly operating report. I'm
16 so sorry.
17     MR. O'NEILL: We'll -- this is James O'Neill.
18 They will confirm it's Sherwood, but I would expect they'd
19 be filed next week.
20     MR. BATES: Okay. And is Sherwood preparing the
21 MORs?
22     MR. O'NEILL: I believe the answer to that
23 question is yes. The Sherwood team is on and they can
24 respond if that's not the case, but I think (indiscernible)
25 assisting the debtor in preparing the operating reports.

Page 99

1     MR. BATES: Okay. I'm happy to accept that from
2 you, Jamie. Okay. Okay. Are there any plans to retain any
3 professionals other than those already retained and not
4 including -- or excuse me, and -- okay. Let me take that
5 again. Are there any plans to retain any professionals
6 other than those already retained or for whom the retention
7 application has already been filed?
8     MR. POMERANTZ: You're talking about other than
9 the ordinary course professional (indiscernible), right?
10     MR. BATES: Other than OCPs and B. Reilly. I'll
11 be granular.
12     MR. POMERANTZ: The answer is no.
13     MR. BATES: Okay. Okay. And the debtor has no
14 subsidiaries. Is that correct?
15     MR. HARVEY: That is correct.
16     MR. BATES: Okay. I'm going to take us off silent
17 mode at this point.
18     AUTOMATED VOICE: The conference is now in talk
19 mode.
20     MR. BATES: Okay. We're now off silent mode.
21 That concludes the United States trustee's questioning. I
22 -- if -- I know that Ms. Roglen was on and wanted to ask
23 questions. Is that still the case, Ms. Roglen?
24     MS. ROGLEN: Yeah. That's right. And I, you
25 know, was paying close attention. So you asked a lot of my

Page 100

1 questions, and I'm going to try hard not to retread anything
2 you've already covered.
3     MR. BATES: Okay. Great. Take it away, and we'll
4 just jump in if we get too far afield here. But I'm
5 confident that won't happen.
6     MS. ROGLEN: Okay. Thanks. Mr. Harvey, during
7 the trustee's questioning earlier, you mentioned briefly a
8 valuation I think in February of 2023. Is that right?
9     MR. HARVEY: Yes. That was correct.
10     MS. ROGLEN: What was valued in that practice?
11     MR. POMERANTZ: I think his answer was that he
12 wasn't aware of the valuation did and didn't do and what the
13 amount was. If you have any recollection, Mr. Harvey, of
14 what it is you can answer. If not, you can just answer I
15 don't know.
16     MR. HARVEY: Yes, it's the same process. We had
17 recently taken test (indiscernible), which I referred to in
18 February of 2023. And there's a standard valuation process
19 that we do that's called a 409A. It's a very standard
20 process for all software companies. And so that was what
21 that valuation was related to.
22     MS. ROGLEN: Okay. And do you recall what the
23 value was that was provided by that valuation?
24     MR. HARVEY: Not specifically off the top of my
25 head.

Page 101

1     MS. ROGLEN: Do you have a ballpark idea?
2     MR. POMERANTZ: I think he answered that he didn't
3 know. So he had -- I would ask you not to guess or estimate
4 or speculate. If you had any basis or factual basis to be
5 able to answer the question now you can answer it. If not,
6 you can say I don't know.
7     MR. HARVEY: I don't know.
8     MS. ROGLEN: I'm sorry. Mr. Harvey, did you say
9 something after?
10     MR. HARVEY: I did, yes. I said I don't know.
11     MS. ROGLEN: Okay. Thank you. Moving on, I think
12 earlier -- do you have a copy of the petition package of
13 you, or do you not have a copy of it?
14     MR. HARVEY: I have in front of me -- are you
15 referring to the petition packet from June 19th?
16     MS. ROGLEN: Yes.
17     MR. HARVEY: Yes, I have a number of the motions,
18 but I'm not sure what you're specifically referring to.
19     MS. ROGLEN: I am asking about -- specifically I'm
20 going to -- I want to ask some questions about the balance
21 sheet that was filed as an attachment to the petition.
22     MR. HARVEY: Give me one second. And let's -- let
23 me see if I can find it.
24     MR. O'NEILL: Do you have it in front of you? Mr.
25 Harvey, you don't have it in front of you.

1     MR. HARVEY:  I don't have it in front of me.

2     MS. ROGLEN:  Okay.  Are you familiar with the

3 balance sheet that was filed with the petition?

4     MR. HARVEY:  I don't remember specific numbers off

5 the top of my head to the balance sheet.

6     MS. ROGLEN:  There is a line item on the balance

7 sheet that is called Deferred Revenue that's listed as a

8 liability in the amount of $5,148,359.63.  Do you know what

9 that line item is?

10     MR. HARVEY:  I understand deferred revenue as a

11 general concept, but I am not looking at that line in front

12 of me right now.

13     MS. ROGLEN:  Can you tell me your understanding of

14 the concept of deferred revenue?

15     MR. POMERANTZ:  And we're not -- she's not

16 speculating -- or I'd say do not speculate or guess.  If you

17 have an understanding of what deferred revenue generally

18 means separate and apart from what it means in this

19 particular line item she's referring to, then answer.

20     MR. HARVEY:  Okay.  Yes.  I do.  So as it relates

21 to QLess and other software service companies, we bill

22 upfront customers for the upcoming year.  (indiscernible)

23 coming up.  As customers (indiscernible), they prepay during

24 their one-year contract and they prepay that under contract.

25 And so we deduct from the deferred revenue and recognize

1 revenue on a monthly basis for that customer.

2     MS. ROGLEN:  Okay.  So this is basically an

3 accounting function to account for pre-payment under those

4 contracts?

5     MR. HARVEY:  Yes, it's a gap accounting file

6 function.

7     MS. ROGLEN:  Okay.  There is another line on the

8 balance sheet under liabilities that's called Other Long

9 Term Liabilities that's listed at $250,000.  Do you know

10 what goes into that amount?

11     MR. HARVEY:  I do not know off the top of my head

12 what that amount -- what it -- what constitutes that amount.

13     MS. ROGLEN:  Okay.  I'm going to turn now to the

14 Schedules of Assets and Liabilities if you want to flip back

15 to those.

16     MR. HARVEY:  Sure.  Give me just one second.

17 Okay.  I have the document in front of me.

18     MS. ROGLEN:  Okay.  The -- turning to what's the

19 third page of the document, which is really the first page

20 of the form where it says Summary of Assets and Liabilities

21 for Non-Individuals, do you have that page?

22     MR. HARVEY:  So is this -- was this in Part 1?

23     MS. ROGLEN:  Yes, it starts with -- it's the page

24 that has Part 1 and Part 2 on it.

25     MR. HARVEY:  Okay.  Yes.  Which item specifically?

1     MS. ROGLEN:  So at the bottom of that page for

2 total liabilities this lists $8,111,375.37 in total

3 liabilities.  You see that?

4     MR. HARVEY:  (indiscernible).  Are you referring

5 to Part 2, Number 4?  Ms. Roglen, are you referring to Part

6 2, Item 4?

7     MS. ROGLEN:  Yes, that's right.

8     MR. HARVEY:  Okay.  I'm with you.  Go ahead.

9 Could you ask me the question again please?

10     MS. ROGLEN:  Sure.  That number there lists total

11 liabilities for the debtor as $8,111,335.37, right?

12     MR. POMERANTZ:  Are you asking him to read what

13 the number on the page says and agree with you what the

14 number on the page says?

15     MS. ROGLEN:  I'm just making sure we're in the

16 same place.

17     MR. POMERANTZ:  Okay.  I think he said he

18 (indiscernible) --

19     MS. ROGLEN:  Yeah.

20     MR. POMERANTZ:  -- (indiscernible).

21     MS. ROGLEN:  Okay.  So do you know if that amount

22 includes liabilities that the debtor has listed as

23 contingent, unliquidated, or disputed?

24     MR. POMERANTZ:  And do you have to go and do you

25 have to add up all the amounts on the schedule to be able to

1 answer that question, Mr. Harvey?  Or do you know if it

2 includes where the contingent unliquidated disputed amount

3 is checked and there is an amount listed?  Do you know if

4 the software was listing it together or would you basically

5 add those numbers regardless of whether it's listed as

6 contingent, unliquidated, or disputes?  And if you don't

7 know the answer, you can say I don't know the answer.

8     MR. HARVEY:  My apologies.  I was on mute.  Yes, I

9 don't know the answer.

10     MS. ROGLEN:  Okay.  Continuing in the schedule,

11 I'd like to go to Schedule D.

12     MR. HARVEY:  Yes, I'm at Schedule D.

13     MS. ROGLEN:  Okay.  The first item in that

14 schedule under 2.1 is a secured claim for Brex Inc.  The

15 amount of the claim is listed as undetermined.  Can you

16 explain why that's undetermined?

17     MR. HARVEY:  No, I cannot explain why this is

18 undetermined.

19     MS. ROGLEN:  Can you explain the basis for Brex

20 Inc.'s secured claim?

21     MR. HARVEY:  Brex offers us credit card services

22 in which we can do things like pay vendors.  That is the

23 nature of the services they provide to us.

24     MS. ROGLEN:  And it's secured by a bank account?

25     MR. HARVEY:  I think I know the answer to that,

1 but I'm going to answer that I don't know because I don't
2 want to guess at it.
3       MS. ROGLEN: Okay. Do you know how much money was
4 owed to Brex as of the petition date?
5       MR. HARVEY: I do not. Not off the top of my
6 head.
7       MS. ROGLEN: Okay. The next item in the same
8 schedule on the next page for Item 2.2 is the secured claim
9 of Celtic Bank. That's listed in the amount of $6,444,513.
10 Does that amount include all outstanding principal,
11 interest, fees, and other charges in connection with that
12 loan as of the petition date?
13       MR. HARVEY: I cannot -- I can answer only one
14 part of that question. It doesn't include a principal.
15       MS. ROGLEN: Okay. I believe the principal is
16 6.25 million I believe?
17       MR. HARVEY: That is correct.
18       MS. ROGLEN: Okay. But you don't know for sure
19 whether the 6.44 million that's listed in the schedule
20 includes everything that was done.
21       MR. HARVEY: That's correct. That would --
22 there's a number of items on it. I can't remember
23 specifically which ones are in and which ones are out
24 (indiscernible).
25       MR. POMERANTZ: This is Jeff Pomerantz. I can

1 tell you (indiscernible) principal and anything else.
2       MS. ROGLEN: You just cut out a little. You said
3 it does include everything?
4       MR. POMERANTZ: Yes, it does.
5       MS. ROGLEN: Thanks, Jeff. Okay. Moving to -- or
6 what's the -- what are the terms of that loan? Are you
7 familiar with the terms of the loan?
8       MR. HARVEY: There are a lot of terms associated
9 with the loan, but could you maybe ask me specifically?
10       MS. ROGLEN: Sure. What's the interest rate on
11 that loan?
12       MR. HARVEY: The interest rate changes because it
13 is not always the same. So I don't know as of today what
14 the interest rate is. That can change -- like I said, it
15 changes throughout the year.
16       MS. ROGLEN: Okay. What's the term of the loan?
17       MR. HARVEY: The term of the loan, it's a three-
18 year loan.
19       MS. ROGLEN: And when was it issued?
20       MR. HARVEY: February of 2023 I'm fairly certain.
21       MS. ROGLEN: And do you know when the service
22 payments are due on that loan? Are they paid monthly,
23 quarterly?
24       MR. HARVEY: Monthly.
25       MS. ROGLEN: And do you know the amounts of the

1 (indiscernible) for each month?
2       MR. HARVEY: I do not.
3       MS. ROGLEN: Okay. I'm going to move now into the
4 next Schedule EF.
5       MR. HARVEY: Yes, (indiscernible).
6       MS. ROGLEN: The trustee already asked my
7 questions about the IRS, so we can skip that. In 2.2, there
8 is a priority claim of goods for the State of Washington
9 Department of Revenue that's listed in an undetermined
10 amount and the box is checked for unliquidated. What is
11 that priority claim for?
12       MR. HARVEY: That was sales tax to the State of
13 Washington that we paid. And --
14       MS. ROGLEN: And what --
15       MR. HARVEY: -- there is -- go ahead. Please.
16       MS. ROGLEN: Now continue. I'm sure you were
17 going to answer my next question.
18       MR. HARVEY: Oh, I'm just saying that it states a
19 -- the sales tax to the State of Washington.
20       MS. ROGLEN: Okay. And what period is that for?
21       MR. HARVEY: I don't know off the top of my head
22 which period.
23       MS. ROGLEN: Okay. I think it says here that the
24 date this debt was incurred is for 2/2/2024. Does that
25 sound right?

1       MR. HARVEY: I see it here as well, and yes, I'm
2 reading the same thing.
3       MS. ROGLEN: Do you have an idea of what the taxes
4 were that were due to the State of Washington since 2/1 of
5 2024?
6       MR. HARVEY: I do not.
7       MS. ROGLEN: And do you know typically when those
8 taxes are due? Like for example, if either the tax is for
9 the second quarter of 2024, when do those need to be paid to
10 the State of Washington?
11       MR. HARVEY: I do not know that. Not off the top
12 of my head.
13       MS. ROGLEN: Okay. Next I'm going to Section 3,
14 Non-Priority Unsecured Claims. And I have a couple more
15 questions about Section 3.10, which is the Palisades
16 unsecured claim.
17       MR. HARVEY: I have it in front of me.
18       MS. ROGLEN: Okay. That $250,000, do you know
19 whether that was captured in the balance sheet that was
20 filed with the petition?
21       MR. POMERANTZ: Only if you know the answer. If
22 you say -- if you don't know, you can say I don't know.
23       MR. HARVEY: (indiscernible) to that time and when
24 the -- when each were created or when it came and was
25 created, I don't know off the top of my head.

28 (Pages 106 - 109)

Page 110

1    MS. ROGLEN: Okay. And I think you answered
2 earlier that there is no written agreement accompanying that
3 $250,000 loan?
4    MR. HARVEY: I did not say that.
5    MS. ROGLEN: Is there a written agreement
6 accompanying that $250,000 loan?
7    MR. POMERANTZ: I think he said (indiscernible).
8 I think that was what you heard (indiscernible). That was
9 not him. He didn't know.
10    MS. ROGLEN: Okay. So do you know whether there
11 are any repayment terms on that $250,000 loan?
12    MR. HARVEY: Not off the top of my head.
13    MS. ROGLEN: Okay. Next I wanted to ask about
14 Section 3.18.
15    MR. HARVEY: Yes, I (indiscernible).
16    MS. ROGLEN: Okay. That was the claim for the
17 U.S. Small Business Administration in the amount of
18 $127,237.
19    MR. HARVEY: Yes, I see that.
20    MS. ROGLEN: That (indiscernible) -- what is this
21 claim based on?
22    MR. HARVEY: This is based on a PPP loan. This is
23 before my time with QLess. But it was my understanding it
24 was based on a PPP loan, the Paycheck Protection Program of
25 -- I don't know the exact name for (indiscernible). And

Page 111

1 there was a -- an amount that the U.S. Small Business
2 Administration believes that QLess owed to it. We disputed
3 that because we did not agree that we owed that amount. We
4 set out to dispute them and the U.S. Small Business
5 Administration has not responded to us or contacted us.
6    MS. ROGLEN: And when did you submit that dispute
7 to them?
8    MR. HARVEY: I don't remember off the top of my
9 head.
10    MS. ROGLEN: Okay. Next I want to move into
11 Schedule G.
12    MR. HARVEY: Yes, I have it in front of me, Ms.
13 Roglen.
14    MS. ROGLEN: Yes. Thank you. Earlier you
15 mentioned an agreement with QLess AM whereby they, you know,
16 provide certain services to the debtor. Is that contract
17 listed in this schedule?
18    MR. HARVEY: I don't see it in the schedule, no.
19    MS. ROGLEN: Okay. What's the payment structure
20 under that contract?
21    MR. HARVEY: (indiscernible) --
22    MR. POMERANTZ: (indiscernible) --
23    MR. HARVEY: Go ahead.
24    MR. POMERANTZ: I was just going to say if you
25 know without having the contract in front of you. If not,

Page 112

1 you can say I don't know.
2    MR. HARVEY: I don't have the contract in front of
3 me.
4    MS. ROGLEN: Do you know if the debtor pays QLess
5 AM in advance for services or if it pays in arrears for
6 services it already provided?
7    MR. HARVEY: I (indiscernible) those payments.
8 Yeah, so I don't know because that is some (indiscernible)
9 financing.
10    MS. ROGLEN: Do you know if QLess AM was owed any
11 money as of the petition date?
12    MR. HARVEY: I do not know if there is some small
13 amounts or some amount that is owed to QLess AM as of the
14 petition date.
15    MS. ROGLEN: Do you know if a claim is scheduled
16 for QLess AM in Schedule EF?
17    MR. HARVEY: No, I do not believe that there was
18 any claim by QLess AM in Schedule EF.
19    MS. ROGLEN: Okay. Sticking with Schedule G, I
20 think there's a total of 13 contracts and leases that are
21 scheduled in Schedule G. One of them, which the trustee
22 asked about earlier in 2.12 actually looks like it's kind of
23 a (indiscernible) aggregation of multiple warrant option
24 agreements.
25    MR. HARVEY: Mm-hmm.

Page 113

1    MS. ROGLEN: And 2.10 lists the debtor's office
2 lease from Providence Partners, LLC. I think you mentioned
3 earlier it's for their office space in Colorado. And --
4    MR. HARVEY: That is correct.
5    MS. ROGLEN: -- for -- and for that, a claim is
6 included in Schedule E and F for unpaid rent, correct?
7    MR. HARVEY: (indiscernible). I need to find
8 Schedule EF.
9    MS. ROGLEN: Sorry I'm referring to two schedules
10 at once and you have to flip.
11    MR. HARVEY: No, it's okay. Sorry. Go ahead.
12    MR. POMERANTZ: At 3.13.
13    MS. ROGLEN: Thank you.
14    MR. HARVEY: Okay. I'm looking at the schedules
15 you asked about. Here we go. I'm finding the Schedule EF,
16 and it's -- you said 3.13?
17    MR. POMERANTZ: Correct.
18    MR. HARVEY: Okay. Okay. I'm at 3.13. Ms.
19 Roglen, would you mind repeating your question?
20    MS. ROGLEN: Sure. That's unpaid rent under the
21 Providence Partners lease, correct?
22    MR. HARVEY: This is definitely for the Denver
23 office in rent, and I am not certain if this represents the
24 unpaid amount or not. Like the monthly unpaid amounts or
25 not. I never looked at the individual monthly payment for

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1 that lease.

2    MS. ROGLEN: Okay.

3    MR. HARVEY: I see that (indiscernible).

4    MS. ROGLEN: Apologies. Flipping back to Schedule

5 G --

6    MR. HARVEY: Okay.

7    MS. ROGLEN: -- Section 2.2 lists the other office

8 lease from BPP East Union, LLC, which I think is for your

9 space in Pasadena, California?

10    MR. HARVEY: Yes, that is correct.

11    MS. ROGLEN: Do you know why no claim was

12 scheduled for this lease?

13    MR. HARVEY: We actively use this office space,

14 and this office space is the headquarters of our company.

15 And we are required to have an office space of headquarters

16 for our company. This is also where customers who have --

17 who send us paper checks also send it to this location. So

18 this is an operational site of the company.

19    MS. ROGLEN: Okay. So is the landlord --

20    MR. POMERANTZ: James --

21    MS. ROGLEN: -- there not owed any money?

22    MR. POMERANTZ: Yeah, James. I think she's asking

23 were they -- was the company current on this lease. To the

24 best of your knowledge.

25    MR. HARVEY: To the best of my knowledge yes.

1    MS. ROGLEN: Okay. So other than the two leases

2 we just discussed and the warrant agreement, there's 10

3 scheduled executory contracts, each of which are called a

4 vendor services agreement with 10 different providers of

5 various services. And those are all services provided to

6 the debtors under these contracts, right?

7    MR. HARVEY: (indiscernible). Which schedule are

8 you referring to? Schedule G? Is that the (indiscernible)

9 contracts?

10    MS. ROGLEN: That's right.

11    MR. HARVEY: Yes, I see the (indiscernible). I'm

12 just double checking which one of them.

13    MS. ROGLEN: Mm-hmm.

14    MR. HARVEY: I'm sorry. I don't recall. Did you

15 have a question about these?

16    MS. ROGLEN: Yeah. These contracts were all

17 contracts where the debtors pay money to these service

18 providers under the agreement, not the other way around,

19 right?

20    MR. HARVEY: Yes. Yes. We pay -- well, no, we do

21 not pay money to warrant holders.

22    MS. ROGLEN: Yes, correct. Excluding the warrant

23 options and even taking out the leases that we already

24 discussed, the 10 vendor service agreements where the

25 vendors provide services to the debtors and the debtors pay

1 them for those services.

2    MR. HARVEY: Yes, that is correct.

3    MS. ROGLEN: Okay. Are all of those vendors

4 current because there aren't any claims scheduled for any of

5 those vendors?

6    MR. POMERANTZ: This assumes did you agree with

7 the statement that there are no claims scheduled for any of

8 those vendors, which were required to go back to -- with the

9 schedule. So do you have a specific question without having

10 him to have to compare the schedules to the exhibit? What

11 is the question since we see that there's no claim there?

12 There's no claim there. So what's the question?

13    MS. ROGLEN: I'm asking if that's accurate and if

14 all of those contracts are paid currently and that there are

15 no amounts owing to any contract counterparties. I think

16 that the scheduled claims are understated. That's where I'm

17 going.

18    MR. POMERANTZ: It was patently apparent that

19 (indiscernible). If you know the answer, James, you can

20 answer.

21    MR. HARVEY: So yeah, I would like to give a

22 definitive answer. I know on some of these the answer is

23 yes. There's just some that I'm not -- I can't recall off

24 the top of my head. I think the answer's yes, but you know,

25 I am not in -- into the journal entries to see if the

1 payment was actually made.

2    MR. POMERANTZ: Right. All we're asking for is

3 your knowledge right now. If you don't have specific

4 knowledge to answer the question, just say I don't know.

5    MR. HARVEY: Yeah, I don't know.

6    MS. ROGLEN: Okay. Did you prepare Schedules E

7 and F?

8    MR. HARVEY: Along with my financial advisor and

9 our finance team. I reviewed Schedules E and F with our

10 team.

11    MS. ROGLEN: Okay. That's all of my questions.

12 Thank you, Mr. Harvey.

13    MR. HARVEY: Thank you.

14    MR. BATES: Okay. Thank you, Ms. Roglen. At this

15 time I'm going to ask if there are any other creditors or

16 counsel on the line who wish to examine the witness.

17    MR. A. BAECKER: Yes. If you don't have an

18 objection (indiscernible), I would like to ask a couple of

19 questions.

20    MR. BATES: Is that Ron Baecker?

21    MR. POMERANTZ: (indiscernible).

22    MR. A. BAECKER: This is Alex Baecker.

23    MR. BATES: Alex Baecker?

24    MR. POMERANTZ: Yes, and I (indiscernible) --

25    MR. BATES: Mr. Baecker --

1      MR. POMERANTZ:  -- by counsel.

2      MR. BATES:  Excuse me.  Yes.  Mr. Baecker, you are

3  represented by counsel in this matter, so if you have

4  questions, I would prefer that it be submitted to counsel to

5  be directed to the witness.  Otherwise I -- that's the

6  procedure that I think we should follow here.

7      MR. POMERANTZ:  (indiscernible) -- yeah.  I think

8  also, Malcolm, questions been closed.  Ms. Roglen said she

9  had no more questions, so I think it's time to ask questions

10  of (indiscernible).

11      MR. BATES:  I understand that, but if -- yeah, I

12  hear you.  But yes, Mr. Baecker, if -- because you're

13  represented in this matter, your questions should be asked

14  through counsel.  That's without prejudice to your right to

15  seek discovery pursuant to Bankruptcy Rule 2004 or

16  otherwise.

17      MR. A. BAECKER:  Okay.  Is there an opportunity

18  for my counsel to present additional questions either in

19  writing or in a follow-up call?

20      MR. BATES:  Well, as I stated, this is where --

21      MR. POMERANTZ:  No, unless discovery --

22      MR. BATES:  Excuse me, Jeff.  I'll field it.  I

23  appreciate that.

24      MR. A. BAECKER:  The question is for the trustee,

25  not for the counsel, Jeff --

1      MR. BATES:  Mr. Baecker, please.  I don't really

2  want to have to mute the lines while I'm trying to wrap

3  things up here.  It's been a long examination.  I'll answer

4  your question.  This is without prejudice to your right as a

5  party in interest in this case to seek discovery pursuant to

6  the Federal Rules of Bankruptcy Procedures, the Federal

7  Rules of Civil Procedure, or any other applicable statute.

8      With respect to the 341 meeting specifically, I am

9  going to be leaving the meeting open potentially to

10  reconvene because I'm anticipating supplemental disclosures

11  and amendments to the schedules by the debtor.  If we do

12  reconvene, there will be an additional opportunity for your

13  counsel to ask questions.  If not, as I stated, you're

14  entitled to seek any discovery you wish in this case.

15      MR. POMERANTZ:  Malcolm, I kind of have to object

16  to keeping the 341 open.  We have been here -- it's now been

17  three hours in a Subchapter V case.  I think we've answered

18  all the questions to the best of the ability, which is all

19  Mr. Harvey was required to answer.  If there's informal

20  questions that you want follow-up on, we're happy to provide

21  you to.  But we would object to keeping this 341 open.

22      MR. BATES:  I understand that we've been here --

23      MR. POMERANTZ:  (indiscernible).

24      MR. BATES:  Jeff, I understand we've been here for

25  a long time.  We're going to have amendments to the

1  schedules.  We have an issue with, in my view, improper

2  sealing of information that's been provided in connection

3  with the schedules and SOFA.  There are going to be

4  additional disclosures that are going to be made.  There

5  were numerous questions that the witness was not able to

6  answer and that I am anticipating follow-ups from the

7  debtors on.  So until I've had a chance to review that

8  information and address the issue of the sealing of

9  information in the schedules and SOFA, I don't think I can

10  close the meeting.

11      Now I may review the supplemental information and

12  conclude that there's nothing else to pursue here and close

13  it, but I'm not prepared to close it until those issues have

14  been resolved.

15      MR. POMERANTZ:  Okay.  Well, just for the record,

16  we have -- we obviously know we have to file a sealing

17  motion, and that will be addressed in court.  And if the

18  court requires us to file any additional information, you

19  will have you rights to get (indiscernible) additional

20  information.  But after three hours of questioning going

21  through the painstaking detail, Mr. Harvey was not required

22  to be able to answer every last one.  He answered many

23  questions, provided a lot of information.

24      Again, we will cooperate with your office and

25  provide additional information, so we do object.  And I

1  understand your position.  You understand our position to

2  the 341 being open, and we reserve the right to not show up

3  to a 341 or to seek appropriate relief from the court.

4      MR. BATES:  All rights that you may have are --

Page 122

1          C E R T I F I C A T I O N

2

3  I, Sonya Ledanski Hyde, certified that the foregoing

4  transcript is a true and accurate record of the proceedings.

5

6  <%12151,Signature%>

7

8  Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20  Veritext Legal Solutions

21  1801 Market Street

22  Suite 1800

23  Philadelphia, PA 19103

24

25  Date:  August 15, 2024

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

**[& - 3.20]**                                                                                    Page 1

| & | | | |
|---|---|---|---|

**&**   2:3

**1**

**1**   15:17 32:20
37:7,8 48:1
68:25 70:17
78:21 81:1
82:4 91:7,8,10
91:11,12,12
103:22,24
**10**   40:13 115:2
115:4,24
**10,000**   84:16
**100,000**   62:11
**11**   1:5 4:4 31:9
32:19 33:15
42:7 73:10
74:13 91:17
**11.2.**   71:21
**11b**   38:4
**12**   32:9,15
**120**   69:12
**12151**   122:6
**127,237**   110:18
**13**   75:11
112:20
**14**   52:17,20
**15**   42:14 53:16
54:6 122:25
**150,000**   85:6
**150k**   86:21
**16**   47:6,7
**167k**   73:16
**17**   33:7 34:7
35:8 75:1

**170,000**   62:5
**17th**   86:22 88:2
**18**   59:23 81:3
85:6
**18,904**   83:24
**18,904.11.**   86:4
**1800**   122:22
**1801**   122:21
**18th**   82:5 83:14
83:20,24 84:1
84:16,21 86:20
95:24
**19**   1:15 4:7
86:3 91:10,12
91:12
**19103**   122:23
**19k**   83:16
**19th**   33:9 81:14
83:21,25
101:15
**1st**   15:16 77:1
81:14

**2**

**2**   4:7 49:5 71:3
80:2 85:2
103:24 104:5,6
**2,900**   78:24
**2.1**   105:14
**2.10**   113:1
**2.12**   68:5
112:22
**2.2**   45:23 106:8
108:7 114:7
**2/1**   109:4

**2/2/2024**
108:24
**20**   86:22
**200,000**   88:2
**2000**   86:22
**2004**   118:15
**2009**   24:18
43:2
**200k**   80:16
**2018**   48:9,11
**2021**   51:23
52:25 53:2,13
55:25 56:8
57:10,11,15,17
58:4
**2022**   9:17
30:22 69:1
71:8
**2023**   30:24,24
36:24 47:6,7
47:15 71:7,8
71:10 100:8,18
107:20
**2024**   1:15 4:7
15:17,17 34:7
35:8 59:23
71:22 81:3
85:6 90:13
91:3,4 95:23
96:17 109:5,9
122:25
**209**   88:1
**21st**   47:10
**23,832**   83:22

**24-11395**   1:7
4:5 35:7
**24k**   83:15
**25**   12:22 15:7
**250,000**   60:5,9
61:5 103:9
109:18 110:3,6
110:11
**250k**   59:25
**26a**   75:13,24
**270**   62:6
**28**   16:4
**28,350**   82:12
**29**   77:4,7
**29,400**   82:12
**2:00**   1:16
**2lp**   59:19

**3**

**3**   37:8 38:2
53:9 78:7,21
80:14 91:3,7,8
91:11 93:17,18
109:13
**3.10**   59:15
109:15
**3.11.**   62:22
**3.12**   63:18
**3.13**   113:16
**3.13.**   113:12,18
**3.16.**   64:21
**3.18.**   110:14
**3.19.**   65:16
**3.2**   49:11
**3.20**   66:17

**3.3** 51:16
**3.3.** 53:11
**3.4** 37:12
**3.4.** 55:9
**3.5** 37:12
**3.6.** 56:15
**3.8** 57:7
**3.8.** 57:4,6
**30** 12:22 15:7
  24:12
**300,000** 61:2
**30th** 82:18
**31,000** 92:7
**31,200** 91:4
**32** 12:1
**340** 62:2
**341** 1:19 4:4
  7:16,25 8:5,18
  19:3 20:19
  119:8,16,21
  121:2,3
**35** 43:1,5
**35,447** 81:6
**350,000** 9:20
  62:2 86:20
**39** 39:6

**4**

**4** 33:7 34:23
  35:1,3,8 88:16
  104:5,6
**4,000** 53:23
**400,000** 53:23
  54:7
**401k** 75:6

**409a** 100:19
**41** 39:6
**45** 12:19,20,21
  15:8
**48** 35:8

**5**

**5,148,359.63.**
  102:8
**50,000** 61:7
**500,000** 53:20
  54:7
**55** 39:10

**6**

**6** 20:8 71:21
**6,444,513** 106:9
**6,900** 78:24
**6.25** 106:16
**6.44** 106:19
**6/19** 54:8
**600,000** 54:8,12
**64** 40:14
**65** 12:3
**66** 34:8 35:7
**660,000** 54:1,3
**67** 16:16 41:2
  68:21
**6k** 38:5

**7**

**7** 39:3 54:10
**70,000** 84:1
**70k** 83:15
**72** 42:9 68:17
**74** 44:24,25
  45:19

**75** 44:25 45:19
  92:8

**8**

**8,111,335.37**
  104:11
**8,111,375.37**
  104:2
**80** 92:8,8,9
**824** 1:13

**9**

**9** 39:9 74:21
**9.1** 27:17
**90** 32:11 38:5
  38:10,12 78:8

**a**

**a1** 71:12
**ab** 34:15 35:4
  35:16 37:7
  38:2 39:3
  68:17
**ab72** 42:12
**ability** 119:18
**able** 7:19 8:11
  19:11 20:12
  33:13 38:21,24
  69:23 101:5
  104:25 120:5
  120:22
**absolutely** 9:7
  26:13 52:19
  80:22 87:24
  97:21
**accept** 61:1,4
  99:1

**access** 60:8
  87:12
**accompanying**
  110:2,6
**accomplish**
  33:13
**accordance**
  59:9
**account** 28:2
  37:19,20,25
  84:9 88:12
  103:3 105:24
**accountant**
  43:19 44:11
**accountants**
  43:25
**accounting**
  75:16 103:3,5
**accounts** 27:24
  37:9,12,13,14
  84:10
**accrual** 25:20
  75:17
**accrued** 27:8
  27:12 88:12
**accurate** 66:14
  116:13 122:4
**accustomed**
  12:9,25
**action** 45:2
**active** 52:10
**actively** 15:1
  73:14 114:13
**activities** 82:16

**actual** 22:13
40:3 54:8 86:5
**actually** 11:17
27:1 47:9,17
51:3 52:6 63:4
63:6 70:17
72:16 75:18
77:3 85:20
95:3 112:22
117:1
**add** 23:1
104:25 105:5
**addition** 91:21
**additional**
15:17 26:21
118:18 119:12
120:4,18,19,25
**additionally**
7:19
**address** 7:15
120:8
**addressed**
98:14 120:17
**addresses** 77:9
77:10 92:17
**adjustment**
89:25 91:24
**administration**
110:17 111:2,5
**advance** 112:5
**advice** 7:18
65:14
**advisements**
95:9

**advises** 94:22
**advisor** 44:11
117:8
**advisory** 95:1
**affairs** 16:15
34:4,6 68:20
**affiliate** 13:22
14:4
**affiliation** 89:3
89:4
**affirm** 8:25
**afield** 7:25
100:4
**aged** 38:5
**agents** 13:4
**aggregate**
25:15
**aggregation**
112:23
**ago** 9:15 12:2,3
12:21 15:5,8
23:16 38:10
**agree** 43:18
104:13 111:3
116:6
**agreed** 28:22
**agreement**
37:17 62:13
90:5,7 95:14
110:2,5 111:15
115:2,4,18
**agreements**
13:17 68:9
112:24 115:24

**ahead** 16:6
19:11 20:22
25:11 26:22
43:9 63:9,10
64:20 67:15
77:24 86:25
97:11 104:8
108:15 111:23
113:11
**al** 88:22
**alderton** 64:23
**alex** 2:10 5:15
6:24 49:12
53:19 117:22
117:23
**alleged** 54:1,12
**alleges** 52:23
**allen** 5:17
**allowed** 51:14
53:4 61:12
**amazon** 81:17
84:12
**amend** 77:10
**amendments**
119:11,25
**amount** 38:6
48:5 49:14,16
49:18,22 50:10
50:25 51:3,4
62:7,13,16
63:3,17 81:9
92:19 96:2,3,6
100:13 102:8
103:10,12,12
104:21 105:2,3

105:15 106:9
106:10 108:10
110:17 111:1,3
112:13 113:24
**amounts** 38:21
38:25 50:19
54:15,15,19,23
55:4 79:19
104:25 107:25
112:13 113:24
116:15
**analysis** 43:17
43:18,21,25
44:5,10
**anderson** 63:18
**anderson's**
63:20
**andrew** 3:4
4:25
**annual** 25:18
84:19
**annually** 9:21
76:23
**answer** 7:20
12:13 18:12
23:4,4 26:2
29:10,13 30:14
33:1,21 34:10
37:2,5 41:21
47:11 53:4
60:22 62:15
64:9 65:10
67:9,11,14,14
67:17 68:22
69:14,22 74:4

88:8 92:13
96:14 97:12,25
98:22 99:12
100:11,14,14
101:5,5 102:19
105:1,7,7,9,25
106:1,13
108:17 109:21
116:19,20,22
116:22 117:4
119:3,19 120:6
120:22
**answer's** 58:19
58:25 116:24
**answered**
12:10,16 39:8
44:24 47:19
68:18 69:13
70:15 74:23,25
75:1 77:3
80:15 95:5
97:4,6 101:2
110:1 119:17
120:22
**answering** 12:9
41:11
**answers** 12:16
42:7 62:21
90:10
**anticipated**
41:1
**anticipating**
119:10 120:6
**anybody** 5:2
6:23

**apart** 102:18
**apologies** 5:7
12:7,8,17 13:1
20:18 31:10
33:2 36:5
46:17 71:24
72:24,24 105:8
114:4
**apologize** 11:4
14:12 19:4,15
19:23 31:6
74:24 83:5
98:7
**apparent**
116:18
**appeals** 58:5
**appearance**
4:24
**appearances**
4:14 6:1,10
7:13
**appearing** 4:16
**appears** 46:20
**apple** 56:5,6
**applicable**
30:17 51:20
119:7
**application**
99:7
**applies** 45:14
53:11
**appointed** 9:12
16:16,18,19,20
16:21 93:24

**appointment**
94:18
**appointments**
24:8,9
**appraisals** 36:2
36:6,7
**appraiser**
36:25 37:1
**appreciate** 8:4
17:19 59:11
68:16 86:19
87:21 97:24
118:23
**appropriate**
8:3 121:3
**approximately**
15:8 27:14
53:20
**april** 9:16,16
15:16
**ar** 38:5
**arbitration**
50:4,8,22,24
51:11 53:21
54:16 62:25
67:5,8,10
79:24
**argentina**
24:25
**argument**
65:22
**armanino**
82:12,13,17
**armenia** 13:4
14:19 25:3

**armenia's**
14:22
**arrangements**
7:21
**arrears** 112:5
**arrival** 48:8
65:11,13
**arsht** 57:22
85:5
**asked** 7:14 23:2
87:17 98:5
99:25 108:6
112:22 113:15
118:13
**asking** 17:15,20
20:25 36:10
45:10 58:7,8
93:4 101:19
104:12 114:22
116:13 117:2
**asserted** 49:12
49:18 50:4,19
50:25 51:7
53:20 67:9
**asserting** 54:16
**assessing** 8:1
**assets** 33:3 34:5
34:8,14 35:4
35:16,20,22,24
36:17 39:7
42:2 44:1
46:10,11 47:21
103:14,20
**assist** 60:5

assisting 98:25
associated
  52:24 107:8
assume 23:9
  45:14
assumes 116:6
assuming 12:13
attached 23:10
attachment
  16:4 42:12
  69:16 75:24
  78:7 88:15
  101:21
attention 99:25
attorney 2:4,10
  2:15,20 4:8
  30:15,18,21
  45:13 58:9
audit 82:15,15
  82:18 91:21
audited 82:18
auditor 44:11
  82:13
august 70:5
  122:25
authorized
  94:15,17,18
automated
  19:13,21 20:2
  99:18
availability
  43:16,19,22
  44:7,8
available 19:22
  43:12 44:5,18

47:1 61:3
avoid 8:8 81:21
  83:4
aware 10:23,24
  18:2,4,10 21:3
  21:6,10,13
  27:13,25 29:6
  32:4,6,17
  34:16 35:18
  44:4,12 69:8
  98:3 100:12
aws 81:6,10,10
  81:13

**b**

b 1:23 6:6,17
  46:3 99:10
back 8:17
  12:23 13:10
  15:4 20:23
  22:12,16 29:11
  32:1,10 41:20
  48:9 49:2
  55:15 59:14
  69:1 74:4 81:1
  81:9 85:1 86:3
  91:13 103:14
  114:4 116:8
backer 2:10
background
  7:9 19:16,25
  20:6 22:22
  51:23,24 81:7
  87:22 88:19
baecker 3:6
  6:13,17,17,24

49:12 50:12
51:13 53:20
54:16 61:12
117:17,20,22
117:22,23,25
118:2,12,17,24
119:1
bah 29:18,18
  29:18 35:6,6,6
balance 38:14
  76:21 101:20
  102:3,5,6
  103:8 109:19
ballard 2:9
  5:17
ballpark 42:17
  42:21,23 101:1
bank 27:24
  37:9,14,19,19
  37:25 45:24
  105:24 106:9
bank's 46:23
bankruptcy 1:1
  1:12 4:6 29:19
  30:9 32:3,8,9
  32:11,13,15
  36:16,18 44:14
  79:10,17 87:14
  91:17 118:15
  119:6
based 80:3 90:1
  97:18 110:21
  110:22,24
baseless 49:1

basically 17:3
  37:11 41:4
  49:2 52:2
  60:10 61:4
  103:2 105:4
basis 13:9
  14:16 25:18,18
  25:20,24 40:24
  48:3 51:20
  53:12 55:14
  59:24 71:23
  75:17 81:13
  82:3 91:22
  101:4,4 103:1
  105:19
bates 1:24 4:2,8
  4:18,22 5:2,6,9
  5:11,19,24 6:5
  6:7,9,14,19 7:6
  8:23,24 9:4,9
  9:12,15,18,22
  9:25 10:3,9,13
  10:16,18,22,25
  11:2,4,7,15,16
  11:19,21,24
  12:2,5,15,20,24
  13:2,10,14,17
  13:20 14:1,9
  14:11,17,24
  15:2,12,15,19
  15:22 16:1,6,9
  16:13,23 17:2
  17:10,19 18:1
  18:7,11,15,19
  18:24 19:2,7

| | | | |
|---|---|---|---|
| 19:10,14,23 | 46:13,19 47:2 | 72:17,22 73:4 | 97:21 98:4,10 |
| 20:3,5,9,14,15 | 47:6,13,16,25 | 73:9,12,25 | 98:13,20 99:1 |
| 20:17 21:4,8 | 48:10,20,24 | 74:5,9,11,16,18 | 99:10,13,16,20 |
| 21:11,14,18,21 | 49:4,9,14,25 | 74:21,23 75:7 | 100:3 117:14 |
| 22:3,7,12,21,25 | 50:3,14,24 | 75:10,12,13,19 | 117:20,23,25 |
| 23:5,7,12,15,18 | 51:16,18,19 | 75:23 76:2,4,8 | 118:2,11,20,22 |
| 23:25 24:13,15 | 52:13,17,21 | 76:12,16,18,20 | 119:1,22,24 |
| 24:19,22 25:4 | 53:11,14,15,18 | 76:24 77:2,7 | 121:4 |
| 25:7,14,19,21 | 53:23 54:1,4,9 | 77:13,17,18 | **beat**  68:24 |
| 26:4,9,13,22 | 54:14,18,23 | 78:4,6,9,11,18 | **becker**  5:15 |
| 27:7,9,11,14,18 | 55:3,8,11,18,22 | 78:25 79:6,16 | 6:12 |
| 27:23 28:1,9 | 56:2,7,12,14,18 | 79:21,25 80:6 | **begins**  7:24 |
| 28:13,17 29:4 | 56:21 57:3,6,8 | 80:13,25 81:11 | 52:22 |
| 29:16 30:10,16 | 57:14,19 58:1 | 81:19,23 82:1 | **behalf**  5:3,17 |
| 31:1,4,6,8,12 | 58:6,16,20,24 | 82:4,7,10,21,24 | 5:20 6:11,23 |
| 31:15,21 32:2 | 59:1,11,17,18 | 83:4,8,10,12,20 | 24:5 31:13 |
| 32:5,7,18,22,25 | 59:22 60:10,14 | 83:23 84:1,4,8 | **believe**  4:22 |
| 33:6,11,17,20 | 60:16,23 61:8 | 84:14,20,24 | 5:24 12:19 |
| 33:24 34:2,12 | 61:14,16,21,24 | 85:2,4,8,12,17 | 17:8 21:7 |
| 34:18,19,20,23 | 62:4,9,12,17,19 | 85:23 86:2,8 | 22:17 33:8 |
| 35:3,12,17,25 | 62:24 63:3,14 | 86:17 87:2,7 | 46:11 51:10 |
| 36:6,7,10,12,22 | 63:17,20,23 | 87:10,21 88:6 | 54:20 59:4 |
| 36:25 37:3,6 | 64:4,12,14,19 | 88:10,15,18,25 | 66:15 67:13,13 |
| 37:16,22 38:1 | 64:23 65:1,6,9 | 89:3,5,9,12,15 | 67:17 72:23 |
| 38:4,11,16,20 | 65:12,16,19,21 | 89:22 90:3,8 | 79:10 81:15 |
| 38:22,24 39:2 | 65:25 66:4,7 | 90:10,18,22,25 | 82:3 84:25 |
| 39:5,12,15,17 | 66:10,12,17,21 | 91:2,9,14,19,23 | 85:15,16 86:10 |
| 39:20,24 40:2 | 66:23 67:2,6 | 92:2,10,15,23 | 86:16 90:6,20 |
| 40:5,9,12,16,22 | 67:12,15,19,21 | 93:4,6,12,15,17 | 91:11 92:25 |
| 41:1,13,16 | 68:4,7,8,14,16 | 93:20,23 94:2 | 98:22 106:15 |
| 42:3,6,9,24 | 68:24 69:6,11 | 94:5,8,11,14,15 | 106:16 112:17 |
| 43:3,13,24 | 69:18,25 70:10 | 94:20 95:3,13 | **believes**  111:2 |
| 44:6,19,22,23 | 70:13,21,24 | 95:16,20,23 | **beneficial**  27:2 |
| 45:9,16,18,20 | 71:2,5,13,16,20 | 96:1,8,11,16,20 | **benefit**  14:20 |
| 45:23 46:1,7 | 72:1,4,10,13,15 | 96:23 97:1,14 | |

**best** 10:11 76:3
  78:12,21 81:14
  114:24,25
  119:18
**better** 41:18
**beyond** 43:21
**bifurcated** 90:4
**big** 78:11
**biggest** 37:24
**bill** 40:4 81:13
  81:24 102:21
**billed** 89:22,23
**billing** 82:2
**billings** 38:18
**bills** 38:9
**bind** 60:17
**bit** 4:7 22:14
  37:10 41:3,20
  44:9 62:7
  64:20 70:18
  83:12 85:20
  88:19
**biweekly** 89:17
**blank** 35:8
  49:17,20 55:5
  63:4,15
**bleeds** 54:4
**bls** 1:7 4:5 35:7
**board** 9:14
  16:18,19,20,22
  17:16,17 31:14
  31:15,19,24,25
  42:23 94:17
**boise** 85:21

**bonuses** 97:7
**bookkeeping**
  88:23
**books** 43:11,20
  44:18 75:16,25
  76:5 88:23
**bottom** 48:24
  78:22 80:1,13
  84:15 85:21
  104:1
**box** 108:10
**bpp** 114:8
**brex** 83:14,17
  86:3 105:14,19
  105:21 106:4
**brian** 2:22 6:3
**bridge** 37:19,25
  60:10
**brief** 4:11
**briefly** 7:1 10:3
  23:25 29:18
  100:7
**broad** 51:11
**broaden** 44:9
**brought** 30:4
**brown** 55:9,16
  55:19,25
**build** 15:1
**building** 40:20
**bunch** 93:6
**burn** 36:1
**bus** 87:14
**business** 10:7
  12:10,12 13:21
  13:25 23:22

24:1,2,16,17
  28:20 29:20
  30:8 41:10
  42:21 43:3
  65:14 69:1,24
  70:7 71:3
  78:14,17 83:7
  95:11,18
  110:17 111:1,4
**busy** 70:3,5

**c**

**c** 2:1 4:1 5:22
  6:6,18 66:5
  122:1,1
**calendar** 77:1
**calibrated**
  97:18
**california**
  46:15 114:9
**call** 4:11 8:10
  8:14,17 15:6
  41:6 46:14
  87:3 118:19
**callback** 24:10
**called** 8:8 13:3
  40:17 49:6
  55:23 75:22
  76:7 100:19
  102:7 103:8
  115:3
**camara** 3:4
  4:25,25
**camden** 6:5
**capacity** 93:8
  94:25

**capital** 14:22
  57:4 59:14,19
  60:8
**capitalized**
  40:16,25
**captured**
  109:19
**card** 83:17 84:5
  84:10 105:21
**cards** 84:5,7,13
  86:3
**carolyn** 2:17
  5:22
**case** 1:7 4:4
  16:16 25:4,23
  28:16 29:19
  31:9 32:3,12
  32:13,16,20
  33:15 34:6
  35:7 41:19
  59:20 60:1
  71:18 73:1,14
  74:13 76:9
  79:2 82:25
  85:11 86:6,11
  97:3,8 98:24
  99:23 119:5,14
  119:17
**cases** 5:15
**cash** 27:19,20
  28:7,10,11,11
  28:15,22 29:21
  37:10 71:10,14
  71:15,17 75:17

**cashflow** 70:22
**category** 21:18
**causes** 45:2
**caveat** 42:14
**caveats** 61:21
**cease** 8:2
**celtic** 37:14,19
  45:24 46:22
  106:9
**ceo** 4:21 9:7,13
  11:22 56:24
  94:25
**certain** 13:11
  52:3,4 107:20
  111:16 113:23
**certainly** 29:1
  86:18
**certified** 122:3
**cfo** 76:7
**cfos** 89:1
**chairvin** 80:1,2
**chance** 120:7
**change** 28:23
  31:19 77:14
  89:12,18
  107:14
**changed** 96:17
**changes** 27:18
  107:12,15
**chapter** 1:5 4:4
  31:9 32:19
  33:15 73:9
  74:13 91:17
**characterize**
  60:18 62:20

**charged** 89:14
**charges** 106:11
**check** 6:21 16:1
  37:2
**checked** 105:3
  108:10
**checking**
  115:12
**checks** 28:20
  28:24,25 29:2
  29:7 114:17
**chief** 5:1 7:4
  93:3,8
**chipman** 55:9
  55:16,19,25
**civil** 119:7
**claim** 18:9
  45:24 46:4
  48:2,4 49:12
  50:5,13,17
  51:3,4,5,7,14
  51:20 53:20
  55:14 60:19,24
  61:2 105:14,15
  105:20 106:8
  108:8,11
  109:16 110:16
  110:21 112:15
  112:18 113:5
  114:11 116:11
  116:12
**claimant** 50:18
  63:17
**claimed** 52:3

**claims** 7:20
  10:22 21:8,10
  45:1,1,5 48:2
  49:6,6 50:10
  51:11,21 52:3
  54:20 55:14
  58:21 61:9,11
  62:6,6 67:24
  67:24 68:1
  71:18 109:14
  116:4,7,16
**clarification**
  12:8 17:25
  23:7 59:12
**clarify** 17:14
  22:1 39:12
  41:25 79:4
**clear** 12:13
  14:2 73:3
**clearpoint** 22:5
  75:25 88:18
  91:16 92:11
  96:23,25
**clearpoint's**
  91:5
**client** 30:15,18
  30:21 45:14
  58:9
**close** 14:5
  77:19 96:22
  99:25 120:10
  120:12,13
**closed** 118:8
**closer** 71:7
  84:14 85:21

**cloud** 24:5
**collateral** 46:4
**collecting**
  32:24
**collection**
  37:15
**collectively**
  24:14
**collector** 6:4
**color** 51:22
  71:9 81:5
  97:24
**colorado** 2:14
  2:15,20 5:20
  5:23 39:19
  113:3
**column** 46:3
**come** 8:16
  13:10 22:12
  26:6 32:1
  41:20 64:6
  74:4 84:25
  90:17 91:13
**comfortable**
  41:11
**coming** 27:15
  42:3 87:8,17
  92:15 93:1
  102:23
**comment** 45:10
  77:8,13 92:16
**commission**
  93:16
**commissions**
  93:3,7,8,11

**common** 38:11
38:18
**companies** 14:6
100:20 102:21
**company** 10:6
11:8,11,11,14
12:11 13:3
17:4 30:8
31:13 32:7
46:10,10 48:11
48:14,16,19
55:23 70:1,3
73:5 74:14
79:5,7,8,13,16
82:9 84:16,18
87:11,17 89:20
90:21,24 95:2
98:1 114:14,16
114:18,23
**company's**
10:7 42:2
48:25 49:1
**compare**
116:10
**compensation**
54:1,12
**complaint**
49:22 63:4
**completely**
51:1
**completion**
55:1
**complied** 28:15
**comply** 52:5

**computer's** 4:2
**concept** 102:11
102:14
**conclude**
120:12
**concluded** 6:25
7:10
**concludes**
99:21
**condition** 7:15
8:1
**conducted** 36:8
**conference**
19:22 99:18
**confident** 100:5
**confidential**
67:8
**confirm** 20:1,8
23:22 37:8,11
46:3,20,25
47:2 55:16
57:8,10,16
59:13,18 75:4
98:18
**confirmed** 63:5
**connected** 8:14
**connection**
64:8 79:12,13
106:11 120:2
**consider** 7:21
30:16
**considerable**
53:1
**consideration**
52:4,6,8

**considered**
21:23,25
**constituted**
31:15
**constitutes**
103:12
**consult** 30:17
**consultancy**
76:7
**consultant** 54:2
54:13
**consultants**
21:15,24 22:2
22:4
**consulting**
21:22 22:6
91:4 95:5,7,14
**contacted**
111:5
**contacts** 80:10
**contemplate**
42:1 97:13
**contemplated**
79:10,17
**contents** 33:25
**contingent** 45:1
45:4 48:3,6
49:23 50:7,12
50:15,17,18
54:20 104:23
105:2,6
**continue** 30:7
108:16
**continues** 54:9

**continuing**
105:10
**contract** 27:16
95:14 102:24
102:24 111:16
111:20,25
112:2 116:15
**contractors**
21:15,20,23
22:2,8,11
24:24 80:4
**contracts** 103:4
112:20 115:3,6
115:9,16,17
116:14
**cooperate**
120:24
**copy** 41:22
101:12,13
**cordean** 2:17
5:20,22,22,24
**corporate**
11:17,18 14:4
14:8 44:13
**corporation**
45:24
**correct** 11:23
13:13,19 14:10
15:10,13,14
16:4,11 20:9
33:10,11,14,16
36:11,12 47:10
49:3 54:21,22
63:2,22 66:6
73:11 74:2

78:9,25 79:15
80:5,22 82:6
83:2 87:24
89:11 91:18,20
92:1 95:15,19
95:24 98:6
99:14,15 100:9
106:17,21
113:4,6,17,21
114:10 115:22
116:2
**correctly** 43:6
80:19
**corroon** 63:18
**cost** 25:15 26:3
26:5,6 60:6
62:8 70:4,7
81:14
**costs** 13:8,12
13:14 25:8
40:24 60:6
80:20 84:12
**could've** 82:9
**counsel** 4:14
5:12,15 6:9 7:1
7:18,22 19:15
19:17,25 20:11
33:20 44:2
47:3 58:18
72:20 79:1,5,8
79:14 117:16
118:1,3,4,14,18
118:25 119:13
**counterclaims**
45:4 67:10

**counterparties**
116:15
**county** 2:19 6:4
6:5,6
**couple** 28:18
48:5 49:10
67:22 75:1
81:1 109:14
117:18
**course** 76:14
78:14,16 83:1
83:7,9 85:13
99:9
**court** 1:1,12
4:6 120:17,18
121:3
**cover** 47:22
80:20 87:4,4
91:6 95:20
**covered** 35:20
64:4,10,11,17
64:18 100:2
**created** 109:24
109:25
**credit** 84:4,5,7
84:9 86:3
105:21
**creditor** 10:10
**creditors** 1:19
5:12 6:11,20
8:15,18 17:7
17:17 19:14
61:1,3,4,6
69:22 117:15

**critical** 68:1
81:10,21 87:15
**cro** 4:23
**cumulatively**
43:1
**curiosity** 73:17
**curious** 32:13
48:2 49:17
57:21 70:2
85:24 93:7
96:12
**current** 9:18,20
10:4 16:3 27:4
42:14,16 75:24
114:23 116:4
**currently** 10:9
11:9,25 15:5,6
15:8,20 18:25
20:20 21:1,14
23:23 27:15
46:22 58:16,17
70:21,24 76:2
82:14 116:14
**customer** 37:15
37:18,18 80:9
80:10 103:1
**customers** 10:8
10:8 24:4,6,6,7
24:10,11,12
27:17 38:9,12
38:19 70:7,9
80:9 81:12
93:14 102:22
102:23 114:16

**cut** 19:16 36:5
107:2

**d**

**d** 2:12 4:1 5:22
45:21 48:21
56:4 67:22,23
105:11,12
**dailey** 56:16,18
56:18
**daily** 14:16
**damages** 63:7
**date** 26:25
28:16 31:23
36:11 47:7,12
59:24 67:24
70:17 77:19
80:17 81:4
82:18 83:15
86:21,22 91:15
93:25 106:4,12
108:24 112:11
112:14 122:25
**dated** 47:6
**dates** 47:7 48:8
48:9 83:18
88:2 89:14
**david** 56:4
**day** 40:18
52:14 59:24
60:1 67:25
81:4 91:22,22
95:17,18
**days** 32:11 38:5
38:10,12 47:8
60:8 69:13

78:8 80:17
86:24
**de** 3:4 4:25,25
**deal** 87:16
**deals** 42:9
**debt** 17:9 18:5
  59:23,25
  108:24
**debtor** 1:8 4:4
  5:10 7:19 8:1,7
  10:10,14,16,17
  10:19,21,22
  11:1,5,25
  13:12,21 14:20
  17:7,9,12 18:9
  18:12,16 21:2
  21:5,8,12,14
  22:15,15 23:16
  23:23 24:15,17
  27:4,7,11,24
  28:1,14,19,23
  28:23 29:1,19
  30:11 31:9
  32:13 33:20
  34:6 35:19
  38:20,24 40:17
  42:11,15 50:15
  50:16 55:19
  56:22 57:23
  59:2 60:1
  63:24,25 65:2
  65:5,21 66:24
  69:7 70:22,24
  73:13 75:2,7
  77:2 80:7 98:5

98:7,25 99:13
104:11,22
111:16 112:4
119:11
**debtor's** 4:14
  4:18,20 7:1,4,8
  7:14,18,22
  15:6 16:14
  19:5,17,25
  20:11 21:1
  23:22 24:1
  25:8 27:15,19
  31:18 32:19
  33:15 35:21,24
  36:3,8,17 37:9
  38:12 39:6
  41:5 47:3,20
  47:22 51:2
  52:7 59:15,19
  61:17 64:5
  68:20 69:2,12
  75:16 76:24
  78:13 80:4
  82:24 113:1
**debtors** 2:4 5:3
  32:10 47:3
  54:19,24 115:6
  115:17,25,25
  120:7
**debts** 11:1,5
  21:12 79:11
**december**
  30:24
**decide** 30:11
  31:9

**decided** 74:13
**decision** 31:11
  31:12,24 73:6
  77:20
**declaration**
  33:5 52:14
  53:19 55:1
  85:18
**declared** 11:10
  11:13,21
**decreases**
  89:20
**deduct** 102:25
**deemed** 51:14
**defer** 44:2
  58:18
**deferred** 102:7
  102:10,14,17
  102:25
**definitely**
  113:22
**definition**
  42:22 94:23
**definitive**
  116:22
**delaware** 1:2
  1:14 4:6,9 25:5
  25:6 85:10
**delay** 19:23
**demand** 49:22
  63:6
**denver** 113:22
**department**
  2:15,20 5:20
  5:23,25 108:9

**deposited**
  37:19
**derek** 93:2
**describe** 10:3
  23:25 46:15
  72:3
**described** 53:3
**describing** 52:1
  91:25
**detail** 120:21
**detailed** 78:20
**determination**
  87:18
**determine**
  44:17
**determined**
  72:8
**developed**
  47:23
**development**
  13:5 14:23
  25:1
**different** 15:22
  40:6 84:9
  115:4
**difficult** 26:1
**dip** 17:10 28:2
  59:19 60:1
  79:1,13 87:12
**directed** 118:5
**direction** 10:6
**directly** 7:22
  13:7 56:23
  63:25

**director** 17:1
17:14 31:22
77:14 93:21
94:3,7,12,16,21
94:23
**directors** 9:14
11:8 15:19,21
15:24 16:3,3
16:17,18,19,20
16:24 17:6,7
18:6,11,15
19:5 20:25
21:9,11 31:14
31:20,20 77:14
94:17,20 97:7
**disastrous** 82:9
**disclose** 58:9
**disclosed** 59:7
98:2
**disclosing**
30:21 96:1
**disclosure**
30:14
**disclosures**
51:6 85:18
119:10 120:4
**disconnect** 8:10
**disconnected**
8:16
**discovery**
118:15,21
119:5,14
**discrepancy**
71:8

**discuss** 7:22
42:22
**discussed** 25:2
58:10 62:24
115:2,24
**discussing** 53:9
57:11
**disposable** 61:6
61:7
**dispute** 50:7,10
54:19 72:18
111:4,6
**disputed** 48:3,7
50:8,11,16,17
50:18 54:20
104:23 105:2
111:2
**disputes** 105:6
**distinct** 89:1
**district** 1:2 4:6
4:9
**dno** 64:5,7,15
**doc** 35:7
**docket** 16:16
32:20 34:8
68:21
**docs** 62:20
**document**
16:10 33:9,12
33:17,21,24,25
34:7,24 35:7
35:14 103:17
103:19
**documented**
90:5,6

**documents**
32:23 62:14
**doing** 78:15
**dollars** 61:10
**don't** 40:7
97:13
**double** 115:12
**doubt** 82:10
**doubtful** 38:7
**drake** 55:23
56:1,7,11
**drop** 55:6
**due** 26:25 38:9
77:25 84:20
89:14 93:1
107:22 109:4,8
**duties** 10:4,5

**e**

**e** 1:23,23 2:1,1
2:6 4:1,1 5:16
5:22 6:6,17,18
56:5 113:6
117:6,9 122:1
**earlier** 19:19
25:2 63:5 70:1
70:20 91:25
100:7 101:12
110:2 111:14
112:22 113:3
**earn** 93:3
**earned** 93:8
**earning** 29:21
**earns** 93:16
**east** 114:8

**eastern** 4:7
**easy** 95:4
**edges** 26:15
**education** 70:9
**edward** 56:5
**ef** 47:25 48:1
49:5 53:3
57:15 59:16
67:23,23 108:4
112:16,18
113:8,15
**effectively** 13:6
**efficient** 34:21
**either** 8:3 77:22
89:15 92:17,19
109:8 118:18
**electronic**
37:18
**elicit** 58:10
**ellucian** 84:15
84:17
**email** 7:11,15
19:18 20:22
**emergence**
97:18
**employee** 13:15
37:21
**employees**
11:24 12:1,4
12:12,14,21,22
13:7,11,11
15:5,6,7 21:16
21:23 24:23,25
37:21 97:8

**employment**
13:17
**empted** 70:13
**encumbered**
47:20
**engage** 95:11
**engineering**
14:23
**englewood**
39:19
**ensure** 10:8
**enter** 4:24
**entered** 7:12
**entire** 95:21,22
**entities** 13:1
17:18,22 18:8
76:4 89:1,2
**entitled** 52:4,8
119:14
**entity** 8:13
12:11 13:2,3
56:2 75:24
80:15 88:20,21
88:25 89:5
91:5
**entries** 116:25
**entry** 66:18
**environmental**
98:1
**equity** 22:14
23:9 53:1
**escambia** 2:19
6:4,6
**esq** 2:6,7,12,17
2:22

**essence** 52:23
**estate** 58:21
**estimate** 26:7
62:5 81:14
101:3
**estimated** 81:9
82:4
**estimates** 30:7
**evaluation**
43:22
**event** 51:23
53:2,13 57:10
57:11,16,17
**everybody**
20:18
**everyone's** 8:4
**ewing** 71:22
72:7 73:8,13
73:14 74:12
**exact** 22:17
40:20 110:25
**exactly** 14:21
31:23 88:20
90:20
**examination**
4:13 6:21,25
7:7,10 8:9 9:5
23:21 119:3
**examine**
117:16
**example** 22:5
28:2 37:20
42:22 93:14
109:8

**examples** 22:10
95:12
**excellent** 33:6
**excluding**
115:22
**excuse** 18:24
19:2 34:4
42:11 43:5
99:4 118:2,22
**executed** 62:13
**executive** 7:5
11:12
**executory**
115:3
**exhibit** 116:10
**existing** 10:7
**exists** 51:3
97:17
**expanded**
91:16
**expect** 98:18
**expenses** 85:25
**experience**
81:16
**expired** 46:20
**explain** 33:20
88:20 105:16
105:17,19
**explanation**
15:3
**extensive** 32:10
78:20 81:2
**extent** 7:24
44:8 51:4,11
67:9

**eye** 49:20

**f**

**f** 1:23 113:6
117:7,9 122:1
**face** 38:6 42:13
**fact** 77:25
**factors** 40:24
**factual** 101:4
**failed** 48:12,16
52:5
**fair** 64:19
69:25 84:8
87:10
**fairly** 107:20
**fall** 70:12
**false** 74:24
**familiar** 72:17
102:2 107:7
**far** 7:25 19:24
20:19 22:14
61:17 73:13,16
100:4
**favor** 5:12
**february** 36:23
47:6,7,14
90:13 100:8,18
107:20
**federal** 119:6,6
**fee** 84:19 91:24
94:8,11,23
95:7
**feel** 8:10 30:19
30:20 41:11
**fees** 30:3 56:9
88:13 94:3,16

94:21 106:11
**field**  118:22
**fighting**  30:7
**file**  25:4 26:19
  30:11 31:9
  46:23 50:12
  59:5 73:17
  77:11 103:5
  120:16,18
**filed**  16:15
  23:13 28:7
  29:19 30:23,24
  30:24 32:3,7
  32:10,20 34:6
  35:8 42:1
  44:15 45:4
  48:13 60:2,19
  68:2 86:11
  92:18 97:6,23
  98:15,19 99:7
  101:21 102:3
  109:20
**files**  51:13
**filing**  9:23 10:1
  27:19 30:22
  33:5,10 35:13
  35:14 46:16
  54:8,25 60:7
  60:11 86:6,24
  91:17
**filings**  22:13
  33:4 39:8 40:7
  44:14 73:15
  97:2

**final**  28:11
**finance**  22:5
  88:22,24 89:19
  91:22 96:22,24
  117:9
**financial**  7:14
  8:1 16:15
  25:16 34:4,6
  44:11 68:20
  82:19 95:11
  117:8
**financing**  112:9
**find**  101:23
  113:7
**finding**  113:15
**fine**  15:12
  26:15 32:2
  40:12 60:23
  62:20 64:20
  85:19
**finished**  8:15
  8:17
**firm**  5:14,17
  55:14,16 56:19
  57:22 63:20
  64:24 65:19
  66:21,22 86:1
  86:21
**firms**  55:12
  58:7 72:25
**first**  19:24
  20:18 26:24
  34:7,16 40:18
  46:1 48:6 49:9
  52:14 57:21

67:25 77:8
  81:5 89:16
  92:10 103:19
  105:13
**fiscal**  76:24
**five**  15:21,24
  17:22 47:8
**flag**  78:21
**flip**  41:22
  103:14 113:10
**flippant**  60:16
**flipping**  114:4
**florida**  6:8
**folks**  22:9 24:7
  24:8
**follow**  15:11
  26:10,20 29:3
  29:9,11,14
  37:4 41:14
  69:5 86:18
  91:1 92:14
  94:24 96:10,18
  118:6,19
  119:20 120:6
**followed**  34:5
  48:16
**following**  48:9
**forecasting**
  95:11
**foregoing**
  122:3
**forgot**  5:25
**form**  103:20
**formal**  43:18
  43:25

**formally**  14:9
**former**  30:4,23
  30:25 56:24
  94:25
**forms**  28:20
  52:23
**forward**  19:18
**founder**  30:5
  30:23,25
**francis**  93:2,8
**freddie**  16:19
  16:25 31:25
  93:21
**free**  8:10
**frivolous**  51:12
**front**  32:19,24
  33:4,12 34:11
  52:15 68:7
  74:22 101:14
  101:24,25
  102:1,11
  103:17 109:17
  111:12,25
  112:2
**full**  96:13
**fully**  9:22
**function**  89:19
  103:3,6
**fund**  87:13
**funded**  37:23
  37:24 47:9
  87:20
**funding**  75:8
**further**  7:23
  39:8 83:13

| 85:20 | 20:22 25:11 | 69:1 70:15,15 | **growth** 59:14 |
|---|---|---|---|
| **g** | 29:11 34:14 | 71:20 74:21 | 59:19 |

**g** 4:1 5:16 68:5
111:11 112:19
112:21 114:5
115:8
**gap** 40:23
103:5
**general** 7:19
36:2 49:6
51:19 61:9
67:22 75:15
77:8 92:16
102:11
**generally** 23:22
35:18 53:12
78:12 102:17
**gentlemen** 6:1
**getting** 23:19
37:6 52:6
79:18
**give** 7:18 9:1
16:5 29:12
32:21 37:2
39:22 51:22
52:13 65:8
68:24 69:23
71:9 81:6
101:22 103:16
116:21
**given** 50:15
52:9 88:18
**glad** 65:24
**go** 4:11 5:4,11
5:20 19:11

39:9 42:7 43:9
44:8 52:17
62:22 63:9,10
64:17 67:15
68:19 77:4,24
78:6,18 80:25
83:12 86:25
97:11 104:8,24
105:11 108:15
111:23 113:11
113:15 116:8
**goes** 19:25 54:4
80:11 103:10
**going** 4:10 6:22
6:23 13:10
17:2,6 19:4,10
20:23 23:21
26:13 27:2
34:3,7,13,14,21
34:24 35:9
38:1 39:2,9
41:2,3 42:7
44:2 45:20
47:16 49:4,10
50:8 51:16
55:8,11,13
56:15 57:3,19
57:20 58:12,18
59:4,5,12 61:2
61:5,6 62:21
62:22 63:12
64:20 65:16
68:4,5,14,17,19

75:10 76:8
77:4 78:6,18
80:25 81:20
82:11,24 86:15
87:9,12 88:15
97:3,5 99:16
100:1 101:20
103:13 106:1
108:3,17
109:13 111:24
116:17 117:15
119:9,25 120:3
120:4,20
**good** 29:17
**goods** 108:8
**governance**
11:18
**granular** 27:24
99:11
**grauman** 56:25
56:25 57:1
**great** 4:2,3
16:13 20:5,18
29:16 34:12
38:1 42:6 46:1
55:8,11 57:19
60:5 68:4 75:7
75:13 100:3
**greater** 38:10
**gross** 68:25
73:23
**ground** 4:11
7:7

**guaranteed**
10:25 11:5
21:12
**guess** 6:16
14:20 15:3
23:3 25:14,19
25:22,24 46:14
46:19 48:5
49:17 64:5
70:2 71:7,16
79:18 84:23
86:2,19 87:2
89:15 91:4
101:3 102:16
106:2
**guesses** 45:12
**guessing** 47:8
**guys** 44:23
98:10

| **h** |
|---|

**half** 30:2 86:23
**halfway** 52:22
90:11
**hand** 44:8,8
**handed** 96:21
**hang** 8:15
**happen** 38:15
60:18 69:11
100:5
**happened**
90:15
**happening**
89:21

| | | | |
|---|---|---|---|
| **happy** 48:23 | 25:11 26:1,5 | 55:8,10,17,20 | 83:2,6,9,11,17 |
| 81:18 97:23 | 26:10 27:6,9 | 55:23 56:4,10 | 83:22,24 84:3 |
| 99:1 119:20 | 27:13,16,20,25 | 56:13,17,20,23 | 84:7,11,17,22 |
| **hard** 39:6 | 28:3,6,24 29:5 | 57:5,7,13,14,18 | 84:25 85:3,7,9 |
| 100:1 | 29:6,13,17,18 | 57:24 58:3,14 | 85:15,22,25 |
| **hardware** 24:4 | 29:20 30:12,13 | 58:18 59:13,15 | 86:7,9,13 |
| **harry** 22:9 | 30:16,19 31:3 | 59:17,21 60:3 | 87:22,24 88:8 |
| **harutyunyan** | 31:8,10,14,19 | 60:5,12,15 | 88:14,17,21 |
| 14:15 | 31:22 32:4,6 | 62:12,23 63:2 | 89:2,4,8,11,13 |
| **harvey** 3:3 4:21 | 32:17,18,21,23 | 63:12,16,19,22 | 89:18,23 90:6 |
| 7:4 8:22,23,24 | 33:2,8,16,19,23 | 63:25 64:9,21 | 90:9,16,19,23 |
| 9:3,7,7,11,14 | 34:1,3,11 | 64:22,25 65:4 | 91:1,8,10,15,20 |
| 9:16,20,24 | 35:23 36:5,13 | 65:8,10,13,18 | 92:1,4,13,21 |
| 10:2,5,11,15,17 | 36:19,21,23 | 65:20,23 66:1 | 93:4,10,13,16 |
| 10:20,24 11:2 | 37:1,4,14,17,23 | 66:6,9,11,20,22 | 93:19,22,25 |
| 11:6,10,23 | 38:3,8,14,17,22 | 67:1,4,16,17,20 | 94:11,14,17,22 |
| 12:1,3,7,17,21 | 39:1,4,11,14,16 | 67:21 68:3,7 | 95:8,15,19,22 |
| 12:25 13:3,13 | 39:18,22,25 | 68:13,23 69:4 | 95:25 96:6,9 |
| 13:16,19,23 | 40:3,6,10,15,19 | 69:8 70:1,4,11 | 96:14,18,21,25 |
| 14:3,10,13,21 | 40:23 41:9,10 | 70:19,23 71:1 | 97:9,11 98:3 |
| 14:25 15:10,14 | 41:14 42:8,18 | 71:4,10,14,19 | 99:15 100:6,9 |
| 15:16,21,24 | 42:20,25 43:7 | 71:23,24 72:2 | 100:13,16,24 |
| 16:5,7,11,18,25 | 43:9,10,17 | 72:5,11,14,24 | 101:7,8,10,14 |
| 17:8,12,15,20 | 44:2,19,21 | 73:12,19,21 | 101:17,22,25 |
| 17:24 18:2,4 | 45:7,9,16,19,22 | 74:2,3,12,15,17 | 102:1,4,10,20 |
| 18:10,14 19:17 | 45:25 46:6,16 | 74:20,22 75:6 | 103:5,11,16,22 |
| 19:19,25 20:3 | 46:17,24,25 | 75:9,12,18,21 | 103:25 104:4,8 |
| 20:6,10,12,15 | 47:11,14,24 | 76:1,3,6,10,23 | 105:1,8,12,17 |
| 20:15,17,24 | 48:8,11 49:3,5 | 77:1,6,12,17,22 | 105:21,25 |
| 21:3,6,10,13,17 | 49:8,13 51:17 | 77:24 78:3,5,8 | 106:5,13,17,21 |
| 21:20,25 22:4 | 51:18 52:1,11 | 78:10,15,24 | 107:8,12,17,20 |
| 22:8,16,19 | 52:14,16,19 | 79:3,15,20,22 | 107:24 108:2,5 |
| 23:15,17,24 | 53:4,8,14,17,22 | 80:1,5,8,22 | 108:12,15,18 |
| 24:2,14,17,20 | 53:25 54:3,6 | 81:8,12,25 | 108:21 109:1,6 |
| 24:23 25:6,9 | 54:11,17,22,25 | 82:2,6,8,13,23 | 109:11,17,23 |

110:4,12,15,19
110:22 111:8
111:12,18,21
111:23 112:2,7
112:12,17,25
113:4,7,11,14
113:18,22
114:3,6,10,13
114:25 115:7
115:11,14,20
116:2,21 117:5
117:8,12,13
119:19 120:21
**harvey's** 72:20
**hate** 34:20
**head** 22:19
67:6 69:4 74:4
79:22 90:16
92:6 94:1 96:7
96:21,24
100:25 102:5
103:11 106:6
108:21 109:12
109:25 110:12
111:9 116:24
**headed** 29:24
69:24
**heading** 60:7
**headquarters**
24:21 114:14
114:15
**healthcare** 75:8
**hear** 19:11
20:21 43:6
63:11 65:24

118:12
**heard** 110:8
**hearing** 5:3
6:25 8:21
40:18 94:13
**held** 9:10 14:12
**help** 80:8,11
**helpful** 17:25
41:23 56:14
97:15
**helping** 15:1
**hi** 4:15 5:16
18:21,24 19:2
**high** 10:8 18:7
25:22 26:5
34:15 35:20
86:19 89:24,25
**higher** 70:9
92:3
**hired** 94:6
**history** 52:1
**hmm** 17:10
26:4 28:13
35:3 37:16,22
38:16 40:5
65:12 69:11
70:21 76:19
79:25 81:11,19
81:23 83:23
88:6 92:10
93:15 96:8
112:25 115:13
**hoffman** 16:22
**hogan** 78:23
79:1,6

**hold** 8:14 54:11
61:25
**holders** 23:9
68:9,10 115:21
**hook** 56:8
**hope** 66:18
**hour** 92:8,8,9
**hourly** 89:22
89:23 90:1,1
92:5
**hours** 92:5,6
119:17 120:20
**hudspeth** 77:15
77:21
**hundred** 61:10
61:19
**hyde** 122:3,8

**i**

**idaho** 85:21
**idea** 98:14
101:1 109:3
**identifiable**
41:6
**identify** 8:12
**idi** 98:6
**immediately**
9:23
**impact** 44:16
**impairment** 8:8
**implied** 11:11
**impression**
67:8
**improper** 120:1
**inc.'s** 105:20

**include** 13:15
36:14 55:4
106:10,14
107:3
**included** 7:15
42:12 50:20
51:8 60:6
61:18 113:6
**includes** 80:24
104:22 105:2
106:20
**including** 13:1
31:17 33:5
47:22 67:24
86:21 99:4
**income** 40:24
61:7 69:2
76:21
**incorporated**
25:6
**increases** 89:20
**incurred** 30:3
47:8 59:23
108:24
**indebted** 10:16
10:17 18:16
21:2
**indemnificati...**
64:6 65:2,22
66:2
**indemnified**
56:10 64:2
**indemnifies**
57:1

**indemnity**
  66:25
**independent**
  16:24,25 21:15
  21:20,23 22:1
  22:8,11 80:4
  93:21 94:7,12
**indiscernible**
  5:10 6:3 11:16
  12:18,19 14:14
  16:21 17:12,15
  17:16 18:18,22
  18:23 19:1,6,8
  20:4 22:18
  23:6,8 25:2,9
  25:10,13 26:3
  26:19,21 28:3
  28:6 30:12,13
  31:5,7 33:4
  35:10,11,15
  36:14,20 40:1
  40:10,11 41:10
  42:1 43:7,8,12
  43:17,19,23
  44:5 46:9,12
  46:21 48:13,22
  49:23,24 50:1
  50:9 53:7
  54:25 58:23
  59:6,8,10 60:3
  60:13,15,22,25
  61:2,8,11,11,13
  61:15 62:3,8
  62:16,18 63:8
  64:8,13 66:11

68:15 72:8,14
72:18,20,21,23
72:25 73:1,2,7
73:18,19 74:10
76:6,17 77:23
78:1,2,2 79:4,7
81:17,21 82:8
83:2 84:12
85:1 86:9,11
86:12,14 87:6
88:4 89:19
90:1,17,23
91:18 92:7
94:4,6,10,14
95:9,12 97:9
97:10,13,17,19
97:20 98:24
99:9 100:17
102:22,23
104:4,18,20
106:24 107:1
108:1,5 109:23
110:7,8,15,20
110:25 111:21
111:22 112:7,8
112:23 113:7
114:3 115:7,8
115:11 116:19
117:18,21,24
118:7,10
119:23 120:19
**individual**  7:20
  113:25
**individuals**
  18:5 92:16

103:21
**industrious**
  40:7
**info**  77:20
**informal**
  119:19
**information**
  26:18 29:12,15
  30:15,18,21
  35:11 41:6
  45:13 58:10
  59:6,7 120:2,8
  120:9,11,18,20
  120:23,25
**initial**  98:7,14
  98:15
**initially**  74:12
**injection**  71:11
  71:15,17
**inquiries**  8:3
**insiders**  32:12
**instruct**  64:9
**instructions**
  7:13 20:21,23
**insurance**  27:5
  64:5,8
**intended**  96:12
**intending**
  51:12
**interchangea...**
  49:7
**interest**  46:23
  48:15 53:21
  71:6,15 106:11
  107:10,12,14

119:5
**interested**
  45:11 71:8
**interesting**
  19:4 20:20
  70:14
**interim**  28:11
  76:7 89:1
  94:25
**interject**  46:8
**interjection**
  67:7
**interrupt**  34:21
**interruption**
  19:5,15
**interruptions**
  20:19
**interview**  98:7
**introduce**  7:2
**introduced**
  30:1
**introducing**  7:4
**investment**
  35:2 51:17
  53:1 57:12
**investor**  66:15
  66:15
**investors**  16:22
  66:11 71:11,17
  82:19 95:12
**invoice**  59:2
  89:8
**invoiced**  89:6,9
  92:12

**invoices** 38:13
89:17
**invoicing** 91:6
**involve** 30:14
**involved** 56:7
**ip** 40:13 47:22
**irs** 48:2,12,12
48:14,15,18
50:17 108:7
**issue** 41:19,24
46:1 51:25
64:8 80:9,10
96:2 120:1,8
**issued** 107:19
**issues** 7:22
44:15 52:9
87:16 98:1
120:13
**item** 25:16
32:20 33:7
34:8 37:8,8
38:4 39:10
40:14 41:2
42:9 44:24
45:23 49:11
50:10 53:9
55:9 57:5
59:15 65:16
68:5,21 71:3
71:21 75:1,13
77:4,7 93:20
102:6,9,19
103:25 104:6
105:13 106:7,8

**items** 30:20
37:12 39:6
40:19 44:25
93:7 106:22

**j**

**jackson** 2:22
6:3,3,6,8
**james** 2:6 3:3
4:15,20 7:4 9:7
20:7,15 28:4
28:21 29:8
59:3 76:13
86:12 98:17
114:20,22
116:19
**jamie** 20:9
29:16 41:17
59:11 76:16
85:15,17 99:2
**january** 33:9
70:8 77:1
**jarod** 3:5 5:7
5:11
**jeff** 4:16 7:3
11:20 14:3
17:13,19 18:1
20:5 22:23,25
36:9 41:8,17
43:13 50:3
53:4 60:3
61:16 63:5,9
67:7,12 69:21
72:25 77:24
87:21 106:25
107:5 118:22

118:25 119:24
**jeffrey** 2:7
**jim** 36:13
**jobs** 14:19
**join** 19:3
**joined** 4:23
5:25 6:22
**joining** 31:23
**jones** 2:3 4:17
**jot** 29:14
**journal** 116:25
**judge** 4:5
**judgment**
92:24
**july** 1:15 4:7
15:17 34:6
35:8
**jump** 20:23
23:21 27:3
28:5 34:3,13
38:1 39:2 41:2
45:21 47:16,25
49:4 51:16
55:9 56:15
57:4,20 59:4
59:12 64:20
68:4,14,17
71:2,20 74:21
75:10 86:3
88:15 97:3
100:4
**jumping** 16:6
84:14
**june** 26:12
31:11 59:23

81:3,14,14
82:4,5,17,18
83:20,21 84:16
84:21 85:6
86:3,20 91:3,4
91:7,7,8,8,10
91:10,11,11,12
91:12,12,12
93:25 94:1,2
95:23,24 96:6
96:17 101:15
**justin** 18:17,21
**justin's** 19:4

**k**

**k** 6:18 56:5
**kansas** 56:5
**kbb** 57:4
**keep** 87:13
**keeping** 29:11
119:16,21
**kevin** 56:24,25
57:1
**khachaturian**
66:18
**kind** 14:17 18:8
29:11 51:22
71:6 73:15
75:2 77:8 90:4
93:2,7 95:5,6
112:22 119:15
**know** 14:11
18:22 19:17
23:3,16,18
25:7 26:25
28:24 29:13,17

32:25 33:11
34:9 36:15
37:1,9 38:7
39:7 40:23
41:9,17,18,22
42:18,19,19,20
42:23,25 43:16
44:13,24 45:7
45:11,12,17
47:11,14 49:9
55:18 56:21
60:9,12,14,18
60:19 61:16
62:19 64:6
68:17,21 69:1
69:2,12 70:3
71:22 72:2
77:18 79:20
82:23 84:22
86:5,7,13,14,23
87:16 88:8
90:16,19 92:13
92:17,23 93:25
94:23 95:14
96:6,14,16,18
97:25 99:22,25
100:15 101:3,6
101:7,10 102:8
103:9,11
104:21 105:1,3
105:7,7,9,25
106:1,3,18
107:13,21,25
108:21 109:7
109:11,18,21

109:22,22,25
110:9,10,25
111:15,25
112:1,4,8,10,12
112:15 114:11
116:19,22,24
117:4,5 120:16
**knowledge**
10:12 28:14
67:20 76:3
78:12 95:1
114:24,25
117:3,4
**knowledgeable**
28:25 29:2
**known** 54:23
55:1
**knows** 23:3,4
64:10

**l**

**l** 5:16
**labor** 14:19
**landlord** 39:20
114:19
**largely** 40:20
96:21
**late** 9:16
**laurel** 2:12 5:16
**law** 5:13 55:12
55:14,16 56:18
57:22 58:7
63:20 64:24
65:17,19,19
66:21,22 72:25
86:21

**lawsuit** 31:3
44:15 52:9,10
52:23 58:4
61:13 63:5
72:6,12,14
**lawsuits** 30:4,5
30:7,8 31:2
45:5,6
**lawyer** 45:8
**lawyers** 41:22
58:11 62:2
**layoffs** 12:5
15:13
**leading** 36:16
36:17
**leant** 10:18,20
60:1
**lease** 113:2,21
114:1,8,12,23
**leased** 39:13
**leases** 112:20
115:1,23
**leave** 55:5
66:12
**leaving** 18:24
31:22 119:9
**led** 30:9
**ledanski** 122:3
122:8
**left** 20:24 49:17
49:19 63:14
77:15 78:3,4
**legal** 7:18 8:6
12:9,13,16,18
30:3,22 36:14

41:11 65:1,4
65:14 86:1,1
88:12 122:20
**legally** 60:12
**legend** 28:19
34:24 35:9
**lender** 17:10
35:19 59:19
60:1 79:1
82:20
**lender's** 35:21
79:14
**level** 18:7 25:22
34:15 35:20
42:23 49:20
86:19
**liabilities** 33:3
34:5,8,14
103:8,9,14,20
104:2,3,11,22
**liability** 48:18
50:2 102:8
**lien** 46:15
47:20,22 48:4
48:13,16,17,18
48:20,25
**liens** 35:21
**light** 91:17
**limit** 17:6
**line** 5:12 6:10
6:20 7:21,24
8:2 19:3,15
20:8 23:19
25:16 46:14
48:24 93:7,20

102:6,9,11,19
103:7 117:16
**lines**  7:8 19:16
19:18,24 82:11
119:2
**liquidated**  50:5
63:6
**list**  16:12 18:8
23:9 29:11
43:1 68:10,11
78:11
**listed**  16:3
17:22 20:25
31:17 32:14
46:4 48:3,5,6
49:14,15,22
50:11,22 51:21
52:3 55:12
59:4,24 75:14
76:9,14,15
77:9 78:13
80:18 85:13
95:6 96:4
102:7 103:9
104:22 105:3,5
105:15 106:9
106:19 108:9
111:17
**listen**  8:9,11
50:14
**listening**  8:5
**listing**  32:11
105:4
**lists**  37:9 104:2
104:10 113:1

114:7
**litany**  17:3
**litigation**  23:20
45:3 49:18
50:9 51:25
52:2 55:19
56:22,24 58:13
58:15,17 61:24
63:1,23 64:1,9
65:6 66:8 67:2
67:4 73:10
**little**  4:7 22:14
25:12 27:23
37:10 41:3,20
44:9 62:7
64:20 70:18
74:7 83:12
85:20,21 88:19
107:2
**llc**  65:17 75:25
80:14 88:18
113:2 114:8
**llp**  2:3 56:16
71:22 78:23
82:12 85:6
**loan**  37:17 47:9
60:10 62:13,14
62:20 87:3
106:12 107:6,7
107:9,11,16,17
107:18,22
110:3,6,11,22
110:24
**loans**  21:4

**local**  14:19,21
93:1
**located**  24:19
24:20
**location**  39:25
72:7,13,15
80:3 114:17
**locations**  24:8
24:21
**long**  9:9 24:15
79:17,18 103:8
119:3,25
**look**  35:6 47:18
47:18 51:1
53:15 63:4
69:20 80:2
85:23 88:3
**looked**  113:25
**looking**  25:14
25:17 33:6,8
34:13,22,23
35:3,5,17 37:8
38:4 39:5,10
40:12 42:9
43:15 46:13,17
48:1 49:11
52:19 54:6,7
59:15,22 63:18
68:25 70:16
71:21,24 75:13
77:7 78:10
80:14 83:17
89:15 90:11
91:3 93:17
102:11 113:14

**looks**  18:12
38:5 46:22
47:19 56:15
59:22 70:17
71:6 75:23
77:3 78:22
80:17 82:11
84:15 89:16
90:12 95:16
112:22
**loosely**  90:1
**loss**  70:25 71:1
**losses**  29:22,23
42:10 43:2
**lost**  53:9
**lot**  26:2 30:6
43:17 45:2
55:13 90:10
99:25 107:8
120:23
**lovells**  78:23
79:1,6
**low**  26:6
**lower**  92:5
**lp**  84:16
**lucas**  22:9 80:1
**lufson**  22:9

**m**

**m**  1:24 6:6
93:20
**ma'am**  18:20
**made**  21:4
31:10,12 32:11
32:13 51:6
61:3 73:6

77:13 78:13
81:3 86:5
87:17 88:12
117:1 120:4
**maintain** 76:5
**maintained**
75:16,20,21
**maintains**
75:24
**majority** 73:21
**make** 6:1 31:24
32:8 45:10
60:6 73:17
81:22 87:14
**making** 7:21
45:11 88:6
104:15
**malcolm** 1:24
19:8 60:22
69:15 73:3
86:10 118:8
119:15
**malcolm.m.b...**
7:11
**malcom** 4:8
**management**
27:19,20 28:8
28:10,11,12,15
28:22 37:10
**mark** 16:20
**market** 1:13
95:9 122:21
**marketing**
25:18

**markets** 95:2
**markiles** 64:24
**mary** 14:15,15
18:21
**material** 70:6
**matias** 80:2
**matter** 118:3
118:13
**matters** 30:23
95:10
**mean** 12:15
25:21 27:22
30:20 44:6
48:21 50:16,24
73:12 77:18
87:5 89:14
**means** 102:18
102:18
**meant** 14:6
87:4,4 91:6
**media** 13:4
**meet** 10:7 24:6
**meeting** 1:19
4:4,12 7:16,25
8:5,15,16,18
19:3 119:8,9
120:10
**meetings** 24:7
**member** 17:16
31:24,25
**members** 7:18
17:17 31:16,17
**mentioned** 70:1
100:7 111:15
113:2

**merchant** 52:4
**merger** 52:24
**midway** 83:13
**might've** 23:12
**mil** 86:23
**million** 24:12
27:17 42:14
43:1,5 106:16
106:19
**mind** 113:19
**minimum**
50:20
**minute** 16:5
25:22
**mistake** 17:15
**mm** 17:10 26:4
28:13 37:16,22
38:16 40:5
65:12 69:11
70:21 76:19
81:11,19 83:23
88:6 92:10
93:15 96:8
112:25 115:13
**mode** 19:22
20:20 99:17,19
99:20
**modify** 51:13
**moment** 25:7
32:21
**monday** 93:1
**money** 10:18
10:20 30:6
60:9 73:20,22
87:8,9,12,17,20

88:4 106:3
112:11 114:21
115:17,21
**month** 25:23
26:11,11,11
81:24 90:13,21
95:18,21,22
96:4,13 108:1
**monthly** 13:8
13:12 25:24
26:17,17,19
80:19,23 81:13
82:3 89:16
90:14 92:3,4
95:7 98:15
103:1 107:22
107:24 113:24
113:25
**months** 26:5,6
32:9,15
**mor** 26:25
98:14
**morris** 57:22
72:8 73:2 85:5
85:9 88:7,11
**mors** 98:21
**motion** 28:10
59:5,10 75:3
77:11 85:14
92:18,20,24,25
97:19 120:17
**motions** 87:15
101:17
**move** 8:3,3
62:21 73:7

85:19 108:3
111:10
**moving**  101:11
107:5
**multiple**  24:20
30:3 84:5,7
112:23
**mute**  19:11,13
19:22 20:2,2
105:8 119:2
**muted**  7:9 8:12
19:16,24 20:13

**n**

**n**  2:1,7 4:1 5:17
5:23 122:1
**nakias**  22:10
**name**  4:8 5:13
5:13,14 6:14
6:17 9:6 14:14
39:23 40:6
56:2 88:22
110:25
**named**  56:24
56:25
**names**  6:1 22:9
32:5
**narrowed**
29:23
**nathaniel**  16:21
**nature**  24:1
51:10 58:1
105:23
**near**  78:21
80:13

**need**  12:23
19:19 22:16
23:3 29:12,15
37:2 44:24
48:22 77:9
92:17 96:9,18
98:1 109:9
113:7
**needed**  60:8
87:11,13,18
91:16
**needs**  77:9
80:10 91:22
92:18,20,20
**negative**  70:22
70:23
**neil**  77:15
**neither**  7:17
**net**  29:22,23
43:2 69:2
**never**  48:16
113:25
**new**  27:24
29:25 31:24
40:21 53:1
70:20
**nibble**  26:14
**nice**  85:12
**nichols**  57:22
72:8 73:2 85:5
85:10 88:7,11
**noise**  7:9 19:16
19:25
**nols**  42:10,11
42:13,16 43:5

43:16 44:11,17
**non**  12:9 16:22
42:10 49:5
71:3 103:21
109:14
**normal**  78:16
80:19 92:3,4
**normally**  81:24
88:4
**north**  1:13
**note**  7:17 8:5
**notice**  7:16
**number**  4:5
12:23 13:1
16:16 22:17
25:15 26:8
33:7 38:19
46:23 57:5
64:21 70:9
81:3 92:5,6
95:6 101:17
104:5,10,13,14
106:22
**numbers**  15:9
15:11 47:1
74:3 88:3
102:4 105:5
**numerous**
120:5

**o**

**o**  1:23 4:1 5:16
5:22 66:5
122:1
**o'neill**  2:6 4:15
4:15,20 20:7,7

20:10,22 28:4
28:4,7,10,14,21
28:21 29:8,8
30:13 31:5,7
36:15,20 51:24
59:3,3 63:9
64:15 76:13,13
76:17,19 85:16
91:15 92:22
98:8,12,17,17
98:22 101:24
**object**  51:15
119:15,21
120:25
**objected**  50:13
**objection**  59:8
117:18
**obligation**  64:6
65:3,22 66:25
**obligations**
27:3,4
**obviously**
26:20 42:12
45:2 69:21
120:16
**oc**  76:8
**occur**  15:15
**occurred**  15:16
**ocp**  59:5 76:9
76:10 82:25
**ocps**  99:10
**october**  52:24
**offer**  97:7
**offered**  12:8

**[offers - okay]**

| | | | |
|---|---|---|---|
| **offers** 105:21 | 14:17,24 15:2 | 52:13,17,21 | 85:19 86:2,8 |
| **office** 1:11 4:8 | 15:2,11,15,19 | 53:15,17 54:6 | 86:14,17 87:2 |
| 5:1 7:17 39:18 | 15:19,22 16:1 | 54:14 55:3,8 | 87:21 88:10,15 |
| 39:23 113:1,3 | 16:2,7,13,16,23 | 55:11,18,22 | 88:17,18,25 |
| 113:23 114:7 | 17:2,23 18:11 | 56:7,14,15,21 | 89:5,9,22 90:3 |
| 114:13,14,15 | 18:15 19:3,12 | 57:3,3,14,19 | 90:8,10,18,22 |
| 120:24 | 19:12,14,19,23 | 58:6,20,20 | 91:9,23 92:2 |
| **officer** 7:5 | 20:5,10,17,20 | 59:1,11,22 | 92:10,15,15,23 |
| 11:13,17,17 | 21:4,8,14,18,21 | 60:10 61:8 | 93:2,10,12,17 |
| 93:3,9 | 22:3,7,12,13,21 | 62:4,9,12,17,21 | 94:2,8,15,15,20 |
| **officers** 11:8,9 | 23:14,18,18,25 | 63:3,14,17,20 | 95:3,13,16,23 |
| 11:10,11,21 | 24:13,22 25:4 | 64:4,12,14,20 | 96:1,11,16,20 |
| 17:5 97:8 | 25:7 27:2,3,7 | 64:23 65:1,6 | 96:23 97:1,14 |
| **oh** 5:9 16:9 | 27:14,18 28:1 | 65:16,19 66:7 | 97:24 98:4,4,5 |
| 19:6 20:17 | 28:17,17 29:4 | 66:10,12,17,23 | 98:10,13,20 |
| 31:10 35:5,12 | 29:8,16,16 | 67:2,6,15,19,21 | 99:1,2,2,4,13 |
| 39:24 47:17 | 30:10 31:4,12 | 68:4,8,13,19,24 | 99:13,16,20 |
| 50:21 54:11 | 31:15,21 32:2 | 69:6,11,18,25 | 100:3,6,22 |
| 55:24 61:14 | 32:2,7,18,25 | 70:10,13,14,21 | 101:11 102:2 |
| 64:12 67:15 | 33:6 34:2,12 | 70:24 71:2,13 | 102:20 103:2,7 |
| 69:18 72:24 | 35:1,12,17,25 | 71:16,20 72:5 | 103:13,17,18 |
| 75:19 78:4 | 36:22 37:3,7 | 72:10,15 73:9 | 103:25 104:8 |
| 85:20 87:2 | 38:1,3,11,20 | 73:12,23 74:9 | 104:17,21 |
| 93:12 94:2 | 39:2,4,15,17,20 | 74:16,21,23,25 | 105:10,13 |
| 108:18 | 39:24 40:9,12 | 75:7,10,19,23 | 106:3,7,15,18 |
| **okay** 4:2,3,18 | 40:22 41:1,1 | 76:2,8,18,20,24 | 107:5,16 108:3 |
| 4:22 5:2,3,9,11 | 41:13 42:3,6,8 | 77:2,4,7,12,18 | 108:20,23 |
| 5:19 6:9,10,19 | 42:24 43:3 | 78:4,6,10,11,18 | 109:13,18 |
| 6:20,25 7:6,6 | 44:19,23 45:16 | 79:21,25,25,25 | 110:1,10,13,16 |
| 8:21,24 9:4,9 | 45:18,20,20,22 | 80:13,13,25,25 | 111:10,19 |
| 9:12,18 10:9 | 46:1,7,13,19 | 81:23,23 82:1 | 112:19 113:11 |
| 10:13,16,22 | 47:2,13,16,25 | 82:4,7,10,21 | 113:14,18,18 |
| 11:15,19,21,24 | 47:25 48:10,20 | 83:5,6,12 84:8 | 114:2,6,19 |
| 12:2,5,17,24 | 48:24 49:4,8 | 84:14,24 85:2 | 115:1 116:3 |
| 13:10,20 14:1 | 49:25 51:9,16 | 85:3,8,12,12,17 | 117:6,11,14 |

118:17 120:15
**old** 40:18
**once** 4:3 6:24
7:9 8:14 72:7
113:10
**one's** 83:15,15
**ones** 16:3 37:24
49:11 78:19
106:23,23
**op** 26:17
**open** 96:2
119:9,16,21
121:2
**opened** 27:24
**operate** 13:24
24:5,25
**operates** 24:4
25:2
**operating** 13:8
13:12,14 16:22
23:23 26:19
29:21,22,22,23
37:20 42:10
43:2 60:6 70:6
70:8 80:20
84:12 85:25
98:15,25
**operational**
65:14 91:21
114:18
**operations** 10:7
24:19,20 25:8
25:15 27:15
87:14

**opportunity**
118:17 119:12
**opposed** 15:7
92:11
**option** 19:21
88:24 112:23
**options** 60:25
115:23
**order** 8:6 20:8
28:11,12,15,22
**orders** 67:25
**ordinary** 76:14
78:13,16 82:25
83:6,9 85:13
99:9
**organization**
13:5 25:1
80:11,12
**original** 72:5
**originally** 73:5
**originating**
15:4
**outlined** 59:10
**outside** 78:13
78:16
**outsource**
12:11
**outsourced**
13:5 25:1
**outstanding**
58:21 79:19
106:10
**oversee** 10:6
**owe** 17:9 18:5

**owed** 79:11
106:4 111:2,3
112:10,13
114:21
**owing** 116:15
**own** 6:11 7:8
8:10 13:24
14:11 51:14
**owned** 14:14
**owner** 14:15
**ownership** 14:4
14:8

**p**

**p** 2:1,1 4:1 66:5
**p.m.** 4:7
**pa** 122:23
**pacer** 34:25
**pachulski** 2:3
4:16 73:2
**package** 101:12
**packet** 101:15
**page** 16:8,9,10
33:6 34:21,23
35:1,3,7,8,8
54:5,10 68:6
71:3 78:21
80:1,2,13 81:1
83:13 84:15
85:2,5 93:17
103:19,19,21
103:23 104:1
104:13,14
106:8
**pages** 40:10

**paid** 9:22,25
48:14,25 49:2
59:1,9 67:25
79:18 89:5
92:11 95:13,17
95:24 107:22
108:13 109:9
116:14
**painstaking**
120:21
**palisades** 17:8
17:9,14 53:1
57:20 59:13,13
59:19 61:1,11
62:6 64:2,2,4
87:3,19 109:15
**paper** 114:17
**paragraph**
52:17,20,21
53:16,18,19
54:6,9
**parameters**
4:11 7:7
**part** 14:16
31:25 33:9
37:7,8 38:2
39:3,9 40:13
42:7 43:13
44:14 48:1
49:4 68:25
70:16 71:20
74:21 75:11
90:23 103:22
103:24,24
104:5,5 106:14

participation
  8:5
particular  33:9
  43:1 70:5
  96:15 102:19
particularly
  29:25
parties  5:4 7:10
  7:21 20:12
partner  84:17
  84:18
partners  5:1,8
  113:2,21
partnership
  84:19
party  5:14 7:12
  8:2,4,7 119:5
pasadena  24:21
  39:21 114:9
pass  92:24
past  29:23 30:2
  34:13
patently  116:18
path  29:24
pay  37:20
  38:12 40:4
  74:12 80:23
  81:8,22 84:12
  84:12 87:13,18
  89:10 105:22
  115:17,20,21
  115:25
paycheck
  110:24

paychecks
  37:21
paying  99:25
payment  80:16
  80:20 81:6
  84:16 85:5
  86:4,5,15 88:1
  88:2,11,12
  89:12,13 90:4
  91:3 94:18
  96:13,15,16,22
  103:3 111:19
  113:25 117:1
payments
  32:11 71:21
  78:13,22 80:18
  81:3 82:11,17
  82:22 84:9
  85:24 88:7
  89:14 90:12,14
  92:19 95:6,20
  107:22 112:7
payroll  37:21
  48:12,14 60:7
  80:24
pays  13:8,12
  112:4,5
pc  85:21
pdf  16:9
penalties  48:15
penalty  9:2
pending  4:5
  29:5 52:10
  61:13

pension  75:2
people  19:9
  81:17
percentage
  38:17 40:20
perfect  24:13
performance
  79:12
performed  36:3
  36:22,23
period  15:23
  70:8 82:2
  90:14 108:20
  108:22
periodically
  6:21
perjury  9:2
person  24:9
  88:21 90:21
personal  35:4
  35:16
personally
  10:25 11:4
  21:12 41:6
perspective
  52:7 70:4,8
petition  9:23
  12:6 15:13,23
  15:25,25 23:13
  27:3,4 32:19
  33:7,15 35:19
  36:11,16,20
  45:5 49:18
  56:10 57:2,23
  57:25 58:22

59:24 63:1
  64:2 67:24,25
  76:1,22 77:16
  77:19 78:7
  80:17 81:4
  83:14 86:15,21
  86:22 101:12
  101:15,21
  102:3 106:4,12
  109:20 112:11
  112:14
philadelphia
  122:23
phone  8:12,14
  24:11 36:5
picked  82:16
pii  41:6 74:25
pike  42:4
pivoting  22:14
place  71:6
  104:16
places  57:15
plaintiff  50:25
plan  60:18,20
  60:25 61:1,4
  61:18 69:16
  70:15 75:3,8
  97:5,16,17,22
plans  97:7 99:2
  99:5
play  97:3
please  4:14
  5:12,21 6:2,15
  7:1,17 8:5,10
  8:12,15,17,25

9:5 10:3 19:17
20:1,22 24:1
52:18 58:11
72:4 104:9
108:15 119:1
**plus** 53:20,23
54:1
**pm** 1:16
**point** 20:24
34:3 41:3 51:6
53:9 71:17
79:5,8 92:25
99:17
**policy** 41:5,23
**pomerantz** 2:7
4:16 7:3,3
11:16,20,20
14:2,3 17:13
17:13 18:3
19:8 20:4
22:18,23,23
23:2,6,8,14
25:10,12,17,20
26:16 34:18,20
35:1,10,13
36:9,9 41:8,8
41:25 42:5,18
43:8,10,15
44:4,12 45:7
46:8 47:5
48:23 49:21
50:1,6,21 51:9
53:6 55:7
58:19,22,25
60:4,21,24

61:10,15,20,23
61:25 62:5,10
62:15,18 63:8
63:10 64:7,13
64:16 66:14
67:11,13 68:15
69:15,19 72:16
72:19,23 73:3
73:5,11,18,23
74:1,6,10
77:23,25 79:4
79:7 81:16,20
86:10,14 87:1
87:5,8,11 94:4
94:6,10 97:10
97:12,16 99:8
99:12 100:11
101:2 102:15
104:12,17,20
104:24 106:25
106:25 107:4
109:21 110:7
111:22,24
113:12,17
114:20,22
116:6,18 117:2
117:21,24
118:1,7,21
119:15,23
120:15
**portion** 73:20
**position** 9:10
10:4 42:15
43:3 48:25
49:1 51:2,2,10

55:7 61:17
121:1,1
**positions** 45:4
**positive** 70:22
**possession**
17:12 28:19,23
**post** 15:25 27:3
27:4 67:25
86:15
**potential** 44:10
**potentially**
119:9
**potter** 63:18,20
**ppp** 110:22,24
**practice** 100:10
**prayer** 63:7
**pre** 9:22 12:6
15:13,23,25
35:19 36:15
45:5 47:7 48:8
49:18 56:10
57:2,23,24
62:25 64:2
70:13 76:1,21
77:16 78:7
96:12 103:3
**preceding** 32:9
32:15
**precise** 12:23
15:11 26:8
37:2,4
**precisely** 69:4
**prefer** 12:15
118:4

**prejudice**
118:14 119:4
**premiums** 27:5
**preparations**
74:7
**prepare** 117:6
**prepared** 8:22
26:6 33:1
54:24 76:21
82:19 120:13
**preparing**
98:20,25
**prepay** 102:23
102:24
**prerequisites**
52:5
**present** 3:1
118:18
**preserve** 8:6
**president** 11:12
**press** 20:8
58:12 64:19
**pretty** 32:10
77:19 78:20,21
81:2 85:23
**preview** 55:13
**previous** 53:8
88:3
**principal**
106:10,14,15
107:1
**print** 35:10,13
**printed** 28:19
**prior** 9:23 32:3
36:10 65:10

**priority** 48:1,4
  49:5 68:1
  108:8,11
  109:14
**privacy** 41:5,23
**privately** 14:12
  58:11
**privilege** 30:18
  45:14
**privileged**
  30:21 58:9
**pro** 61:3
**probably** 19:6
  22:1 23:19
  41:18 47:4
  48:21,22 50:13
  75:3 80:14
**problem** 32:22
  37:6 41:16
  65:9 72:1
**procedure**
  118:6 119:7
**procedures**
  59:10 119:6
**proceedings**
  122:4
**process** 100:16
  100:18,20
**produced**
  98:10
**product** 14:22
  15:1 29:25
  70:20
**products** 11:12
  93:11,13

**profession** 62:6
**professional**
  55:15 76:14
  83:1,9 85:13
  99:9
**professionals**
  99:3,5
**profit** 70:25
  75:2
**profitability**
  29:25
**profitable** 69:7
  69:9
**program** 75:22
  110:24
**prohibited** 8:20
**projected**
  69:12,23
**projections**
  69:16,23
**proof** 50:13
**property** 32:8
  32:14 35:4,16
  36:3,8
**propose** 69:20
**proprietary**
  40:16
**prospective**
  89:6
**prospectively**
  92:11
**protected**
  45:13
**protection**
  110:24

**provide** 14:22
  24:3 26:7,7
  55:19 56:23
  57:23,24 63:23
  64:1 65:1,4,6
  66:2,24 67:1
  75:2,8 77:20
  79:9 80:6,8
  105:23 111:16
  115:25 119:20
  120:25
**provided** 39:6
  55:20,24 56:21
  58:8 65:14
  68:10 71:17
  85:10 100:23
  112:6 115:5
  120:2,23
**providence**
  39:13,16 113:2
  113:21
**providers**
  115:4,18
**provides** 22:5
  42:12 86:1
  88:22 94:24,25
  95:8
**providing**
  14:18,18 59:9
**public** 7:19
  30:20
**purpose** 33:14
  51:5
**purposes** 7:25

**pursuant** 59:1
  95:13 118:15
  119:5
**pursue** 30:9
  120:12
**put** 8:13 28:23
  30:8

---

**q**

**qless** 1:6 4:4,21
  5:1 9:8,14 13:4
  13:7,8,8,11,12
  13:18,21 14:11
  14:12,13,14,16
  15:7 16:15
  18:5 19:3
  20:16 24:2
  29:20 30:4
  31:9 32:2,5
  34:9 52:25
  53:21 55:20,21
  55:24 56:8,10
  56:24 57:1
  58:12,14,16
  60:6 64:3 66:2
  66:15 67:1,9
  68:20 69:9
  72:6 79:23
  80:14,20 85:10
  88:2,23 94:18
  94:22,25 95:1
  102:21 110:23
  111:2,15 112:4
  112:10,13,16
  112:18

**qtech** 66:3
**quality** 10:8
**quarter** 109:9
**quarterly**
  107:23
**question** 6:24
  11:3 12:9,10
  15:4 18:4 26:2
  26:23 27:10
  29:2,5 30:14
  30:17 31:8
  36:2,13 38:23
  41:2,21 42:7
  47:18 48:13
  50:21,23 51:19
  53:5 58:10
  62:21 66:23
  67:9 68:8
  69:14,21 70:14
  74:24,25 79:18
  88:9 91:2 93:5
  98:23 101:5
  104:9 105:1
  106:14 108:17
  113:19 115:15
  116:9,11,12
  117:4 118:24
  119:4
**questioning**
  7:24 8:2 99:21
  100:7 120:20
**questions** 7:14
  7:20 8:9,21
  11:8 17:3,6,21
  23:20 25:21

26:14,20 28:18
29:10 33:1,12
33:21 34:10,16
36:1 40:13
45:15 48:5
55:12,13 58:7
64:10 67:22
68:18,22 70:14
75:14,16 80:15
90:11 91:5
97:2,2,5,6,24
99:23 100:1
101:20 108:7
109:15 117:11
117:19 118:4,8
118:9,9,13,18
119:13,18,20
120:5,23
**queue** 24:10
**quick** 7:7 78:15
  97:2
**quickbooks**
  75:22
**quickly** 86:3
**quite** 82:16

**r**

**r** 1:23 2:1 4:1
  5:16,22 6:13
  6:17,18 56:4,6
  122:1
**raised** 52:9
**rata** 61:3
**rate** 23:15 90:2
  91:24 92:2,3,4
  107:10,12,14

**rather** 26:7
  69:19
**reach** 97:23
**reaching** 51:12
**read** 33:17
  104:12
**reading** 109:2
**ready** 34:9,11
  68:22,23 75:12
**real** 35:4,16
**reality** 50:10
**really** 34:15
  68:8,11 71:8
  77:11,11 86:2
  87:12 88:21
  89:24,25
  103:19 119:1
**reason** 50:22
  82:21
**recall** 100:22
  115:14 116:23
**recapitalization**
  51:23 53:2,13
  57:10,11,16,17
  58:5
**recapitalized**
  52:25
**receipts** 37:15
  37:18,18
**receive** 7:13
  61:6
**received** 7:16
  18:22 74:18
  94:21 96:3,3
  98:6,8

**recent** 26:11
  46:11
**recently** 100:17
**recognize**
  102:25
**recollection**
  72:20 78:1
  86:11 100:13
**reconciles**
  42:25
**reconvene**
  119:10,12
**record** 5:13,21
  6:15 8:13 9:6
  16:14 37:11
  120:15 122:4
**recorded** 8:19
**recordings**
  8:19
**records** 43:11
  43:21 44:18
  76:5
**recover** 38:21
  38:25
**refer** 12:12
  40:17 42:11
  49:6 57:15,16
**reference** 34:7
  46:15 97:17
**references**
  21:21
**referred** 53:13
  70:20 71:11
  94:23 100:17

**referring** 16:14
17:21,23 31:2
75:4 101:15,18
102:19 104:4,5
113:9 115:8
**reflect** 42:14
48:23 51:13
67:23
**reflected** 43:11
43:16 44:14
74:1
**reflects** 46:22
**refresh** 72:19
**refund** 74:19
**refunds** 42:10
42:13,16 43:5
**regarding** 7:14
7:16,20
**regardless**
105:5
**reilly** 99:10
**reiss** 16:19,25
31:25 93:21
94:18,19
**relate** 84:4
**related** 53:8
55:21 58:3,4
66:8 67:4
70:20 72:6
79:23 88:25
95:10 100:21
**relates** 38:7
73:9 102:20
**relating** 79:9

**relations** 61:12
**relationship**
13:20 14:5,5
14:20 17:4
**relative** 86:5
**relevant** 59:7
75:15
**relief** 77:9
121:3
**relieve** 77:20
**relieved** 78:1
90:21
**remember**
26:23,23 31:23
91:11 92:6
102:4 106:22
111:8
**remind** 76:10
**remit** 48:12
**remotely** 24:24
**remove** 48:16
**removed** 48:17
**rendered** 89:10
91:6 95:21
**rent** 113:6,20
113:23
**repayment**
110:11
**repeat** 18:19
27:10 38:23
58:6 83:18
**repeating**
113:19
**replaced** 77:15
77:16

**report** 26:19
98:15
**reports** 26:17
26:18 98:25
**represent** 5:14
8:13 58:12,16
65:21 84:9
96:2,11
**representation**
72:6,11
**representative**
4:20 7:8
**representatives**
4:19
**represented**
58:14 79:16
81:15 118:3,13
**representing**
6:15,16,18
55:25 85:10
**represents**
70:11 113:23
**request** 68:10
68:11
**requests** 98:6,7
**required** 8:6
114:15 116:8
119:19 120:21
**requires**
120:18
**rereview** 78:15
**reserve** 121:2
**resolve** 41:24
**resolved**
120:14

**resources** 60:9
**respect** 8:7
57:12 62:13
92:17 93:2
119:8
**respond** 29:1
98:24
**responded** 98:9
111:5
**response** 36:14
41:14 45:19
87:22
**restate** 11:3
**restructuring**
5:1 95:10
**result** 30:3
**retain** 82:25
99:2,5
**retained** 93:23
99:3,6
**retainer** 59:2
74:12,19 89:7
**retention** 99:6
**retread** 100:1
**return** 73:20
**returned** 73:21
**returning**
70:12
**revenue** 2:15
2:20 5:21,23
5:25 27:14,16
69:1,12 71:3
93:3,9 102:7
102:10,14,17
102:25 103:1

108:9
**revenues** 70:17
87:19
**review** 39:8
97:23 120:7,11
**reviewed** 117:9
**richardson**
16:21 17:16
**right** 6:20
11:22 14:9
15:6 17:11
18:25 23:12
28:9 32:24
34:13 36:15
40:8 47:16
50:5 53:14
55:6 57:19
59:12 63:1,7
63:21 66:19
68:14 72:25
74:1 75:10,25
76:9 78:18
79:2 80:4,21
83:8,10 87:6
88:3 95:8,18
97:1,21,22
99:9,24 100:8
102:12 104:7
104:11 108:25
115:6,10,19
117:2,3 118:14
119:4 121:2
**rights** 8:6,8
120:19 121:4

**rimon** 85:21
**rise** 70:6
**robert** 56:4,6
**roglen** 2:12
5:16,16,19
6:23 99:22,23
99:24 100:6,10
100:22 101:1,8
101:11,16,19
102:2,6,13
103:2,7,13,18
103:23 104:1,5
104:7,10,15,19
104:21 105:10
105:13,19,24
106:3,7,15,18
107:2,5,10,16
107:19,21,25
108:3,6,14,16
108:20,23
109:3,7,13,18
110:1,5,10,13
110:16,20
111:6,10,13,14
111:19 112:4
112:10,15,19
113:1,5,9,13,19
113:20 114:2,4
114:7,11,19,21
115:1,10,13,16
115:22 116:3
116:13 117:6
117:11,14
118:8

**roglen's** 23:19
**role** 9:13
**roll** 4:11
**ron** 6:12
117:20
**ronald** 3:6 6:17
**room** 62:1
**roughly** 12:19
15:10 24:12
27:17 42:23
62:2 90:20
**round** 71:12
**rule** 118:15
**rules** 4:11 7:7
93:1 119:6,7
**run** 17:2,21
49:10 81:1
**running** 88:24
**runs** 81:9

**s**

**s** 2:1 4:1 6:6
56:5 66:5
**sajak** 88:22
**salaries** 13:15
**salary** 9:19,20
9:23,25
**sale** 42:1 55:20
55:21 97:7
**sales** 93:11
108:12,19
**sam** 56:5
**satisfaction**
33:22 68:19
80:16

**saul** 71:22 72:7
73:7,13,14
74:12
**save** 27:1
**saw** 21:21
60:18 63:3
**saying** 14:3
66:18 67:14
92:24 108:18
**says** 35:3 41:5
50:24 53:19
57:4 68:9
78:25 103:20
104:13,14
108:23
**schedule** 17:22
21:1 31:17
32:10 33:3
34:15,16 35:4
35:15,16 38:2
42:12 45:21
48:1,21 53:3
57:15 59:15
67:23,23 68:5
68:6,17 77:5
78:20 90:12
96:4 104:25
105:10,11,12
105:14 106:8
106:19 108:4
111:11,17,18
112:16,18,19
112:21 113:6,8
113:15 114:4
115:7,8 116:9

**scheduled**
112:15,21
114:12 115:3
116:4,7,16
**schedules**
21:22 32:15
34:4,8 51:6,13
54:24 55:2,3
67:22 103:14
113:9,14
116:10 117:6,9
119:11 120:1,3
120:9
**scheme** 90:4
**school** 70:12
**scope** 44:9
**scopia** 66:3,4
66:10,15
**scroll** 85:12
**scrolling** 95:16
**se** 26:11
**seal** 77:10
92:20,25
**sealing** 120:2,8
120:16
**seasonality**
70:2
**second** 30:24
39:22 46:14
52:13 54:11
57:20 65:8
68:25 70:7
101:22 103:16
109:9

**section** 8:18
75:4,15 109:13
109:15 110:14
114:7
**secured** 35:19
35:20 45:24
105:14,20,24
106:8
**security** 46:23
**see** 6:22 35:5
35:12,15 38:14
46:16 49:14,15
53:22 54:3,7,7
54:8,12 55:12
57:7,7,21
63:19 65:18
68:25 70:6
76:20 78:16,24
81:17 83:22,22
84:3 87:25
88:1 93:6 95:6
101:23 104:3
109:1 110:19
111:18 114:3
115:11 116:11
116:25
**seek** 82:24
118:15 119:5
119:14 121:3
**seeking** 30:18
45:13
**seem** 19:11
**seen** 59:8
**self** 75:8

**sell** 93:13
**send** 7:11 20:22
20:23 114:17
114:17
**sense** 12:9,10
12:12,13,16,18
13:21,25 41:10
41:12 69:23
**sent** 19:19 38:8
38:9
**sentence** 52:22
**separate** 12:11
62:25 89:2
102:18
**september** 70:6
**series** 17:20
71:12
**serocaro** 51:17
57:12
**serve** 81:12
**service** 10:8
102:21 107:21
115:17,24
**services** 14:17
14:23 21:22
22:6 24:11
55:15,19,21,24
56:22,24 57:23
57:24 58:2,3,7
59:9 63:24
64:1 65:1,4,7
66:2,24 67:1,2
79:1,9,13 80:6
80:8 81:18
85:9 86:1

88:22 89:10
91:6,7,16 95:1
95:12,21
105:21,23
111:16 112:5,6
115:4,5,5,25
116:1
**set** 10:5 24:8
111:4
**several** 51:21
52:3 53:11
55:12 57:15
60:8
**severance**
53:24
**shannon** 4:5
**shared** 39:23
**shareholder**
10:13 23:20
31:2,3 52:23
57:1 58:4 63:1
66:8 72:6,12
72:14 73:10
85:11
**shareholders**
18:12 22:15
23:16 30:5,25
52:3
**sharing** 75:2
**sheet** 101:21
102:3,5,7
103:8 109:19
**sheets** 76:21
**sherbin** 22:10
22:10

**sherwood** 4:23
  5:1,8 98:18,20
  98:23
**shocked** 98:4
**short** 87:3
**shortfall** 87:19
  87:20
**should've** 12:8
**show** 121:2
**showing** 70:25
**sign** 4:3
**signature** 122:6
**signed** 33:15,18
  33:22,24
**significant**
  29:22 30:3
  70:9
**significantly**
  29:24 82:16
  91:16
**silent** 19:22
  20:20 99:16,20
**similar** 23:10
  55:13 69:13
**simplify** 74:11
**sir** 4:23 5:2
  6:14,19 8:24
  9:4,9,19 10:4
  11:7 16:10
  17:4 33:15
  34:2 35:5 39:2
  59:18 66:18
  68:22 72:4
**sit** 25:24 43:4

**site** 114:18
**sitting** 25:23
**size** 61:9
**skip** 26:22
  70:16 77:3
  97:5 108:7
**slow** 70:3
**small** 38:17,18
  38:19 85:24
  110:17 111:1,4
  112:12
**smoother** 87:15
**sofa** 16:4,14
  21:1,22 31:18
  33:3 75:5
  120:3,9
**software** 24:3,4
  24:5,6 40:16
  40:18,21 47:22
  47:23 75:21
  81:9 84:18
  93:11,13
  100:20 102:21
  105:4
**solutions**
  122:20
**somebody** 19:2
  65:24
**sonya** 122:3,8
**sorry** 5:6 6:13
  11:2,19 16:6
  18:19 19:2,21
  22:23 27:9
  28:7 31:1
  34:18,20 36:7

38:22 43:14
  44:6 53:9 54:4
  55:24 56:3,19
  59:14 61:9,16
  72:17,22 76:12
  80:22 82:25
  83:18 86:25
  87:1 88:1
  91:10 94:5,11
  98:16 101:8
  113:9,11
  115:14
**sought** 77:10
**sound** 15:9
  108:25
**sounds** 80:3
**space** 39:18
  113:3 114:9,13
  114:14,15
**spaces** 39:13
**spahr** 2:9 5:17
**speak** 7:11
  18:17 20:12
**speaking** 8:12
  11:19 25:23
  28:21 35:18
  53:12
**specific** 7:20
  25:13 28:18
  35:25 41:3
  46:21 49:11
  63:6 78:19
  102:4 116:9
  117:3

**specifically**
  27:21 36:6
  47:11,21 75:14
  100:24 101:18
  101:19 103:25
  106:23 107:9
  119:8
**specifics** 52:11
  64:17 91:13
**speculate** 101:4
  102:16
**speculating**
  102:16
**spell** 5:13 56:2
**spent** 30:6,6
**stafford** 5:18
**standard**
  100:18,19
**standing** 45:10
**stands** 76:11
**stang** 2:3 4:17
**star** 20:8 55:23
  55:24 56:1,7
  56:11
**start** 4:13 5:15
  9:5 34:12
  40:13 46:2
  74:24
**started** 4:10 7:1
  72:7
**starting** 6:11
**starts** 23:21
  103:23
**state** 2:14 5:13
  6:14 9:6 97:3

108:8,12,19
109:4,10
**stated** 118:20
119:13
**statement**
16:15 34:3,5
68:20 81:15
116:7
**statements**
23:10 25:16
54:24 76:21
82:19
**states** 1:1,11,12
4:9,13 99:21
108:18
**statute** 119:7
**stayed** 58:17
**step** 15:4 32:10
55:15 59:14
**sticking** 37:7
112:19
**story** 84:6
**straight** 34:14
68:5
**strategy** 10:6
**street** 1:13
122:21
**strike** 39:9
**structure** 22:14
111:19
**struggle** 65:23
65:24
**stubbs** 64:23
**students** 70:11

**study** 91:24
**stuff** 97:22
**subchapter**
97:19 119:17
**subject** 51:25
52:2 61:21
**submit** 111:6
**submitted**
35:14 86:20
118:4
**subsidiaries**
99:14
**subsidiary**
13:22,23 14:4
14:7
**substantially**
35:21,23 46:9
47:20
**suggest** 26:16
**suit** 57:1
**suite** 122:22
**sum** 61:2
**summary** 34:13
103:20
**sums** 87:4
**supplemental**
119:10 120:11
**support** 65:15
70:7 80:9,11
80:12
**supporting**
79:23
**supports** 46:4
**sure** 7:3 15:12
26:9,22 27:23

60:24 81:22
83:20 91:2,14
93:6 95:3
101:18 103:16
104:10,15
106:18 107:10
108:16 113:20
**suspect** 26:17
86:12
**swear** 8:20,25
**switch** 72:8
91:23
**sworn** 8:22
**system** 27:19
27:20 28:8
34:25 37:10

**t**

**t** 56:6 122:1,1
**take** 11:18 15:4
32:9 38:12
44:25 50:14
55:15 59:14
69:20 99:4,16
100:3
**taken** 45:4
100:17
**talk** 99:18
**talked** 37:9
**talking** 25:18
58:22 73:6
99:8
**talks** 73:13
**tapling** 16:20
94:22 95:4

**tax** 6:4 42:10
42:13,16 43:5
48:4 108:12,19
109:8
**taxes** 27:4,8,8
27:12 48:12,14
109:3,8
**team** 98:23
117:9,10
**teams** 24:9
**tech** 66:4,10,14
66:16
**technical** 39:22
**technically**
13:24 26:24
**technology**
11:13 24:2
**tell** 16:7 27:21
29:18 38:6
52:2 58:11
74:6 102:13
107:1
**temporary**
21:15 22:2,4
**tends** 92:4
**term** 76:10
87:3 103:9
107:16,17
**terms** 28:15,22
43:21 59:9
74:7 89:12,13
90:3 96:17
107:6,7,8
110:11

**terrific** 35:17
  45:20
**test** 100:17
**testify** 43:20,23
  64:16
**testifying** 7:2
  52:11
**testimony** 8:25
**text** 29:6
**thank** 5:2,19,24
  6:7,19 7:6 8:24
  9:4,9 11:7 15:3
  16:11 17:24
  18:1 20:17
  22:12,20 23:5
  30:10 32:18
  34:2 42:6
  45:16 53:15
  56:14 63:17
  68:16 71:2
  73:4 76:16
  97:14 98:13
  101:11 111:14
  113:13 117:12
  117:13,14
**thanks** 5:11
  17:19 28:17
  29:16 44:23
  59:11 100:6
  107:5
**thing** 26:17
  45:12 109:2
**things** 27:5
  37:24 45:11
  52:25 73:15

81:2 105:22
  119:3
**think** 11:16
  14:6 15:2
  17:14 19:10
  20:11 23:12
  26:14,24 27:1
  29:4 33:13
  39:7 40:10,17
  41:3 43:10,17
  43:20,23 46:1
  47:19 48:21
  50:7,19,25
  51:5,7 55:3
  61:25 62:1,24
  63:5,10 64:16
  68:18 69:13,25
  70:15 71:19
  75:3,14 77:22
  77:25 80:14
  85:17 87:17
  90:13 91:12
  92:24 95:5
  97:4,12,25
  98:13,24 100:8
  100:11 101:2
  101:11 104:17
  105:25 108:23
  110:1,7,8
  112:20 113:2
  114:8,22
  116:15,24
  118:6,7,9
  119:17 120:9

**thinks** 50:15,17
**third** 85:4
  103:19
**thousand** 61:10
  61:19
**three** 21:18
  61:6 69:2,17
  69:22 70:5
  83:13 90:12,14
  92:3 107:17
  119:17 120:20
**time** 4:7 8:14
  11:1,5 36:1
  48:11 65:24
  88:4 92:8,11
  109:23 110:23
  117:15 118:9
  119:25
**timeframe**
  82:17
**times** 24:12
  70:3,5 92:3
**timing** 87:25
**title** 9:6 11:17
**today** 4:12,16
  5:3 6:15 7:2
  12:22,22 25:24
  31:16 37:11
  42:1 43:4
  60:19 86:11
  107:13
**together** 44:25
  67:23 105:4
**told** 23:2

**tom** 56:6
**took** 47:18 73:7
**top** 22:19 34:24
  35:4,6 69:4
  79:22 81:1,5
  90:16 92:6
  94:1 96:7
  100:24 102:5
  103:11 106:5
  108:21 109:11
  109:25 110:12
  111:8 116:24
**total** 38:18
  104:2,2,10
  112:20
**totally** 15:12
  61:17
**towards** 29:24
  82:2,14,15
**track** 42:20
  53:9
**tracking** 12:25
  42:21 71:7
  88:23
**trade** 62:2
**transaction**
  52:24 55:25
  56:8
**transactions**
  44:13,16 52:1
  52:12 83:18,19
**transcript**
  122:4
**transfers** 32:8
  32:12,14,14

41:5 71:22,23
72:3 73:19
78:7,23 79:11
83:14 86:20
**transition**  95:4
**treat**  13:23
14:7
**treated**  60:20
**trending**  70:17
**trial**  4:8
**trick**  55:24
**trouble**  81:20
**true**  96:12
122:4
**trust**  51:17
57:12
**trustee**  1:11,25
4:9 8:19 98:6
108:6 112:21
118:24
**trustee's**  4:13
51:9 99:21
100:7
**truth**  9:1,1,2
**try**  83:4 100:1
**trying**  81:8
119:2
**tunnel**  85:5
**tunnell**  57:22
**turn**  103:13
**turned**  82:8
**turning**  103:18
**two**  9:11,15
14:6,8 29:23
36:3,8,16

60:25 69:9
70:5 78:22,22
80:3,17 82:11
82:22 83:14,20
86:23,24 113:9
115:1
**types**  14:23
**typically**  38:19
38:20,24 39:1
84:20 95:17
109:7

## u

**u.k.**  24:25
**u.s.**  4:6 8:19
24:24 78:23
98:6 110:17
111:1,4
**u230011554...**
46:23
**ucc**  46:15,20,21
46:22 47:1,4,6
47:7,19
**ultimately**
41:18 73:6
**unaware**  16:20
44:16
**under**  9:2
27:16 46:14
60:25 67:7
93:1 102:24
103:3,8 105:14
111:20 113:20
115:6,18
**understand**
14:18 15:2

17:5 33:25
44:7 51:1,10
54:15,18 55:5
55:7 61:17
74:18 78:19
102:10 118:11
119:22,24
121:1,1
**understanding**
44:20,21 46:24
48:9,15,17
50:3 55:17
56:13,20,25
57:13 58:17
63:13,16 64:1
67:7 68:3
70:18,19 79:23
80:19 88:11,14
95:25 96:5
102:13,17
110:23
**understated**
116:16
**understood**
17:24 30:19
92:21,22
**undetermined**
46:5,12 105:15
105:16,18
108:9
**union**  114:8
**united**  1:1,11
1:12 4:9,12
99:21

**unknown**  49:16
**unliquidated**
45:1,5 49:16
49:23 50:8,11
50:15 104:23
105:2,6 108:10
**unmute**  7:13
20:8
**unmuted**  19:18
20:1,21
**unpaid**  27:8,12
113:6,20,24,24
**unquantified**
62:7
**unreimbursed**
62:7
**unrelated**  50:9
**unrepresented**
6:20
**unsealed**  92:18
92:20
**unsecured**  48:2
49:5,6 59:25
60:21,24 61:1
61:3,4,5,9
109:14,16
**unused**  42:10
42:13,16 43:4
43:5
**upcoming**
102:22
**updated**  47:4
55:4
**upfront**  102:22

| | | | |
|---|---|---|---|
| **ups** 120:6 | **veritext** 122:20 | 106:2 111:10 | **wilmington** |
| **usdoj.gov** 7:12 | **vernacular** | 119:2,20 | 1:14 |
| **use** 11:18 14:6 | 83:4 | **wanted** 12:13 | **winter** 70:12 |
| 21:15 24:6,11 | **versus** 15:5 | 37:7 39:12 | **wish** 7:10 8:9 |
| 40:24 51:21 | **vice** 11:12 | 46:2 47:21 | 117:16 119:14 |
| 74:13 114:13 | **vicinity** 15:9 | 49:9 51:21 | **witness** 6:24 |
| **used** 32:5 37:1 | **view** 120:1 | 57:8,21 71:2,5 | 7:2 8:20 44:19 |
| 37:13,15,20 | **virtual** 24:9 | 81:22 99:22 | 117:16 118:5 |
| 84:11 | **voice** 19:13,21 | 110:13 | 120:5 |
| **useful** 25:25 | 20:2 99:18 | **wants** 50:12 | **wolflick** 66:18 |
| **usually** 84:13 | **voicemail** | 63:10 | **woman** 14:14 |
| 89:23 | 18:25 19:4 | **warrant** 68:9 | 19:6 |
| **v** | **voluntarily** | 112:23 115:2 | **wondering** |
| **v** 97:19 119:17 | 78:3,4 | 115:21,22 | 42:15 44:25 |
| **valid** 54:19 | **vote** 31:25 | **warrants** 68:10 | 45:3 49:15,19 |
| **valuation** 36:14 | **voting** 31:24 | **washington** | 59:25 73:16 |
| 36:17 44:16 | **w** | 108:8,13,19 | 86:4 90:15 |
| 46:11 100:8,12 | **wada** 3:5 5:5,7 | 109:4,10 | **word** 65:23,25 |
| 100:18,21,23 | 5:7,10 | **way** 13:6 49:7 | 93:24 |
| **valuations** 39:5 | **wage** 68:1 | 57:9 67:25 | **words** 11:22 |
| **value** 42:13,16 | **wages** 40:24 | 79:10 85:4 | 31:16 37:12 |
| 43:4,25 44:8 | 75:3 | 86:18 115:18 | **work** 12:10 |
| 44:10 46:3 | **wait** 16:9 | **we've** 6:22 20:5 | 13:6,6,7 17:18 |
| 92:19 100:23 | **waived** 61:5 | 25:22 29:25 | 20:14 24:11,23 |
| **valued** 100:10 | **walk** 24:7 | 38:8 95:10 | 39:23 54:2,12 |
| **values** 42:15 | **walking** 74:3 | 119:17,22,24 | 79:12 80:11 |
| **various** 52:23 | **walkley** 18:17 | **web** 81:18 | 92:9 |
| 68:9 115:5 | 18:21,21 19:1 | **webex** 24:10 | **working** 4:2 |
| **vendor** 81:21 | **want** 26:7 28:4 | **week** 98:19 | 73:14,15 |
| 87:15 115:4,24 | 36:1 41:4 | **weekend** 26:24 | **workload** |
| **vendors** 68:1 | 51:25 52:10 | **weeks** 92:9 | 89:21,24,25 |
| 105:22 115:25 | 60:17,22 62:19 | **whatnot** 87:16 | **works** 14:16 |
| 116:3,5,8 | 70:16 77:10 | **wheels** 87:14 | **worries** 22:25 |
| **venue** 72:18 | 81:4 84:22 | **wilks** 65:17,19 | 40:9 |
| | 101:20 103:14 | | |

**[worry - zoom]**

**worry**  87:15
**wrap**  119:2
**write**  54:5
**writing**  118:19
**written**  110:2,5
**wrongdoing**
  52:24

### y

**yar**  15:18
**yeah**  12:15,17
  16:2 17:19
  18:7 19:10
  20:14 22:19
  23:5,8 25:14
  25:19 26:13
  27:11 29:9
  33:2 40:3
  41:16,25 43:15
  44:4,12 45:9
  47:5,17 49:21
  50:21 53:6,12
  54:9 57:9 60:4
  60:14,23 61:14
  61:20,23,25
  63:12 65:9
  67:15,17 73:3
  74:24 76:6
  78:17 81:16
  83:11 84:1
  85:16,20 87:1
  87:7,10 92:22
  93:6,10 97:21
  99:24 104:19
  112:8 114:22
  115:16 116:21

  117:5 118:7,11
**year**  12:2,3,21
  15:5,8,17
  23:16 24:12
  30:2,2 31:11
  32:12 61:6
  69:6,8,22 70:3
  70:17 71:7
  76:25 77:1
  94:1 102:22,24
  107:15,18
**years**  9:11,15
  29:21,24 36:4
  36:8,10,16
  69:3,10,17
**yep**  57:7 66:1
**yerevan**  14:22
  25:3

### z

**zero**  61:11
**ziehl**  2:3 4:17
**zoom**  24:9

DELAWARE RULES OF CIVIL PROCEDURE

Part V. Depositions and Discovery

Title V, Rule 30

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed, the deposition
shall be submitted to the witness for examination
and shall be read to the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within 30 days after the
date when the reporter notifies the witness and
counsel by mail of the availability for examination
by the witness, the officer shall sign it and state
on the record the fact of the waiver or of the
illness or absence of the witness or the fact of
the refusal to sign together with the reason, if
any, given therefor; and the deposition may then be

1     used as fully as though signed, unless on a motion

2     to suppress under Rule 32(d) the Court holds that

3     the reasons given for the refusal to sign require

4     rejection of the deposition in whole or in part.

5

6

7

8

9

10    DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

11    ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

12    THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

13    2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

14    OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

15

16

17

18

19

20

21

22

23

24

25

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.